## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

|  |  |
|---|---|
| IN RE INPHONIC, INC., WIRELESS PHONE REBATE LITIGATION _____ This Document Relates To: ALL CASES _____ | ) ) ) ) ) ) ) ) ) ) ) |

Misc. Action No. 06-0507 (ESH)

MDL Docket No. 1792

## OPPOSITION TO MOTIONS TO DISMISS CONSOLIDATED SECOND
## AMENDED CLASS ACTION COMPLAINT

JOHN R. CLIMACO
CLIMACO, LEFKOWITZ, PECA, WILCOX &
GAROFOLI CO., L.P.A.
888 16th Street, N.W., Suite 800
Washington, DC  20006
Telephone:  (202) 349-9864
E-mail:  JRCLIM@climacolaw.com

STEPHEN A. HART
SEGAL McCAMBRIDGE SINGER &
MAHONEY, LTD.
One IBM Plaza, Suite 200
300 North Wabash Avenue
Chicago, IL  60611
Telephone:  (312) 645-7920
E-mail:  shart@smsm.com

KEVIN P. RODDY
WILENTZ, GOLDMAN & SPITZER, P.A.
90 Woodbridge Center Drive, Suite 900
Woodbridge, NJ  07095-0958
Telephone:  (732) 636-8000
Facsimile:  (732) 726-6686
E-mail:  kroddy@wilentz.com

**Co-Lead Counsel for Plaintiffs**

# TABLE OF CONTENTS

INTRODUCTION ……………………………………………………………………... 1

FACTUAL ALLEGATIONS …………………………………………………………… 2

ARGUMENT …………………………………………………………………………11

A.      Each Element Of Plaintiffs' Civil RICO Claims Against Defendants CPG And
        Hegelson Is Properly Stated …………………………………………………11

        1.      Overview Of RICO And Plaintiffs' Civil RICO Claims …………………….. 11

        2.      The FAC Properly Identifies The RICO Enterprise(s) ……………………… 14

        3.      The FAC Properly Alleges That Defendants CPG And Hegelson
                Conducted The Affairs Of Their Representative RICO Association-
                In-Fact Enterprises …………………………………………………………… 19

        4.      Defendants' Pattern Of Racketeering Activity, Consisting Of
                Numerous Acts Of Mail Fraud And Wire Fraud, Is Alleged With
                Requisite Particularity ……………………………………………………… 23

B.      Each Element Of Plaintiffs' Claims For Unjust Enrichment And Disgorgement
        Of Profits Against Defendants CPG And Hegelson Is Properly Stated …………….. 26

C.      Each Element Of Plaintiffs' Claims For Civil Conspiracy Against Defendants
        CPG And Hegelson Is Properly Stated ………………………………………….. 28

CONCLUSION ……………………………………………………………………… 29

# TABLE OF AUTHORITIES

<u>Cases</u>

*Bates v. Northwestern Human Svcs., Inc.*,
466 F. Supp. 2d 69 (D.D.C. 2006) …………………………………………... 13, 14, 24, 25

*BCCI Holdings (Luxembourg), S.A. v. Khalil*,
56 F. Supp. 2d 14 (D.D.C. 1999) …………………………………………………... 11, 24

*Bell Atl. Corp. v. Twombly*,
--- U.S. ---, 127 S. Ct. 1955 (2007) …………………………………………………………… 1

*Bell ex rel. Albert R. Bell Living Trust v. Rotwein*,
535 F. Supp. 2d 137 (D.D.C. 2008) …………………………………………………... 2

*Bess v. Cate*,
2008 WL 697640 (E.D. Cal. Mar. 14, 2008) ………………………………………… 21-22

*Cauderlier & Assocs., Inc. v. Zambrana*,
527 F. Supp. 142 (D.D.C. 2007) …………………………………………………... 27

*Cedric Kushner Promotions, Ltd. v. King*,
533 U.S. 158 (2001) …………………………………………………………... 14, 19

*Conley v. Gibson*,
355 U.S. 41 (1957) …………………………………………………………….. 1-2

*Dumas v. Major League Baseball Props., Inc.*,
52 F. Supp. 2d 1170 (S.D. Cal. 1999) …………………………………………….. 17, 22

*Elemary v. Philipp Holzmann A.G.*,
533 F. Supp. 2d 116 (D.D.C. 2008) …………………………………………….. 24

*Ellipso, Inc. v. Mann*,
2008 WL 852500 (D.D.C. Apr. 1, 2008) …………………………………………….. 28

*Emcore Corp. v. PricewaterhouseCoopers LLP*,
102 F. Supp. 2d 237 (D.N.J. 2000) …………………………………………………... 15

*First Am. Corp. v. Al-Nahyan*,
17 F. Supp. 2d 10 (D.D.C. 1998) ……………………………………………………… 22

*H.J., Inc. v. Northwestern Bell Tele. Co.*,
492 U.S. 229 (1989) ……………………………………………………………………… 12

*Hargraves v. Capital City Mortg. Corp.*,
140 F. Supp. 2d 7 (D.D.C. 2000) …………………………………………………… 16, 17, 19, 24

*In re Lorazepam & Clorazepate Antitrust Litig.*,
295 F. Supp. 2d 30 (D.D.C. 2003) ………………………………………………….... 27

*Maljack Prods., Inc. v. Motion Picture Ass'n of Am., Inc.*,
52 F.3d 373 (D.C. Cir. 1995) ……………………………………………………………… 2

*MCM Partners, Inc. v. Andrews-Bartlett & Assocs., Inc.*,
62 F.3d 967 (7th Cir. 1995) ……………………………………………………… 21, 22

*New England Data Svcs., Inc. v. Becher*,
829 F.2d 286 (1st Cir. 1987) ………………………………………………………… 25, 26

*Odom v. Microsoft Corp.*,
486 F.3d 541 (9th Cir. 2007) ……………………………………………………………… 17

*Pereira v. United States*,
347 U.S. 1 (1954) …………………………………………………………………………… 23

*In re Pharmaceutical Indus. Avg. Wholesale Price Litig.*,
263 F. Supp. 2d 172 (D. Mass. 2003) ………………………………………………... 17

*Rapaport v. United States Dept. of Treasury, Office of Thrift Supervision*,
59 F.3d 212 (D.C. Cir. 1995) …………………………………………………………... 28

*Regency Comms., Inc. v. Cleartel Comms., Inc.*,
160 F. Supp. 2d 36 (D.D.C. 2001) …………………………………………….. 13, 14, 23, 24

*Regency Comms., Inc. v. Cleartel Comms., Inc.*
304 F. Supp. 2d 1 (D.D.C. 2004) …………………………………………………… 13

*Reves v. Ernst & Young*,
507 U.S. 170 (1993) …………………………………………………………………... 19, 20

*River City Mkts., Inc. v. Fleming Foods West, Inc.*,
960 F.2d 1458 (9th Cir. 1992) ………………………………………………………... 17

*Rotella v. Wood*,
528 U.S. 549 (2000) ……………………………………………………………………… 11

*Salinas v. United States*,
522 U.S. 52 (1997) ……………………………………………………………………… 14, 20

*Schmuck v. United States,*
489 U.S. 705 (1989) ……………………………………………………………… 23

*Second Amendment Found. v. U.S. Conf. of Mayors,*
274 F.3d 521 (D.C. Cir. 2001) ………………………………………………... 29

*Sedima, S.P.R.L. v. Imrex Co.,*
473 U.S. 479 (1985) ……………………………………………………... 11-12, 14

*Sellmon v. Reilly,*
2008 WL 1933759 (D.D.C. May 5, 2008) …………………………………… 1, 11

*Seville Indus. Mach. Corp. v. Southmost Mach. Corp.,*
742 F.2d 786 (3d Cir. 1984) ……………………………………………………… 15

*Standard Ins. Co. v. Burch,*
540 F. Supp. 2d 98 (D.D.C. Mar. 3, 2008) ……………………………………... 27

*State Farm Gen. Ins. Co. v. Stewart,*
288 Ill. App. 3d 678 (1997) …………………………………………………….. 27

*Ulico Cas. Co. v. Professional Indem. Agency, Inc.,*
1999 U.S. Dist. LEXIS 8591 (D.D.C. 1999) …………………………………… 22

*United States v. Cooper,*
91 F. Supp. 2d 60 (D.D.C. 2000) ……………………………………………… 18

*United States v. Elliott,*
571 F.2d 880 (5th Cir. 1978) …………………………………………………… 18

*United States v. Feldman,*
853 F.2d 648 (9th Cir. 1988) …………………………………………………… 19

*United States v. Morrow,*
2005 WL 1389256 (D.D.C. June 13, 2005) …………………………………... 16

*United States v. Oreto,*
37 F.3d 739 (1st Cir. 1994) …………………………………………………... 21

*United States v. Palfrey,*
499 F. Supp. 2d 34 (D.D.C. 2007) …………………………………………... 19

*United States v. Perholtz,*
842 F.2d 343 (D.C. Cir. 1988) ……………………………………………... 15, 18, 19

*United States v. Philip Morris, Inc.,*
116 F. Supp. 2d 131 (D.D.C. 2000) ………………………………….. 12, 14, 18-19, 23, 24

*United States v. Philip Morris, Inc.,*
304 F. Supp. 2d 13 (D.D.C. 2004) ………………………………………………….. 12, 23

*United States v. Philip Morris, Inc.,*
316 F. Supp. 2d 13 (D.D.C. 2004) …………………………………………………... 12

*United States v. Philip Morris, Inc.,*
321 F. Supp. 2d 82 (D.D.C. 2004) ………………………………………………. 12, 19-20

*United States v. Philip Morris, Inc.,*
327 F. Supp. 2d 8 (D.D.C. 2004) …………………………………………………..... 12, 23

*United States v. Philip Morris, Inc.,*
327 F. Supp. 2d 13 (D.D.C. 2004) ……………………………………… 12, 15, 19, 20, 24

*United States v. Philip Morris, Inc.,*
449 F. Supp. 2d 1 (D.D.C. 2006) ……………………………….. 10, 12-13, 15, 20-21, 22, 23-24

*United States v. Private Sanitation Ind. Ass'n,*
793 F.Supp. 1114 (E.D.N.Y. 1992) ……………………………………………….. 18

*United States v. Richardson,*
167 F.3d 621 (D.C. Cir. 1999) …………………………………………………….. 15

*United States v. Turkette,*
452 U.S. 576 (1981) ……………………………………………………………... 14, 15, 19

*United States v. Weiner,*
3 F.3d 17 (1st Cir. 1993) …………………………………………………………... 20-21

*United States v. White,*
116 F.3d 903 (D.C. Cir. 1997) …………………………………………………… 15, 19

*United States ex rel. Williams v. Martin-Baker Aircraft Co.,*
389 F.3d 1251 (D.C. Cir. 2004) …………………………………………………… 24

*VNA Plus, Inc. v. Apria Healthcare Grp., Inc.,*
29 F. Supp. 2d 1253 (D. Kan. 1998) ……………………………………………… 17

*Webster v. Omnitron Int'l,*
79 F.3d 776 (9th Cir. 1996) ……………………………………………………... 19

*Western Assocs. Ltd. P'ship v. Market Sq. Assocs.*,
235 F.3d 629 (D.C. Cir. 2001) …………………………………………………... 11-12, 14

*Williams v. Mohawk Indus., Inc.*,
465 F.3d 1277 (11th Cir. 2006) …………………………………………………. 17

*World Wrestling Entertainment, Inc. v. Jakks Pacific, Inc.*,
530 F. Supp. 2d 486 (S.D.N.Y. 2007) …………………………………………………... 15


Statutes

18 U.S.C. § 1341 …………………………………………………………………… 10, 23

18 U.S.C. § 1343 …………………………………………………………………… 10, 23

18 U.S.C. § 1961(1) …………………………………………………………………… 10, 23

18 U.S.C. § 1961(4) …………………………………………………………………… 14, 16

18 U.S.C. § 1961(5) …………………………………………………………………….. 23

18 U.S.C. § 1962(d) …………………………………………………………………….. 19

18 U.S.C. § 1964(c) …………………………………………………………………….. 13

Racketeer Influenced and Corrupt Organizations Act, 18 U.S.C. § 1961-1968 …………… *passim*


Other Authorities

Pub. L. No. 91-452 § 904(a) ………………………………………………………… 11

Blakey, G. Robert & Kevin P. Roddy, *Reflections on Reves v. Ernst & Young: Its Meaning and Impact on Substantive, Accessory, Aiding and Abetting and Conspiracy Liability Under RICO*,
33 AM. CRIM. L. REV. 1345 (1996) ………………………………………………………... 22

## INTRODUCTION

Plaintiffs, Edwin Davis, Paul Rock, Hongyi Yu, Barbara McGivney, Ryan Sutherland, Walter Cover, Melinda Roquemore, Luis Morales, Shelly Salzman, Jonathan Feldman, Joshua Pevnick, Stanley J. Heller and Iona Workman, by counsel and pursuant to this Court's Minute Order dated May 7, 2008, hereby file their Opposition to the Motions to Dismiss the Third, Sixth and Eighth Causes of Action alleged in Plaintiffs' Consolidated Second Amended Class Action Complaint filed by Defendants, Continental Promotion Group, Inc. ("CPG") and Helgeson Enterprises, Inc. ("Helgeson").[1]

As set forth herein, Plaintiffs' 53-page FAC properly alleges each element of the following federal and state claims against Defendants CPG and Helgeson:

- Violations of Section 1962(c) and (d) of the Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. §§ 1961-1968, *see* FAC, ¶¶ 73-78 (Third Cause of Action);

- Unjust Enrichment and Disgorgement of Profits, *see* FAC, ¶¶ 88-91 (Sixth Cause of Action); and

- Civil Conspiracy, *see* FAC, ¶¶ 95-102 (Sixth Cause of Action).

As this Court recently stated, "[t]o defeat a motion to dismiss for failure to state a claim, [Plaintiffs FAC] must contain " 'a short and plain statement of the claim showing that the pleader is entitled to relief,' in order to 'give the defendant fair notice of what the ... claim is and the grounds upon which it rests.'" *Sellmon v. Reilly,* 2008 WL 1933759, *15 (D.D.C. May 5, 2008) (quoting *Bell Atl. Corp. v. Twombly,* ---U.S. ----, ----, 127 S. Ct. 1955, 1964 (2007), and *Conley v.*

---

[1]  Paragraph references to Plaintiffs' Consolidated Second Amended Class Action Complaint are stated herein as "SAC, ¶ __." Page references to Defendants' motions to dismiss are stated herein as "CPG Motion at __" and "Helgeson Motion at __," respectively.

*Gibson,* 355 U.S. 41, 47 (1957)). "At this stage, all reasonable factual inferences must be construed in [Plaintiffs'] favor, and all allegations in [Plaintiffs' FAC] are presumed true." *Bell ex rel. Albert R. Bell Living Trust v. Rotwein,* 535 F. Supp. 2d 137, 141 (D.D.C. 2008) (Huvelle, J.) (citing *Maljack Prods., Inc., v. Motion Picture Ass'n of Am., Inc.,* 52 F.3d 373, 375 (D.C. Cir. 1995)). With these well-settled standards firmly in hand, we turn to the specific allegations of Plaintiffs' FAC.

## FACTUAL ALLEGATIONS

Plaintiffs are residents of Texas, New Jersey, California, Illinois, Florida and Michigan (FAC, ¶¶ 7-19) who, along with hundreds of thousands of consumers located nationwide, were victimized by a scheme to defraud conceived and carried out by the principals of now-bankrupt District of Columbia-based InPhonic, Inc. ("InPhonic"), and its business partners, rebate claims handlers CPG and Helgeson. FAC, ¶¶ 1, 20-22 (describing scheme to defraud and each of the Defendants' participation therein).[2]  Plaintiffs, like the members of the Classes,[3] relied upon false, misleading and deceptive advertisements disseminated, or caused to be disseminated by

---

[2]    As recited in Plaintiffs' FAC, once the scheme to defraud consumers was exposed by this class action and federal regulating actions, InPhonic filed for federal bankruptcy protection in November 2007; as a result, it is no longer named as a Defendant in this nationwide class action. The FAC asserts federal and state law claims against the so-called "Individual Defendants"; namely, InPhonic's Chairman and Chief Executive Officer (David A. Steinberg), President (Andrew B. Zeinfeld), Chief Operating Officer (Brian J. Curran), Senior Vice President of Financial Reporting and Analysis (George J. Moratis), and President of Wireless Activation and Services Division (Brian T. Westrick). FAC, ¶ 20(a)-(g). As reported to this Court during the Scheduling Conference held on May 7, 2008, Co-Lead Counsel for Plaintiffs are currently endeavoring to serve summonses and the FAC on the Individual Defendants.

[3]    Plaintiffs' FAC identifies two separate Classes of victims of Defendants' scheme or artifice to defraud consumers – a Rebate Term Class and a Rebate Deprivation Class. FAC, ¶ 46. Based upon information provided by InPhonic's former counsel, Plaintiffs have previously advised this Court that over 900,000 consumers nationwide were promised and owed rebates arising out of their purchase of wireless devices from InPhonic.

InPhonic and the Individual Defendants nationwide, claiming to provide consumers with deep price discounts and offering various types of mail-in rebates, including a "Customer Appreciation Rebate," a "Customer Loyalty Rebate," a "RAZR V3 Rebate," a "Mail-in Rebate," a "Customer Mail-in Rebate," a "Bonus Loyalty Rebate," a "Wireless Device Rebate," an "AOL Employee Rebate," a "Voice and Data Rebate" and/or a "Mail-In Voice and Data Rebate," in varying dollar amounts ranging from $50 to $200, or even more, with the purchase of a wireless service plan and a wireless device from InPhonic.  To this end, Plaintiffs and the members of the Classes, using the U.S. mail and/or interstate wire facilities, purchased wireless devices and/or wireless service plans from InPhonic through one of its affiliated Internet websites and submitted to InPhonic, Helgeson and/or CPG, using the U.S. mail and/or interstate wire facilities, written rebate claim forms.  Plaintiffs allege that the Individual Defendants, and Defendants Helgeson and/or CPG had no intention of timely fulfilling the promised rebates to Plaintiffs or the members of the Classes, regardless of whether they fully and completely satisfied the unreasonable and artificially complicated rebate redemption protocol adopted by each of the Defendants.  Rather, the Individual Defendants, acting in concert with CPG and Helgeson, and in order to wrongfully increase the entities' revenue and profits, and to earn greater salaries and bonuses for themselves, delayed redeeming or unjustifiably rejected the rebate claims that were properly submitted by Plaintiffs and the members of the Classes as part of a pattern of related and continuous wrongful acts to frustrate, delay, or deny rebate claims properly submitted, via U.S. mail and/or interstate wire facilities, by hundreds of thousands of consumers located throughout United States.  FAC, ¶ 1.

During the Class Period, InPhonic advertised low after-rebate sales prices to solicit consumers through various Internet websites that it owned and/or operated, through in-store

advertisements at major retailers, and through e-mail and Internet advertisements. For example, customers visiting Inphonic's Wirefly or Cellular Choices websites were informed that a popular new phone, the RAZR V3c, will be "FREE after rebate with a new Verizon Wireless account." For many consumers, this was a far more attractive option than purchasing the identical phone directly from Verizon Wireless for $129.99 or more. Similarly, most customers found Inphonic's offer for a Motorola i836 phone, advertised as "Free after rebate" on Radio Shack's website, to be superior to Nextel's offer to sell the same phone for $149.99 or more. These attractive low prices, however, assume that the customer actually received the promised rebate(s) from InPhonic. Here is an example of an Internet advertisement disseminated by InPhonic during the Class Period:



InPhonic advertised many of its wireless devices as being "Better than Free." Customers were told that by purchasing certain wireless devices through InPhonic, they would be entitled to receive a refund of up to $100. InPhonic's various websites stated to consumers that by buying certain wireless devices, "You make $50.00." Another phone was advertised as being "FREE Plus $60 Cash Back." Once again, all of these tempting offers depended upon the customer actually obtaining the promised rebate(s) from InPhonic. Here is another example of an Internet advertisement disseminated by InPhonic during the Class Period:

| Click to Compare | Carrier Phone | Camera Phone | Weight | Price Today | Price After Rebates | Select |
|---|---|---|---|---|---|---|
| ☐ ubmit Quer | Motorola V276 (Camera Phone) | Yes, VGA-quality (640 x 480 Pixels), Self-timer | 3.77 oz | $0.00 | You make $60.00 | Select > |

Based upon these promised rebates, InPhonic's Wirefly website asked consumers to "[c]ompare for yourself and you'll find nobody beats Wirefly's prices -- on the Internet, in local stores or anywhere else." InPhonic's after-rebate prices allowed it to beat all competitors in online price comparisons. According to InPhonic's own data, 70-80% of consumers research wireless service online.

InPhonic advertised its post-rebate prices heavily on virtually all Internet search engines and other websites. For example, a search on the Google website for RAZR finds the following two InPhonic advertisements:

Free Motorola **Razr** v3
www.cellularchoices.net     after $100 rebate with Cingular.
Verizon **Razr** also available here.

Free Motorola **Razr** V3
Choose black or silver. Bluetooth,
VGA camera. Free Shipping.
www.myrateplan.com

InPhonic's reported growth and revenue derived in significant part from its development of business practices that limited the ability of customers, including Plaintiffs and Class members, to actually obtain the promised rebates. Given the large size of the promised rebates – up to $500 for many families – InPhonic's rebate offer(s) played a primary role in consumers' purchasing decisions. Consumers made purchasing decisions based upon the information presented in InPhonic's internet websites and online advertisements, and consumers made the actual purchase online, using interstate wire facilities. For example, InPhonic's websites allowed customers to provide credit card information and enter into final, binding contracts. At the time the contract was entered into, consumers were given every reason to believe that they would ultimately receive the promised rebate from InPhonic and/or its claims processors – Defendants CPG and Helgeson.

However, InPhonic's rebate offers uniformly failed to disclose that its rebates were subject to numerous material limitations. InPhonic also intentionally hid certain material and binding terms and conditions from customers on "back-pages" of its Internet websites that could only be seen if the customer "clicked-thru." At various times, many of these pages were only viewable in a "minimized" screen format and could not be printed for the customer's file for later review. InPhonic also intentionally used smaller-sized typefaces and fonts when describing certain material and binding terms and conditions to de-emphasize their importance and discourage customers from reading them. Thus, when customers purchased   wireless

devices and service plans from InPhonic, they had no way of knowing that, in fact, the rebate offer that played a central role in their purchasing decision was subject to significant limitations and, therefore, were illusory. These undisclosed limitations made the rebate offers unlawful, unfair and deceptive and are part of a sophisticated scheme to defraud Plaintiffs and the members of the Classes, carried out by the Individual Defendants, CPG and Helgeson, to avoid paying rebates. FAC, ¶¶ 25-28, 31-33.[4]

For a period of at least eight years, the scheme or artifice to defraud Plaintiffs and Class members was carried out by Defendants. From 1999 to February 2003, and from late 2006 or early 2007 to its above-referenced bankruptcy filing (in November 2007), the Individual Defendants carried out the scheme to defraud through InPhonic. From February 2003 to October 2005 and from July 2006 to late 2006 or early 2007, the Individual Defendants, InPhonic and Defendant Helgeson acted in concert to carry out the same scheme to defraud. From July 2005 to July 2006, the Individual Defendants, InPhonic and Defendant CPG acted in concert to carry out the same scheme to defraud. FAC, ¶¶ 21-22, 33.

The rebate forms uniformly stated that rebate checks would be received by customers within 10 to 12 weeks of InPhonic's receipt of the customer's rebate request(s); however, Plaintiffs allege that InPhonic (acting under the direction of the Individual Defendants), and

---

[4]    Paragraphs 34-45 detail eight separate, undisclosed limitations on the rebates offered by InPhonic to Plaintiffs and Class members during the Class Period: *First,* customers requesting a rebate were required to agree to a false statement of facts. *Second,* customers who requested a rebate were required to agree to new and unfair contract terms. *Third,* the promised rebate was deemed "null and void" if InPhonic did not receive payment within 30 days. *Fourth,* InPhonic failed to timely distribute forms and information required for customer service rebates. *Fifth,* InPhonic's customer service was so poor that it materially limited consumers' ability to request rebates. *Sixth,* consumers were not allowed to correct minor errors in their rebate requests. *Seventh,* some portion of consumers did not receive necessary paperwork from their wireless carriers in time to request a rebate. *Eighth,* InPhonic and Defendants CPG and Helgeson did not promptly process rebate requests, if at all. FAC, ¶¶ 34-45.

Defendants Helegeson and CPG neither complied with this deadline nor processed rebate requests promptly, if at all.  This policy of delay or rejection caused  significant harm to Plaintiffs and the members of the Classes and allowed the Individual Defendants, InPhonic, Helgeson and CPG to enjoy undeserved revenue, profits, salaries and bonuses in the form of interest and un-cashed rebate checks.  Plaintiffs allege that the compensation that Helgeson and CPG received from InPhonic, pursuant to the contractual agreements executed by these Defendants, was calculated so that Helgeson and CPG received *more* money if they frustrated, delayed, or denied more claims.  FAC, ¶ 45.

Paragraphs 7-19 of the FAC describe with particularity each of the Plaintiffs' transactions, communications and interactions with InPhonic, CPG and/or Helgeson, including the attempts made by each of the Plaintiffs to claim the rebates they were promised and owed, and identify specifically the uses of the U.S. mail and interstate wire facilities (interstate telephone calls, facsimile and Internet) by which each of the Defendants carried out the scheme or artifice to defraud.  The following sampling of Plaintiffs' allegations (which, for purposes of the instant motions, must be deemed to be true) demonstrate CPG's and Helgeson's willful participation in the alleged scheme or artifice to defraud:

Plaintiff, Barbara McGivney ("McGivney"), is a resident of Illinois.  On January 13, 2005, Plaintiff McGivney purchased a mobile phone and wireless phone services through InPhonic.  As part of her purchase agreement and contract, InPhonic agreed to provide Plaintiff McGivney with two $200.00 "Bonus Loyalty Rebates," in addition to a $25 rebate provided by Nextel, so long as certain terms and conditions were met.  In compliance with the requirements established by InPhonic, on January 18, 2006, Plaintiff McGivney submitted her rebate claim, via U.S. mail, to Defendant Helgeson, addressed to its listed address:  Rebate Processing Center,

Department – BAU, P.O. Box 100507, White Bear Lake, Minnesota 55110.[5] Plaintiff McGivney

sent all the documentation, as required by Nextel, InPhonic and Helgeson, within the specified

time period, and she received the $25 rebate from Nextel; however, despite extensive

communications (via U.S. mail and/or interstate wire facilities) with InPhonic, Plaintiff

McGivney's rebates were never paid.  FAC, ¶ 10.

Plaintiff, Shelly Salzman ("Salzman"), formerly known as Shelly Weiss, is a resident of

Florida.  Using the Wirefly.com website operated by InPhonic's wholly-owned subsidiary, on or

about June 19, 2005 Plaintiff Salzman ordered two Motorola RAZR V3 Camera Phones from

InPhonic for $169.99 per phone.  As part of Plaintiff Salzman's purchase agreement and

contract, which Plaintiff Salzman relied upon, InPhonic agreed to provide a $170.00 "Free

RAZR V3 Rebate Offer" for each phone if certain terms and conditions were met.  Acting in

compliance with each and every requirement of that agreement, Plaintiff Salzman initially sent

her rebate form via U.S. mail to Defendant Helgeson at the above-referenced address in White

Bear Lake, Minnesota.[6]  In December 2005, InPhonic informed Plaintiff Salzman that it had

"lost" her rebate claim in its "system."  InPhonic then instructed Plaintiff Salzman to resubmit

her rebate claim to Defendant CPG, addressed to its business address:  Department 63784,

Customer Appreciation Rebate, P.O. Box 52900, Phoenix, Arizona 85072.  On January 6, 2006,

---

[5]    Paragraph 22 of the FAC alleges that Defendant Helgeson is a Minnesota corporation with its principal place of business located at 4461 White Bear Parkway in White Bear Lake, Minnesota. FAC, ¶ 22.  Ignoring and/or disputing Plaintiff McGivney's specific allegations, Defendant Helgeson contends that it "had no relationship whatsoever with any of the Plaintiffs."  Helgeson Memo. at 2.  Helgeson apparently denies that Plaintiff McGivney submitted her rebate claim, via U.S. mail, to Helgeson's Rebate Processing Center in January 2006, but that factual question can hardly be resolved on a motion to dismiss.

[6]    In its moving papers, Defendant Helgeson ignores these allegations made by Plaintiff Salzman.  *Compare* FAC, ¶ 15 *with* Helgeson Memo. at 2.

Plaintiff Salzman resubmitted her rebate claim form by U.S. mail, as instructed by InPhonic.

Thereafter, Plaintiff Salzman was asked to resubmit her rebate claim form three additional times.

Each time, Plaintiff Salzman complied with the instructions and resubmitted her rebate claim

form.  On January 20, 2006, Plaintiff Salzman received an e-mail message, sent via interstate

wire facilities, from InPhonic's "Consumer Contact Center" that read in relevant part:

> Our records indicate a valid rebate is currently being processed. A check will be
> issued and mailed to you upon completion of processing … Your rebate was
> entered successfully on 01/18/2006. Please allow 10-12 weeks for processing
> from this date.

On February 5, 2006, InPhonic sent another e-mail message, via interstate wire facilities, to

Plaintiff Salzman denying her rebate claim on the erroneous grounds that "[t]he bill(s) sent does

not show and invoice/bill date."  In the e-mail message, InPhonic directed Plaintiff Salzman to

send in "any missing/corrected information … [within] 30 days from this letter date."  Plaintiff

Salzman complied with InPhonic's directive and timely submitted yet another rebate claim form.

Nevertheless, on May 23, 2006, InPhonic informed Plaintiff Salzman that her rebate claim was

"invalid," supposedly because her "submission was not postmarked within the valid time

frame."  FAC, ¶ 15.[7]

---

[7]    The remaining allegations of the FAC detailing Plaintiffs' experiences in dealing and
communicating with InPhonic, CPG and/or Helgeson, *see* FAC, ¶ 8 (Plaintiff Rock); ¶ 9 (Plaintiff
Yu); ¶ 11 (Plaintiff Sutherland); ¶ 12 (Plaintiff Cover); ¶ 13 (Plaintiff Roquemore); ¶ 14 (Plaintiff
Morales); ¶ 16 (Plaintiff Feldman); ¶ 17 (Plaintiff Pevnick); ¶ 18 (Plaintiff Heller); and ¶ 19 (Plaintiff
Workman) are entirely consistent with the allegations made by Plaintiffs McGivney and Salzman,
FAC ¶¶ 10, 15.  As set forth below, ¶¶ 8-19 and 76 of the FAC describe with requisite particularity
the alleged predicate acts of "racketeering activity," 18 U.S.C. § 1961(1), including violations of the
federal mail and wire fraud statutes, 18 U.S.C. §§ 1341, 1343, consisting of Defendants' use of U.S.
mail and/or interstate wire facilities to transmit information to, or receive information from,
Plaintiffs and Class members. *See, e.g., United States v. Philip Morris Inc.,* 449 F. Supp. 2d 1, 878-881,
884-885 (D.D.C. 2006) (Kessler, J.) (explicating mail and wire fraud statutes and elements of RICO
predicate offenses).

As set forth below, Plaintiffs respectfully submit that Defendants' scheme or artifice to defraud, which was carried out over nearly eight years through use of the U.S. mail and interstate wire facilities, and which victimized hundreds of thousands of consumers nationwide who did not receive their promised and contracted-for rebates, fits precisely within RICO's express statutory language, clearly stated purpose and legislative history.  *See, e.g., BCCI Holdings (Luxembourg), S.A. v. Khalil,* 56 F. Supp. 2d 14, 49 (D.D.C. 1999) (Green, J.) ("RICO reaches higher-level criminal organizations that have evolved beyond simple schemes and single criminal acts.")  Under persuasive precedents handed down by the judges within this District and Circuit, many of which are ignored by Defendants CPG and Helgeson in their instant motions, each element of Plaintiffs' civil RICO claims are alleged in accordance with Rule 8(a) of the Federal Rules of Civil Procedure and, to the limited extent it is applicable, Rule 9(b).  In their 53-page FAC, Plaintiffs offer Defendants and this Court far more than "a short and plain statement of the claim" showing that Plaintiffs are entitled to relief, and the FAC does far more than merely give Defendants CPG and Helgeson "fair notice of what the ... claim is and the grounds upon which it rests." *Sellmon,* 2008 WL 1933759, *15 (citations and internal quotations omitted).

## ARGUMENT

A.    **Each Element Of Plaintiffs' Civil RICO Claims Against Defendants CPG And Helgeson Is Properly Stated**

   1.    **Overview Of RICO And Plaintiffs' Civil RICO Claims**

As the Supreme Court has recognized, civil RICO causes of action are aimed at turning private parties "into prosecutors, private attorneys general." *Rotella v. Wood,* 528 U.S. 549, 557 (2000) (internal quotation marks omitted).  As the notes following § 1961 of RICO state, the statute is to be "liberally construed to effectuate its remedial purpose."  Pub. L. No. 91-452, § 904(a), 84 Stat. 947.  As a result, the Court has "interpreted the RICO Act broadly, to include

many 'garden-variety fraud and breach of contract cases' that might best be prosecuted under state law rather than federal law." *Western Assocs. Ltd. P'ship v. Market Sq. Assocs.,* 235 F.3d 629, 636 (D.C. Cir. 2001) (quoting *Sedima, S.P.R.L. v. Imrex Co.,* 473 U.S. 479, 525 (1985) (Powell, J., dissenting)). The Supreme Court and this Circuit recognize that "[i]nstead of being used against mobsters and organized criminals, RICO has become a tool for everyday fraud cases brought against respected and legitimate enterprises." *Western Assocs.,* 235 F.3d at 636 (quoting *Sedima,* 473 U.S. at 499).[8] "In the absence of congressional action to narrow RICO's scope, the Supreme Court has refused to countenance procedural limitations crafted by the courts of appeals, and has refused to limit RICO to organized crime, or to organizations rather than individuals." *Western Assocs.,* 235 F.3d at 636 (citing *H.J., Inc. v. Northwestern Bell Tele. Co.,* 492 U.S. 229, 244 (1989)). *See also United States v. Philip Morris Inc.,* 116 F. Supp. 2d 131, 146 n.23 (D.D.C. 2000) (Kessler, J.) ("Although RICO was originally enacted to 'combat organized crime,' its application has expanded far beyond that arena.") (quoting *H.J., Inc.,* 492 U.S. at 248).[9]

---

[8]    Contrary to Defendants' assertion, *see* Helgeson Memo. at 5-7, Plaintiffs submit that an alleged scheme or artifice to defraud that victimizes nearly one million consumers nationwide over an eight-year period (from 1999 to late 2007, when InPhonic collapsed in bankruptcy) is hardly an "everyday fraud case[]," *Western Assocs.,* 235 F.3d at 646, and, given InPhonic's utter collapse into insolvency and bankruptcy proceedings following the revelation that its business "model" was built on fraud, it is hard to conceive InPhonic as being a "legitimate enterprise[]." *Id.*

[9]    As set forth herein, Judge Kessler's numerous published decisions in *United States v. Philip Morris Inc.,* a civil RICO action brought by the U.S. Government against the tobacco industry, address virtually all of the legal issues raised by Defendants CPG and Helgeson in their motions to dismiss Plaintiffs' FAC, and resolve such issues in a manner that is entirely favorable to Plaintiffs' RICO claims in this class action. *See* 116 F. Supp. 2d 131, 146-147, 152-153 (D.D.C. 2000) (outlining RICO's elements and analyzing "enterprise" and "pattern of racketeering activity" elements); 304 F. Supp. 60, 68-70 (D.D.C. 2004) ("racketeering activity" – mail and wire fraud); 316 F. Supp. 2d 13, 16-18 (D.D.C. 2004) (same – "scheme to defraud" element of mail and wire fraud); 321 F. Supp. 2d 82, 84-86 (D.D.C. 2004) ("conduct" element of § 1962(c) claim); 327 F. Supp. 2d 8, 10-12 (D.D.C. 2004) ("scheme to defraud" and factual issues); 327 F. Supp. 2d 13, 18-21 (D.D.C. 2004) ("person"/"enterprise" distinction, conspiracy to violate RICO, and aiding-and-abetting liability); 449 F. Supp. 2d 1, 851-854, 867-869, 873-875, 875-877, 878-885, 889-892, 892-893, 901-

Ignoring these controlling precedents and the above-referenced allegations of Plaintiffs'

FAC, Defendants Helgeson and CPG contend that this is nothing more than a "garden-variety

commercial dispute" that is unworthy of this Court's jurisdiction and attention.   Helgeson

Memo. at 5.   Ignoring the Supreme Court decisions cited and quoted above, Helgeson goes so

far as to contend that "garden-variety fraud or contract claims" can never "present cognizable

RICO claims."   *Id.*   Of course, whether a "fraud" is "garden-variety" or not rests in the eye of

the beholder (*see* note 8, *supra*), but Plaintiffs submit that a scheme or artifice to defraud that

allegedly deprived hundreds of thousands of people of tens of millions of dollars, invariably

involving thousands of communications via the U.S. mail and interstate wire facilities, is no

"garden-variety" fraud.   Helgeson's assertions, *see id.* at 5-7, simply ignore Judge Lamberth's

published decisions in *Regency Comms., Inc. v. Cleartel Comms., Inc.,* 160 F. Supp. 2d 36 (D.D.C.

2001), *subsequent opinion,* 304 F. Supp. 2d 1 (D.D.C. 2004), in which a commercial dispute

between two contracting entities resulted in a bench trial adjudicating plaintiff's breach of

contract and civil RICO claims and awarding plaintiff treble damages for RICO violations.   160

F. Supp. 2d at 43-46 (analyzing plaintiff's RICO claims); 304 F. Supp. 2d at 9-13 (same).

"Any person injured in his business or property" by a violation of § 1962 of RICO may

bring a civil action against the alleged violators.   18 U.S.C. § 1964(c).   If successful, a civil RICO

plaintiff shall be awarded, *inter alia,* treble the damages caused by the racketeering activity.   *Bates*

*v. Northwestern Human Svcs., Inc.,* 466 F. Supp. 2d 69, 79 (D.D.C. 2006) (Walton, J.).   A violation

---

906 (D.D.C. 2006) (analysis of RICO elements, scheme to defraud, enterprise, "association with" enterprise, "conduct" of enterprise's affairs, "causing" use of U.S. mail and interstate wire facilities, "pattern of racketeering activity," *respondeat superior* liability, conspiracy liability).   CPG and Helgeson ignore virtually all of these persuasive precedents in their respective moving papers, and they certainly make no effort to distinguish Judge Kessler's erudite analyses of RICO's elements and their application to the case at bar.

of § 1962(c) of RICO consists of four elements:  (1) conduct (2) of an enterprise (3) through a pattern (4) of racketeering activity.  *Western Assocs.,* 235 F.3d at 633; *see also Salinas v. United States,* 522 U.S. 52, 62 (1997); *Sedima,* 473 U.S. at 496.  As set forth below, the Third Cause of Action (FAC, ¶¶ 73-78) properly alleges each element of Plaintiffs' civil RICO claims (both substantive and conspiracy) against Defendants CPG and Helgeson

## 2.    The FAC Properly Identifies The RICO Enterprise(s)

RICO "prohibits individuals or entities from engaging in racketeering activity associated with an 'enterprise.'"  *Philip Morris,* 116 F. Supp. 2d at 146 (footnote omitted).  An "enterprise" includes "any individual, partnership, corporation, association, or other legal entity, and any union or group of individuals associated in fact although not a legal entity."  *United States v. Turkette,* 452 U.S. 576, 580 (1981) (quoting 18 U.S.C. § 1961(4)).  "Each category describes a separate type of enterprise to be covered by the statute – those that are recognized as legal entities and those that are not."  *Id.* at 582.[10]

---

[10]    For example, ¶ 75 of the FAC alleges that during the Class Period, InPhonic constituted a RICO "enterprise."  Paragraph 76 of the FAC alleges that the Individual Defendants – InPhonic's principal corporate officers – violated § 1962(c) by conducting the affairs of the InPhonic Enterprise through a pattern of racketeering activity.  The validity of this type of RICO claim – namely, corporate officers conducting the affairs of a corporation/enterprise – was expressly recognized by the Supreme Court in *Cedric Kushner Promotions, Ltd. v. King,* 533 U.S. 158 (2001).  This type of civil RICO claim was adjudicated by Judge Lamberth in *Regency Comms.,* 160 F. Supp. 2d at 45, which held that a corporate President and Chief Financial Officer who participated the in operation and management of corporation/enterprise and who each played a role in the implementation in the scheme to defraud plaintiff could properly be held liable under § 1962(c).  *See also Regency Comms.,* 304 F. Supp. 2d at 9-10 (same).

As the Supreme Court recognized in *Cedric Kushner Promotions,* 533 U.S. at 162, a RICO enterprise may be either a "victim" or a "tool" of the persons who conduct its affairs to achieve criminal objectives.  *See also Bates,* 466 F. Supp. 2d at 78.  In this case, ¶ 75 of the FAC identifies the alternative enterprises (the InPhonic Enterprise, the InPhonic-CPG Enterprise, and the InPhonic-Helgeson Enterprise) as "tools" utilized by the Defendants to conduct their nationwide scheme to defraud Plaintiffs and Class members.

In *Turkette,* the Supreme Court stated that there are three elements necessary to establish (or **prove**) an "enterprise": (1) a common purpose among the participants; (2) organization; and (3) continuity. *See United States v. Richardson,* 167 F.3d 621, 625 (D.C. Cir. 1999); *United States v. Perholtz,* 842 F.2d 343, 362 (D.C. Cir. 1988). As these precedents make clear, however, these are elements that must be **proven** at trial. *See United States v. White,* 116 F.3d 903, 924 (D.C. Cir. 1997); *Philip Morris,* 449 F. Supp. 2d at 867-869 & 327 F. Supp. 2d at 18. At the **pleading** stage, however, consistent with Rule 8(a) of the Federal Rules of Civil Procedure, Plaintiffs' FAC must simply **identify** the members of the association-in-fact enterprise(s). *See Turkette,* 452 U.S. at 583; *Seville Indus. Mach. Corp. v. Southmost Mach. Corp.,* 742 F.2d 786, 790 (3d Cir. 1984) (reversing dismissal of civil RICO claim for purported failure to allege "enterprise" because "the district court confused what must be pleaded with what must be proved"); *Emcore Corp. v. PricewaterhouseCoopers LLP,* 102 F. Supp. 2d 237, 264 (D.N.J. 2000) (although three elements of RICO "enterprise" must "eventually be demonstrated in order that plaintiff prevail at trial," court rejected defendants' attempt to "raise th[e] pleading bar," and refused to engage "defendants' premature arguments of alleged lack of separate enterprise structure").[11]

Contrary to Defendants' contentions, *see* Helgeson Memo. at 10-12 and CPG Memo. at 13-14, the Third Cause of Action properly **identifies** the members of two separate RICO enterprises; specifically, (a) the InPhonic-Helgeson Enterprise (an association-in-fact that existed

---

[11]    In *World Wrestling Entertainment, Inc. v. Jakks Pacific, Inc.*, 530 F. Supp. 2d 486 (S.D.N.Y. 2007), Judge Karas recently emphasized that "a RICO plaintiff normally need only satisfy the general notice pleading requirements." *Id.* at 496 (citation omitted). The exception is that "[a]llegations of mail and wire fraud must … be pled with particularity in accordance with Rule 9(b)." *Id.* at 498 (citation omitted). But even that rule is subject to exceptions: "If, however, the plaintiff claims that the mail or wire fraud was only used in furtherance of a scheme to defraud, then the complaint does not have to be as specific with respect to each allegation of mail or wire fraud, so long as the RICO scheme is sufficiently pled to give notice to the defendants." *Id.* (citation omitted).

from February 2003 to October 2005 and from July 2006 to late 2006/early 2007) and (b) the

InPhonic-CPG Enterprise (an association-in-fact that existed from July 2005 to July 2006).[12]

Paragraph 75 alleges:

> At all times during the Class Period, InPhonic constituted an "enterprise," as that term is defined in Section 1961(4) of RICO. In addition, during one portion of the Class Period (as defined in Paragraph 46 of this Amended Complaint), the association-in-fact of InPhonic and CPG constituted an "enterprise" because they were "corporation[s] ... associated in fact although not a legal entity." 18 U.S.C. § 1961(4). During a different portion of the Class Period, the association-in-fact of InPhonic and Helgeson constituted an "enterprise" because they were and are "corporation[s] ... associated in fact although not a legal entity." 18 U.S.C. § 1961(4). Each of these separate association-in-fact enterprises existed during the respective time period(s) when InPhonic maintained a contractual relationship with CPG and when InPhonic maintained a contractual relationship with Helgeson. Specifically, InPhonic and Helgeson formed an association-in-fact enterprise that existed from February 2003 to October 2005, and from July 2006 to late 2006 or early 2007 when, pursuant to their contractual relationship, Helgeson processed rebate claims for InPhonic. InPhonic and CPG formed a separate association-in-fact enterprise that existed from July 2005 to July 2006 when, pursuant to their contractual relationship, CPG processed rebate claims for InPhonic. During these respective periods of time, the core members of the association-in-fact enterprise (namely, InPhonic and Helgeson **or** InPhonic and CPG) remained the same and the basic decision-making structure of the respective enterprise(s) remained the same. During these respective contractual relationships, InPhonic and Helgeson and InPhonic and CPG functioned in a manner equivalent to a joint venture, and each of them had a common purpose, namely, to increase their respective revenue and profits by frustrating, delaying and, ultimately, denying rebate claims submitted by Plaintiffs and members of the Classes. The structure of each such association-in-fact enterprises will be evidenced by the respective contractual agreements between InPhonic and Helgeson and InPhonic and CPG, as well as their course(s) of dealing during the periods of time that each such association-in-

---

[12]     Under Rule 8(e), Plaintiffs are permitted to identify alternative RICO enterprises. *See Hargraves v. Capital City Mortg. Corp.,* 140 F. Supp. 2d 7, 24 (D.D.C. 2000) (civil RICO claims masy be "premised on two different and contrasting allegations regarding what persons constituted an 'enterprise'"). The fact that the alleged association-in-fact enterprise(s) had different members during different phases of the scheme to defraud Plaintiffs and Class members does not defeat Plaintiffs' claims. *See, e.g., United States v. Morrow,* 2005 WL 1389256, *7 (D.D.C. June 13, 2005) (Kollar-Kotelly, J.) ("lack of a strict hierarchy and the variation, at times, between the individuals involvd in the nine-month-long enterprise" was insufficient to support motion for acquittal of RICO charge).

fact enterprise existed.  Their decision-making structure, whether hierarchical or consensual, will also be evidenced by their respective contractual agreements and course(s) of dealing during those time periods; however, upon information and belief, Plaintiffs allege that InPhonic and Helgeson and InPhonic and CPG engaged in a consensual decision-making structure.  Each member of the respective associations-in-fact (InPhonic and Helgeson and InPhonic and CPG) jointly controlled and participated in the operation of that enterprise and its principal commercial activity; namely, the processing of rebate claim forms submitted by Plaintiffs and the members of the Classes.  Each member's role was critical to effectuating the scheme to defraud that is alleged in this Amended Complaint.  Because they are separate corporate entities that were bound together, during the respective time periods, by contractual agreements, each of these corporate entities – InPhonic, Helgeson and CPG – had an existence separate and apart from the "racketeering activity" (namely, multiple acts of mail fraud and wire fraud) described in Paragraph 76 of this Amended Complaint, and beyond that necessary merely to commit each of the acts charged as predicate racketeering offenses.  The primary function of these contractual relationships (namely, to process rebate claims received from Plaintiffs and the members of the Classes) existed quite separate and apart from the predicate acts of mail fraud and wire fraud that are described below.

FAC, ¶ 75.

Thus, even though it is not required under Rule 8(a), Plaintiffs submit that ¶ 75 of the FAC sufficiently alleges the enterprises' "common purpose," "organization," and "continuity."  *See Hargraves,* 140 F. Supp. 2d at 24-25.[13]

---

[13]    Defendants' assertion that the parties to a commercial contract cannot form a RICO "enterprise" simply ignores well-settled authority.  CPG Memo. at 13-14; Helgeson Memo. at 10-11.  *See, e.g., River City Mkts., Inc. v. Fleming Foods West, Inc.,* 960 F.2d 1458, 1462 (9th Cir. 1992) ("Virtually every business contract can be called an 'association in fact'" enterprise); *Dumas v. Major League Baseball Props., Inc.,* 52 F. Supp. 2d 1170, 1177 (S.D. Cal. 1999) (same; discussing *River City Mkts.*); *VNA Plus, Inc. v. Apria Healthcare Grp., Inc.,* 29 F. Supp. 2d 1253, 1259 (D. Kan. 1998) ("Even a commercial contract can serve as the basis of a RICO enterprise") (citations omitted); *In re Pharmaceutical Indus. Avg. Wholesale Price Litig.,* 263 F. Supp. 2d 172, 182 (D. Mass. 2003) (same).  Defendants' argument also ignores two recent and notable examples:  *Odom v. Microsoft Corp.,* 486 F.3d 541, 544, 548-553 (9th Cir. 2007) (recognizing association-in-fact enterprise formed by computer software manufacturer and retailer), and *Williams v. Mohawk Indus., Inc.,* 465 F.3d 1277, 1283-1286 (11th Cir. 2006) (recognizing association-in-fact enterprise formed by carpet manufacturer and third-party temp agencies/recruiters it hired to secure illegal alien workers).

The sufficiency of Plaintiffs' "enterprise" allegations is underscored by Judge Kessler's decision in *Philip Morris,* wherein the government alleged that the tobacco manufacturers and related entities had formed an association-in-fact which engaged in the requisite "pattern of racketeering activity."   116 F. Supp. 2d at 135.   Rejecting a defendant tobacco company's argument that the government had not adequately alleged the existence of an "enterprise" because the complaint supposedly did not "describ[e] how the enterprise operated, who its leaders were, or how the decision-making process functioned," *id.,* Judge Kessler stated in relevant part:

> The Court concludes that the Complaint properly alleges the existence of an enterprise, and Liggett's involvement therein. "It is clear an enterprise can be established through an informal group of people who come together for the common purpose of obtaining financial gain through criminal activity." *United States v. Cooper,* 91 F.Supp.2d 60, 68 (D.D.C. 2000) (Joyce Green, J.) (citations omitted). The enterprise can be as simple as an "amoeba-like infra-structure that controls a secret criminal network." *United States v. Elliott,* 571 F.2d 880, 898 (5th Cir. 1978).

> Liggett's argument that the Government must spell out the mechanics or logistics of the enterprise is unsupported by the case law. Numerous courts, in this Circuit and others, have established that the kind of allegations contained in the Government's Complaint are easily sufficient to survive a Rule 12(b)(6) motion. For example, in *Perholtz,* the complaint stated: "Defendant ... constituted an enterprise ... to wit, a group of individual, partnerships, and corporations associated in fact to unjustly enrich themselves from the proceeds of government contracts ..." 842 F.2d at 351, n. 12. And in [*United States v.*] *Private Sanitation Ind. Ass'n,* 793 F.Supp. 1114 [E.D.N.Y. 1992], the complaint stated that the enterprise was "a group composed of, but not limited to" 112 defendants "associated-in-fact for the purpose of controlling the waste disposal industry in Long Island." *Id.* at 1126. In both cases, the allegations were deemed sufficient to survive a motion to dismiss. In the instant case, the Complaint alleges that Defendants decided on a joint objective to "preserve and expand the market for cigarettes and to maximize" their profits and "agreed that the strategy they were implementing was a 'long-term one' that required defendants to act in concert with each other on the current health controversy, as well as on issues that would face them in the future." The nature of these allegations is at least as detailed as those made in *Perholtz* and *Private Sanitation,* if not more so. Accordingly, the Government has adequately pleaded the enterprise element.

116 F. Supp. 2d at 152-153 (record references omitted).[14]

Under this standard, the allegations of ¶ 75 of the FAC are more than sufficient to identify the members of the InPhonic-Helgeson Enterprise and the InPhonic-CPG Enterprise, and Plaintiffs' civil RICO claims against these Defendants cannot be dismissed on this ground.

### 3. The FAC Properly Alleges That Defendants CPG And Helgeson Conducted The Affairs Of Their Respective RICO Association-In-Fact Enterprises

Section 1962(c) liability attaches to one who "participate[s] in the operation *or management of the enterprise itself." Reves v. Ernst & Young,* 507 U.S. 170, 185 (1993) (emphasis in original). Under § 1962(d), it is "unlawful for any person to conspire to violate any of the provisions of subsection … (c) of this section." 18 U.S.C. § 1962(d). *See Philip Morris,* 321 F.

---

[14]    Section 1962(c) of RICO requires the existence of two distinct entities: A liable "person" (or "persons") and an "enterprise" that is not simply the same person "referred" to by a different name. *Cedric Kushner,* 533 U.S. at 161. In *Philip Morris,* 116 F. Supp. 2d at 152-153, and 327 F. Supp. 2d at 18, Judge Kessler held that an "association-in-fact" RICO "enterprise" can be a group of corporations, such as InPhonic and CPG and/or InPhonic and Helgeson. Because CPG and Helgeson are each a "separate legal entity," they are necessarily "distinct from" the association-in-fact enterprise. *Philip Morris,* 327 F. Supp. 2d at 18.

Contrary to Defendants' assertions, *see* CPG Memo. at 13-15; Helgeson Memo. at 12-13, even though the "enterprise" remains a "separate element" from the "pattern of racketeering activity," which must be proved at trial, *see Turkette,* 452 U.S. at 583; *United States v. White,* 116 F.3d 903, 924 (D.C. Cir. 1997), "the existence of the enterprise may be inferred from proof of the pattern [of racketeering activity]." *Perholtz,* 842 F.2d at 362; *accord White,* 116 F.3d at 924; *United States v. Palfrey,* 499 F. Supp. 2d 34, 47 (D.D.C. 2007) (Kessler, J.); *Hargraves,* 140 F. Supp. 2d at 25 ("It is not necessary to establish that the enterprise 'does something other than commit predicate acts.'") (quoting *Perholtz,* 842 F.2d at 363).

Because InPhonic, CPG and Helgeson are each corporations, the alleged association-in-fact enterprises necessarily have an existence separate and apart from the pattern of racketeering activity in which they allegedly engaged. *See Webster v. Omnitron Int'l,* 79 F.3d 776, 786 (9th Cir. 1996) ("The participation of a corporation in a racketeering scheme is sufficient, of itself, to give the enterprise a structure separate from the racketeering activity: 'corporate entities have a legal existence separate from their participation in the racketeering, and the very existence of a corporation meets the requirement for a separate structure.'") (quoting *United States v. Feldman,* 853 F.2d 648, 660 (9th Cir.1988)).

Supp. 2d at 84. Paragraphs 76-77 of the FAC allege that (a) between February 2003 and October 2005, and between July 2006 and late 2006/early 2007, Defendant Helgeson conducted or participated in the conduct of the Helgeson-InPhonic Enterprise through a pattern of racketeering activity and/or conspired with the Individual Defendants to do so; **and** (b) between July 2005 and July 2006, Defendant CPG conducted or participated in the conduct of the CPG-InPhonic Enterprise through a pattern of racketeering activity and/or conspired with the Individual Defendants to do so. FAC, ¶¶ 76-77.[15]

Contrary to these Defendants' assertions, *see* Helgeson Memo. at 13-14; CPG Memo. at 15-17, they may satisfy the *Reves* Court's test for § 1962(c) liability "even if [they] did not have significant control over" the affairs of their respective association-in-fact enterprises." *Philip Morris,* 449 F. Supp. 2d at 876. Indeed, as the Supreme Court recognized in *Reves,* 507 U.S. at 179, Plaintiffs need only allege that these Defendants played "**some part** in directing" their respective enterprise's affairs. (Emphasis added.) Even if (as CPG and Helgeson contend) InPhonic's executives (the Individual Defendants) "controlled the operation of the alleged enterprise[s]," Helgeson Memo. at 13, this does not obviate their liability for violations of § 1962(c). As Judge Kessler explains:

---

[15]    In *Salinas,* the Supreme Court held that liability under § 1962(c) is not a prerequisite to finding liability under § 1962(d). 522 U.S. at 66. In that case, the defendant was charged with criminal violations of § 1962(c) and (d) but was convicted on the conspiracy charge alone. In concluding that a RICO conspiracy defendant need not commit a substantive RICO offense under § 1962(c), the Court explained that "it is sufficient that the [defendant] adopt the goal of furthering or facilitating the criminal endeavor." *Id.* at 65. The Court noted that RICO's conspiracy section is to be interpreted in light of the common law of criminal conspiracy. *See id.* Accordingly, one who opts into or participates in a § 1962(d) conspiracy to violate § 1962(c) is liable for the acts of his co-conspirators even if that defendant did not personally agree to commit, or to conspire with respect to, any particular one of those acts. *Id.*; *see also Philip Morris,* 327 F. Supp. 2d at 18. Thus, *Reves*' "operation or management" standard applies only to substantive RICO offenses under § 1962(c) and **not** to a conspiracy to violate RICO under § 1962(d). *Id.* at 19-20.

> Following *Reves*, the federal courts of appeals have made it clear that a defendant
> need not be among the enterprise's "control group" in order to be held liable for
> a substantive RICO violation; rather, a defendant need only intentionally perform
> acts that are related to, and further, its operation or management. As the First
> Circuit explained: "The terms 'conduct' and 'participate' in the conduct of the
> affairs of the enterprise include the intentional and deliberate performance of
> acts, functions, or duties which are related to the operation or management of the
> enterprise." Numerous courts have held that *Reves* is satisfied by evidence that
> lower-rung members of an enterprise implemented decisions directed by those
> higher up the ladder in the enterprise or committed racketeering acts which
> furthered the basic goals of the enterprise at the direction of other members of
> the enterprise.

*Philip Morris,* 449 F. Supp. 2d at 876 (citations omitted) (quoting *United States v. Weiner,* 3 F.3d 17,

24 (1st Cir. 1993) (quoting *Reves*)); *see also United States v. Oreto,* 37 F.3d 739, 751 (1st Cir. 1994) (§

1962(c) applies to "foot soldiers" as well as to "generals").

As a result, even if the so-called "control group" of the InPhonic-CPG Enterprise

and/or the InPhonic-Helgeson Enterprise consisted of the Individual Defendants (InPhonic's

executive officers), these Defendants may be held liable for § 1962(c) violations because, by

processing, delaying, frustrating and/or denying rebate claims, CPG and Helgeson performed

acts, functions, or duties which were related to the operation or management of those

enterprises – even if they were "lower-rung members" of the enterprise who only implemented

decisions made by those "higher up the ladder" in the enterprise. *Philip Morris,* 449 F. Supp. 2d

at 876.

Beyond that misguided argument, however, Defendants CPG and Helgeson ignore the

nature of the enterprise(s) Plaintiffs have alleged, and the fact that these Defendants are alleged

to be **members** of their respective association-in-fact enterprise(s).  CPG and Helgeson are not

"outsiders" because they are "alleged to be part of" the enterprises themselves.  *MCM Partners,*

*Inc. v. Andrews-Bartlett & Assocs., Inc.,* 62 F.3d 967, 979 (7th Cir. 1995).  "[I]f the enterprise is the

association-in-fact between [CPG] and [InPhonic], then by definition [CPG] would certainly play

'some part' in directing its affairs." *Bess v. Cate,* 2008 WL 697640, *3 (E.D. Cal. Mar. 14, 2008).

The FAC alleges that these Defendants were vital to the achievement of the primary goal of the

enterprise(s), and that CPG and Helgeson had the ability to deny, deny, or frustrate rebate

claims submitted by Plaintiffs and Class members.  Plaintiffs expect the evidence to show that

high-level employees of CPG and Helgeson not only participated in the operation or

management of the respective association-in-fact enterprises, but also that each Defendant,

acting through their employees, played a significant role in making and implementing decisions

in furtherance of their respective enterprise's activities and purposes.  *See Philip Morris,* 449 F.

Supp. 2d at 876.  But even if CPG and Helgeson were "reluctant participants" in a scheme

devised by the Individual Defendants, "they still knowingly implemented management's

decisions, thereby enabling" the enterprise(s) to "achieve [their] goals."  *MCM Partners,* 62 F.3d

at 979.  "*Reves* would not bar a recovery against these defendants if the [FAC's] allegations were

ultimately established after a trial."  *Id.* (citations omitted).[16]

---

[16]    Contrary to Defendants' assertions, *see* Helgeson Memo. at 10; CPG Memo. at 16, nothing stated in Judge Hogan's decision in *Ulico Cas. Co. v. Professional Indem. Agency, Inc.,* 1999 U.S. Dist. LEXIS 8591 (D.D.C. 1999), is to the contrary.  In that case, an insurance company (Ulico) asserted civil RICO claims against an insurance underwriter (PIA) arising out of alleged anti-competitive conduct directed at plaintiff's customers.  *Id.* at *2-3, 19-20.  Ulico's complaint did not even identify an "enterprise," *id.* at *21, although Judge Hogan construed the complaint as alleging that Ulico itself was a plaintiff/enterprise.  *Id.* at *22.  (That case did ***not*** involve association-in-fact RICO enterprises like this case.)  Judge Hogan held that Ulico did not allege that PIA "conducted" Ulico's affairs, thus, PIA could not be held liable under § 1962(c).  *Id.* at *22-23.  Thus, *Ulico* is a case involving a defendant (PIA) who is an "outsider" to the RICO "enterprise" (Ulico), rather than an "insider," such as CPG and Helgeson, who are alleged to be members (and, thus, "insiders") of the CPG-InPhonic and Helgeson-InPhonic Enterprises.  *See, e.g., MCM Partners,* 62 F.3d at 978-979 (discussing "insider" and "outsider" cases decided under *Reves*); *Dumas,* 52 F. Supp. 2d at 1179-1181 (same); *see generally* G. Robert Blakey & Kevin P. Roddy, *Reflections on Reves v. Young:  Its Meaning and Impact on Substantive, Accessory, Aiding and Abetting and Conspiracy Liability Under RICO,* 33 AM. CRIM. L. REV. 1345 (1996) (same) (cited in *First Am. Corp. v. Al-Nahyan,* 17 F. Supp. 2d 10, 23 (D.D.C. 1998) (Green, J.)).

Once again, Defendants' challenge to this element of Plaintiffs' civil RICO claims must fail.

### 4. Defendants' Pattern Of Racketeering Activity, Consisting Of Numerous Acts Of Mail Fraud And Wire Fraud, Is Alleged With Requisite Particularity

"Racketeering activity" includes acts prohibited by any one of a number of federal criminal statutes, *see* 18 U.S.C. § 1961(1), including alleged violations of the mail and wire fraud statutes, *see* 18 U.S.C. §§ 1341 & 1343.[17]  A "pattern" is demonstrated by two or more instances of "racketeering activity" ("predicate acts") that occur within ten years of one another.  18 U.S.C. § 1961(5).  In this case, the alleged predicate acts of mail and wire fraud committed and/or aided and abetted by Defendants CPG and Helgeson are alleged with particularity in ¶¶ 7-19 and 76 of the FAC.  Each and every mailing and interstate wire communication between Plaintiffs and Class members, on the one hand, and CPG and/or Helgeson and/or InPhonic, on the other hand, qualifies as a predicate act of mail or wire fraud because it was foreseeable to Defendants that Plaintiffs and Class members would use such instrumentalities in seeking to secure the promised rebates.  *See Philip Morris,* 449 F. Supp. 2d at 878-881 (explicating mail/wire

---

[17]    The mail and wire fraud statutes forbid "any scheme or artifice to defraud, or for obtaining money or property by means of false or fraudulent pretenses, representations, or promises…."  18 U.S.C. §§ 1341 & 1343.  To state RICO claims based upon these predicate acts, Plaintiffs must allege (1) a scheme or artifice to defraud and (2) the use of the mails in furtherance of the scheme.  *Philip Morris,* 304 F. Supp. 2d at 69; *see also Regency Comms.,* 304 F. Supp. 2d at 10.  The Supreme Court had held that one "causes" the U.S. mail (or interstate wire facilities) to be used when "one does an act with knowledge that the use of the mails will follow in the ordinary course of business, or where such use can reasonably be foreseen, even though not actually intended…."  *Pereira v. United States,* 347 U.S. 1, 8-9 (1954); *see also Philip Morris,* 449 F. Supp. 2d at 878-879.  The matter or communication sent via the U.S. mail or interstate wires need not itself contain false or misleading information or evidence fraud; rather, "innocent" mailings – ones that contain no false information – may supply the mailing element.  *Schmuck v. United States,* 489 U.S. 705, 715 (1989); *see also Philip Morris,* 449 F. Supp. 2d at 879-880.

fraud jurisprudence) & 327 F. Supp. 2d at 20-21 (recognizing RICO liability for aiding and abetting commission of predicate acts); *BCCI Holdings,* 56 F. Supp. 2d at 52-53. Because Plaintiffs clearly allege multiple predicate acts, "occurring over a period of years, which are clearly related by purpose and method," a "pattern of racketeering activity" has been sufficiently alleged. *Hargraves,* 140 F. Supp. 2d at 25-26; *see also Regency Comms.,* 160 F. Supp. 2d at 46; *Philip Morris,* 116 F. Supp. 2d at 153.

Contrary to Defendants' contentions, *see* CPG Memo. at 10-12; Helgeson Memo. at 7-10, ¶¶ 7-19 and 76 of the FAC allege the predicate acts with the particularity required by Rule 9(b). The above-referenced allegations provide the "who, what, when, where, and how" with respect to the circumstances of the fraud. *Elemary v. Philipp Holzmann A.G.,* 533 F. Supp. 2d 116, 142 (D.D.C. 2008) (Lamberth, J.). Plaintiffs' FAC provides Defendants CPG and Helgeson "sufficient information to allow for preparation of" a responsive pleading, *United States ex rel. Williams v. Martin-Baker Aircraft Co.,* 389 F.3d 1251, 1256 (D.C. Cir. 2004).

Contrary to Defendants' assertions, ¶¶ 7-19 and 76(a)-(f) of the FAC, which describe each type of mailing and interstate wire transmission employed or caused by Defendants in furtherance of the scheme or artifice to defraud Plaintiffs and Class members, provide specific dates and other facts evidencing numerous such communications. *See, e.g.,* ¶ 8 (rebate claim form submitted by Plaintiff Rock on Oct. 7, 2005, and return form letter mailed by InPhonic); ¶ 10 (rebate claim form submitted by Plaintiff McGivney to Helgeson on Jan. 18, 2006); ¶ 11 (rebate claim form submitted by Plaintiff Sutherland to CPG on Jan. 18, 2006); ¶ 12 (rebate claim form submitted by Plaintiff Cover to CPG); ¶ 15 (detailing rebate claim forms submitted by Plaintiff Salzman and electronic mail communications received by her); ¶ 19 (detailing rebate claim forms submitted by Plaintiff Workman and interstate wire communications she received). These predicate act allegations are far more specific than those deemed insufficient by Judge Walton in *Bates,* 466 F. Supp. 2d at 88-93.

But even if this Court were to somehow find that Plaintiffs' predicate act allegations do not pass muster under Rule 9(b), the solution is discovery, rather than dismissal. As the First Circuit stated in *New England Data Servs., Inc. v. Becher,* 829 F.2d 286 (1st Cir. 1987), a decision cited with favor by Judge Walton in *Bates,* 466 F. Supp. 2d at 93:

> We hold that Rule 9(b) requires specificity in the pleading of RICO mail and wire fraud. This degree of specificity is no more nor less than we have required in general fraud and securities fraud cases. However, in a RICO mail and wire fraud case, in regards to the details of just when and where the mail or wires were used, we hold that dismissal should not be **automatic** once the lower court determines that Rule 9(b) was not satisfied. In an appropriate case, where, for example the specific allegations of the plaintiff make it likely that the defendant used interstate mail or telecommunications facilities, and the specific information as to use is likely in the exclusive control of the defendant, the court should make a **second** determination as to whether the claim as presented warrants the allowance of discovery and if so, thereafter provide an opportunity to amend the defective complaint.

> We advocate this procedure because of the apparent difficulties in specifically pleading mail and wire fraud as predicate acts. In the instant case, it is seemingly impossible for the plaintiff to have known exactly when the various defendants phoned or wrote to each other or exactly what was said. The plaintiff clearly set out a general scheme, which very plausibly was meant to defraud the plaintiff, and also probably involved interstate commerce … In this day and age, it is difficult to perceive how the defendants would have communicated without the use of the mail or interstate wires.

> Although this circuit court declined to consider as a factor whether the facts are peculiarly within the defendant's control in a securities fraud case, we include it as one factor in regards to the particular uses of mail or wire in a mail and wire fraud case which otherwise alleges detailed facts that make it seem likely that interstate mail or telecommunications facilities were used. Where there are multiple defendants, as here, and where the plaintiff was not directly involved in the alleged transaction, the burden on the plaintiff to know exactly when the defendants called each other or corresponded with each other, and the contents thereof, is not realistic. Plaintiff here provided an outline of the general scheme to defraud and established an inference that the mail or wires was used to transact this scheme; requiring plaintiff to plead the time, place and contents of communications between the defendants, without allowing some discovery, in addition to interrogatories, seems unreasonable.

*New England Data Servs.,* 829 F.2d at 290-292 (footnote and citations omitted).

In this case, given the scheme or artifice pled by Plaintiffs, it is extremely unlikely that the Individual Defendants, CPG and Helgeson managed to carry it off, allegedly defrauding almost one million consumers nationwide, without utilizing the U.S. mail and interstate wire facilities.  Because there are multiple defendants, and because the scheme was allegedly carried out over a period of years, the burden on Plaintiffs to "know exactly when [D]efendants called each other or corresponded with each other, and the contents thereof, is not realistic."  *Id.* Plaintiffs have provided the details of the mailings and interstate wire communications to which they were parties.  FAC, ¶¶ 7-19.  Plaintiffs have clearly "set out a general scheme, which very plausibly was meant to defraud" Plaintiffs and Class members, "and also probably involved interstate commerce … In this day and age, it is difficult to perceive how the [D]efendants would have communicated without the use of the mail or interstate wires."  *Id.*

For these reasons, this Court should hold that Plaintiffs have satisfied the requirements of Rule 9(b), and have properly pled a pattern of racketeering activity consisting of mail and wire fraud, and leave to discovery, pretrial proceedings and trial the further collection of evidence showing Defendants' predicate acts.

**B.    Each Element Of Plaintiffs' Claims For Unjust Enrichment And Disgorgement Of Profits Against Defendants CPG And Helgeson Is Properly Stated**

Defendants' sole argument in seeking dismissal of Plaintiffs' unjust enrichment claim is that Plaintiffs have not alleged that they bestowed any form of benefit upon Defendants; rather, Plaintiffs only allege that they paid money to InPhonic.  CPG Memo. at 22 ("The current pleadings are deficient in that there is no allegation that the plaintiffs conferred a benefit upon CPG."); Helgeson Memo. at 15 ("Plaintiffs' unjust enrichment claim fails as a matter of law.  No benefit was conferred on Helgeson by Plaintiffs.").  However, Defendants' analysis of this claim because CPG

and Helgeson fail the well-founded principle that "[a] plaintiff alleging an unjust enrichment may be seeking to recover a benefit which he gave directly to the Defendant, **or one which was transferred to the Defendant by a third party**." *In re Lorazepam & Clorazepate Antitrust Litig.*, 295 F. Supp. 2d 30, 51 (D.D.C. 2003) (emphasis added) (denying defendants' motion to dismiss unjust enrichment claim where plaintiffs claimed that defendants were unjustly enriched through payments made by plaintiffs to their subscribers for defendants' product, which conferred an economic benefit upon defendants in the form of windfall profits.); *see also State Farm Gen. Ins. Co. v. Stewart*, 288 Ill. App. 3d 678, 691, ___ N.E.2d ___, ___ (1997) (recognizing that plaintiff may seek to recover benefit which was transferred to defendant by third party.).

Any adjudication as to whether a plaintiff has properly alleged an unjust enrichment claim is determined by the nature of the dealings between the recipient of the benefit and the party seeking restitution. *Standard Ins. Co. v. Burch*, 540 F. Supp. 2d 98, *16 (D.D.C. Mar. 3, 2008) ("Every unjust enrichment case is factually unique, and whether there has been unjust enrichment must be determined by the nature of the dealings between the recipient of the benefit and the party seeking restitution."); *Cauderlier & Assocs., Inc. v. Zambrana*, 527 F. Supp. 2d 142, 155 (D.D.C. 2007) (unjust enrichment is not contingent upon the niceties of contract; jury must decide whether benefit was conferred upon defendant).

In this nationwide class action, Plaintiffs allege that "InPhonic and Helgeson and InPhonic and CPG functioned in a manner equivalent to a joint venture, and each of them had a common purpose, namely, to increase their respective revenue and profits by frustrating, delaying, and ultimately denying rebate claims submitted by Plaintiffs and members of the Classes." FAC, ¶ 75. The FAC alleges that these Defendants were unjustly enriched at Plaintiffs' expense because, pursuant to their fraudulent actions, "the compensation that Helgeson and CPG received from InPhonic, pursuant to the contractual agreements executed by these Defendants, was calculated so that Helgeson and CPG received more money if they frustrated, delayed or denied more claims."

FAC, ¶ 45.  Further, Plaintiffs alleged injury resulting from these Defendants' wrongful activities "because they have suffered monetary loss(es), measured by the amount of their rebate claims that were frustrated, delayed, or denied."  FAC ¶ 78.

Defendants' reliance on *Rapaport v. United States Dept. of Treasury, Office of Thrift Supervision*, 59 F.3d 212 (D.C. Cir. 1995), is misplaced because that case is distinguishable.  In *Rapaport*, the court dismissed an unjust enrichment claim brought against the shareholder of a bank because, after the shareholder failed to pay an amount allegedly owed under an agreement, the bank failed.  *Id.* at 217. In dismissing the claim, the court recognized that defendant's failure to pay did not amount to the bank "conferring something upon him."  *Id.*  Instead, the failure to pay was merely a breach of a contractual obligation.

As alleged in the FAC, Plaintiffs and the members of the Class conferred a benefit upon Defendants in the form of payment for wireless devices and services, with the expectation that Plaintiffs would receive something of value in return – a rebate.  However, to the direct detriment of Plaintiffs and Class members, Defendants retained the benefits of Plaintiffs' payments while failing to provide the rebates, as bargained for.  At this early stage of the litigation, Plaintiffs have alleged sufficient facts to warrant a claim for unjust enrichment and Defendants' motions to dismiss Plaintiffs' unjust enrichment claim should be denied.

**C.  Each Element Of Plaintiffs' Claims For Civil Conspiracy Against Defendants CPG And Helgeson Is Properly Stated**

As set forth above, the Eighth Cause of Action asserts a claim against the Individual Defendants, CPG and Helgeson for civil conspiracy.  FAC, ¶¶ 95-102.  Under the law of the District of Columbia, Plaintiffs must allege four elements to state a claim for civil conspiracy: (1) an agreement between two or more persons; (2) to participate in an unlawful act; (3) an injury caused by an unlawful overt act performed by one of the parties to the agreement; and (4) the

overt act was done pursuant to and in furtherance of the common scheme. *See Second Amendment Found. v. U.S. Conf. of Mayors,* 274 F.3d 521, 524 (D.C. Cir. 2001).

Each element is properly alleged in the Eighth Cause of Action. Because, as set forth above, Plaintiffs' civil RICO claim surpasses these Defendants' pleading challenges, the civil conspiracy claim must also survive. *See Ellipso, Inc. v. Mann,* 2008 WL 852500, *7 (D.D.C. Apr. 1, 2008) (Lamberth, J.) ("Because Ellipso's underlying fraud claims have survived Mann's motion for summary judgment, the Court will also deny Mann's motion as to th[e] [civil conspiracy] charge.").

## CONCLUSION

For the reasons stated herein, Defendants' motions to dismiss the Third, Sixth and Eighth Causes of Action in Plaintiffs' Consolidated Second Amended Class Action Complaint should be denied, and this case should proceed to discovery, class certification and pretrial proceedings.

Dated: May 21, 2008                    Respectfully Submitted,

                                       CLIMACO, LEFKOWITZ, PECA, WILCOX
                                       & GAROFOLI CO., L.P.A.


                                       By:   /s/ John R. Climaco
                                              JOHN R. CLIMACO

                                       888 16th Street N.W., Suite 800
                                       Washington, D.C. 20006
                                       Telephone: (202) 349-9864
                                       E-mail: jrclim@climacolaw.com

SEGAL, McCAMBRIDGE, SINGER &
MAHONEY, LTD.


By: _____/s/ Steven A. Hart_____
       STEVEN A. HART

One IBM Plaza, Suite 200
300 North Wabash Avenue
Chicago, IL 60611
Telephone: (312) 645-7920
E-mail: shart@smsm.com

WILENTZ, GOLDMAN & SPITZER, P.A.


By: _____/s/ Kevin P. Roddy_____
       KEVIN P. RODDY

90 Woodbridge Center Drive, Suite 900
Woodbridge, NJ 07095-0958
Telephone: (732) 636-8000
Facsimile: (732) 726-6686
E-mail: kroddy@wilentz.com

**Co-Lead Counsel for Plaintiffs**