# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| IN RE INPHONIC, INC., WIRELESS PHONE REBATE LITIGATION | ) ) |
| | ) **Misc. Action No. 06-0507 (ESH)** |
| **This Document Relates to:** | ) **MDL Docket No. 1792** |
| **ALL CASES** | ) |
| | ) |

### MOTION OF DEFENDANTS DAVID STEINBERG, ANDREW B. ZEINFELD, GEORGE Z. MORATIS, AND BRIAN T. WESTRICK TO DISMISS THE CONSOLIDATED SECOND AMENDED CLASS ACTION COMPLAINT

Pursuant to 9 U.S.C. § 3 and Federal Rules of Civil Procedure 9(b) and 12(b)(6), Defendants David Steinberg, Andrew B. Zeinfeld, George Z. Moratis, and Brian T. Westrick hereby move to dismiss all claims asserted against them in the Consolidated Second Amended Class Action Complaint. The grounds for this motion are set forth in the accompanying Memorandum of Points and Authorities. A proposed order as required by Local Civil Rule 7(c) is attached.

        /s/ John A. Freedman

**ARNOLD & PORTER LLP**
Scott B. Schreiber (DC Bar No. 197681)
John A. Freedman (DC Bar No. 453075)
Joshua P. Wilson (DC Bar No. 487829)
555 12th Street, N.W.
Washington, D.C. 20004
(202) 942-5000

*Attorneys for Defendant*
*George Z. Moratis*

_____/s/ Ty Cobb_____
**HOGAN & HARTSON LLP**
Ty Cobb (D.C. Bar # 270736)
555 Thirteenth Street, N.W.
Washington, D.C. 20004
(202) 637-5600

Mark D. Gately (DC Bar # 386446)
111 South Calvert Street, Suite 1600
Baltimore, MD 21202-6191
(410) 659-2742

*Attorneys for Defendant, David A. Steinberg*

_____/s/ James P. Wehner_____
**CAPLIN & DRYSDALE, Chartered**
James P. Wehner (D.C. Bar # 454823)
Nathan D. Finch (D.C. Bar # 438819)
One Thomas Circle, N.W.
Suite 1100
Washington, DC  20005
(202) 862-5000

*Attorneys for Defendant Brian T. Westrick*

_____/s/ David Goewey_____
**VENABLE LLP**
David W. Goewey (D.C. Bar # 414257)
575 7th Street,  N.W.
Washington, D.C. 20004-1601
(202) 344-4853

*Attorneys for Defendant Andrew B. Zeinfeld*

Dated: August 15, 2008

# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

IN RE INPHONIC, INC., WIRELESS )
PHONE REBATE LITIGATION )
                                          )    **Misc. Action No. 06-0507 (ESH)**
**This Document Relates to:** )    **MDL Docket No. 1792**
**ALL CASES** )
                                          )

## MEMORANDUM OF DEFENDANTS DAVID STEINBERG, ANDREW B. ZEINFELD, GEORGE Z. MORATIS, AND BRIAN T. WESTRICK IN SUPPORT OF THEIR MOTION TO DISMISS THE <u>CONSOLIDATED SECOND AMENDED CLASS ACTION COMPLAINT</u>

**ARNOLD & PORTER LLP**
Scott B. Schreiber (DC Bar # 197681)
John A. Freedman (DC Bar # 453075)
Joshua P. Wilson (DC Bar # 487829)
555 12th Street, N.W.
Washington, D.C.  20004
(202) 942-5000

*Attorneys for Defendant*
*George Z. Moratis*


**CAPLIN & DRYSDALE, Chartered**
James P. Wehner (D.C. Bar # 454823)
Nathan D. Finch (D.C. Bar # 438819)
One Thomas Circle, N.W.
Suite 1100
Washington, DC  20005
(202) 862-5000

*Attorneys for Defendant*
*Brian T. Westrick*

**HOGAN & HARTSON LLP**
Ty Cobb (D.C. Bar # 270736)
555 Thirteenth Street, N.W.
Washington, D.C. 20004
(202) 637-5600

Mark D. Gately (DC Bar # 386446)
111 South Calvert Street, Suite 1600
Baltimore, MD 21202-6191
(410) 659-2742

*Attorneys for Defendant*
*David A. Steinberg*


**VENABLE LLP**
David W. Goewey (D.C. Bar # 414257)
575 7th Street,  N.W.
Washington, D.C. 20004-1601
(202) 344-4853

*Attorneys for Defendant*
*Andrew B. Zeinfeld*

Dated:  August 15, 2008

# TABLE OF CONTENTS

TABLE OF AUTHORITIES……………………………………………………………… iii

INTRODUCTION AND SUMMARY OF ARGUMENT ............................................................ 1

ARGUMENT ...................................................................................................................... 2

I.      Plaintiffs' Claims Should be Dismissed in Favor of Arbitration. ........................................ 2

II.     Alternatively, the Complaint Should Be Dismissed for Failure to State a Claim and for Failure to Plead Certain Claims With Particularity ......................................................... 6

        A.      Summary of Plaintiffs' Sparse Factual Allegations Concerning New Defendants ......................................................................................................... 7

                1.      Plaintiffs' Specific Factual Allegations Concerning the New Defendants. ...................................................................................... 7

                2.      Additional Factual Allegations Made Through Group Pleading ...................... 8

        B.      Plaintiffs' Consumer Protection Act Claims (Counts I and II) Should Be Dismissed for Failure to State a Claim ....................................................... 9

                1.      Plaintiffs Fail to State a Claim Under the DC Consumer Protection and Procedures Act ....................................................... 9

                        a.      Messrs. Steinberg, Zeinfeld, Moratis, and Westrick did not have a "consumer-merchant relationship" with Plaintiffs ............................ 10

                        b.      Plaintiffs' CPPA claim does not meet Rule 9(b) pleading standards. ........................................................................ 12

                2.      Plaintiffs' 50-State Consumer Protection Act Claims Also Fail. .................... 14

        C.      Plaintiffs' Claims Arising Under RICO (Count III) Should Be Dismissed.............. 16

                1.      The Allegations of § 1962(c) Violations Do Not Meet Rule 9(b)'s Particularity Requirements .............................................................. 17

                2.      The Complaint's Conclusory Allegations of "Conspiracy" Do Not Sufficiently State a Claim Under § 1962(d). .................................. 20

        D.      The Breach of Contract Claim (Count IV) Must Be Dismissed. .............................. 20

E.    The Common Law Negligent Misrepresentation Claim (Count V) Must Be Dismissed. ..........................................................................................21

F.    The Common Law Unjust Enrichment and Disgorgement of Profits Claim (Count VI) Must Be Dismissed. .......................................................23

G.    The Declaratory and Injunctive Relief Claims (Count VII) Must Be Dismissed. ..........................................................................................24

H.    The Common Law Civil Conspiracy Claim (Count VIII) Must Be Dismissed ........25

I.    Dismissal Should Be With Prejudice. .......................................................26

# <u>TABLE OF AUTHORITIES</u>

## FEDERAL CASES

*Adler v. Vision Lab Telecommunications, Inc.*,
    393 F.Supp. 2d, 35 (D.D.C. 2005)................................................................10

*American Greiner Electronics, Inc. v Establissements Henry-Le Paute, S.A.*,
    174 F.Supp. 918 (D.D.C. 1959)................................................................24

*Antoine v. U.S. Bank Nat'l Ass'n*,
    547 F.Supp. 2d 30 (D.D.C. 2008)................................................................14

*Armstrong v. Accrediting Council for Continuing Educ. & Training, Inc.*,
    832 F.Supp. 419 (D.D.C. 1993)................................................................11

*Bates v. NW Human Servs., Inc.*,
    466 F. Supp. 2d 69 (D.D.C. 2006)................................................................17

*Beck v. Prupis*,
    529 U.S. 494 (2000)................................................................16

*Bradley v. Phillips Petroleum Co.*,
    527 F. Supp. 2d. 625 (S.D. Tex. 2007)................................................................18

*Brooks v. Blue Cross & Blue Shield of Fla., Inc.*,
    116 F.3d 1364 (11th Cir. 1997)................................................................7

*Burlington Ins. Co. v. Okie Dokie, Inc.*,
    329 F.Supp. 2d 45 (D.D.C. 2004)................................................................22

*Burnett v. Amrein*,
    243 Fed. App'x. 393, 394 (10th Cir. 2007)................................................................26

*CD Partners, LLC v. Grizzle*,
    424 F.3d 795 (8th Cir. 2005)................................................................5

*Calvetti v. Antcliff*,
    346 F.Supp. 2d 92 (D.D.C. 2004)................................................................10

*Castano v. American Tobacco Co.*,
    84 F.3d 734 (5th Cir. 1996)................................................................14

*Chin v. Chrysler Corp.*,
   182 F.R.D. 448 (D.N.J. 1998) ................................................................14

*Coleman DuPont Homsey v. Vigilant Ins. Co.*,
   496 F.Supp. 433 (D. Del. 2007) .............................................................15

*Davison v. Becker*,
   256 F. Supp. 2d 377 (D. Md. 2003) .........................................................4

*DSMC Inc v. Convera Corp.*,
   349 F.3d 679 (D.C. Cir. 2003) ................................................................5

*Denney v. BDO Seidman, L.L.P.*,
   412 F.3d 58 (2d Cir. 2005) .....................................................................5

*Dooley v. United Technologies Corp.*,
   No. 91-2499, 1992 U.S. Dist. LEXIS 8653 (D.D.C. June 17, 1992) ...........12

*Edwards v. Marin Park, Inc.*,
   356 F.3d 1058 (9th Cir. 2004) ...............................................................26

*Ellipso Inc. v. Mann*,
   541 F.Supp. 2d 365 (D.D.C. 2008) .........................................................16

*Emeronye v. CACI Int'l, Inc.*,
   141 F. Supp. 2d 82 (D.D.C. 2001) ...........................................................6

*Fitts v. Federal Nat. Mortg. Ass'n*,
   44 F.Supp. 2d 317 (D.D.C. 1999) ...........................................................24

*Furash & Co. v. McClave*,
   130 F.Supp. 2d 48 (D.D.C. 2001) ...........................................................22

*Goren v. New Vision Int'l, Inc.*,
   156 F.3d 721 (7th Cir. 1998) .................................................................18

*Gvozdenovic v. United Air Lines, Inc.*,
   933 F.2d 1100 (2d Cir. 1991) ..................................................................6

*Hall v. Clinton*,
   285 F.3d 74 (D.C. Cir. 2002) .................................................................26

*Invista N. Amer. S.A.R.L. v. Rhodia Polyamide Intermediates S.A.S.*,
   503 F. Supp. 2d 195 (D.D.C. 2007) ..........................................................5

iv

*Jacobsen v. Oliver*,
   201 F.Supp.2d 93 (D.D.C. 2002) ...................................................................3

*Johnson v. Computer Tech. Serv., Inc.*,
   670 F. Supp. 1036 (D.D.C. 1987) ...............................................................17

*Kadar Corp. v. Milbury*,
   549 F.2d 230 (1st Cir. 1977) .......................................................................25

*Kaempe v. Myers*,
   367 F.3d 958 (D.C. Cir. 2004) ....................................................................13

*Katzman v. Victoria's Secret Catalogue*,
   167 F.R.D. 649 (S.D.N.Y. 1996) .................................................................16

*Khan v. Parsons Global Servs., Ltd.*,
   521 F.3d 421 (D.C. Cir. 2008) ......................................................................4

*Khan v. Parsons Global Servs., Ltd.*,
   480 F. Supp. 2d 327 (D.D.C. 2007) ..............................................................5

*Kopff v. Battaglia*,
   425 F. Supp. 2d 76 (D.D.C. 2006) ..............................................................10

*Kowal v. MCI Communications Corp.*,
   16 F.3d 1271 (D.C. Cir. 1994) ........................................................11, 12, 15

*Lippe v. Bairnco Corp.*,
   218 B.R. 294 (S.D.N.Y. 1998) ....................................................................20

*Lubin v. Sybedon Corp.*,
   688 F. Supp. 1425 (S.D. Cal. 1988) ............................................................18

*Marshall County Health Care Auth. v. Shalala*,
   988 F.2d 1221 (D.C. Cir. 1993) ....................................................................3

*Mills v. Polar Molecular Corp.*,
   12 F.3d 1170 (2d Cir. 1993) ..........................................................................7

*Moses H. Cone Mem'l Hosp. v. Mercury Constr. Corp.*,
   460 U.S. 1 (1983) ..........................................................................................4

*Mostowfi v. 12 Telecom Int'l, Inc.,*
No. 06-15597, 2008 WL 624012 (9th Cir. Mar. 4, 2008)..................................17

*Paul v. Judicial Watch, Inc.,*
543 F.Supp.2d 1 (D.D.C. 2008) ..................................23

*Potomac Plaza Terraces, Inc. v. QSC Products, Inc.,*
868 F.Supp. 346 (D.D.C. 1994) ..................................22

*RLI Ins. Co., v. Pohl, Inc. of America,*
468 F.Supp. 2d 91 (D.D.C. 2006) ..................................22

*Rapaport v. United States Dept. of Treasury, Office of Thrift Supervision,*
59 F.3d 212 (D.C. Cir. 1995) ..................................23

*Reves v. Ernst & Young,*
507 U.S. 170 (1993)..................................18, 19

*In re Rezulin Prods. Liab. Litig.,*
392 F. Supp. 2d 597 (S.D.N.Y. 2005)..................................24

*Roby v. Corporation of Lloyd's,*
996 F.2d 1353 (2d Cir. 1993)..................................4

*Rolo v. City Investing Co. Liquidating Trust,*
155 F.3d 644 (3d Cir. 1998)..................................20

*Rose v. Bartle,*
871 F.2d 331 (3d Cir. 1989)..................................20

*S.J. Groves & Sons Co. v. Warren,*
135 F.2d 264 (D.C. Cir. 1943)..................................24

*Sampson v. Murray,*
94 S.Ct. 937 (1974)..................................24

*Saporito v. Combustion Engineering*
843 F.2d 666 (3d Cir. 1988)..................................17

*Schiffels v. Kemper Financial Services, Inc.,*
978 F.2d 344 (7th Cir. 1992) ..................................20

*Schmidt v. Fleet Bank,*
16 F. Supp. 2d 340 (S.D.N.Y. 1998)..................................16

vi

*Silverman v. Weil*,
　　662 F. Supp. 1195 (D.D.C. 1987) ....................................................................12, 26

*Sykes v. Jenny Wren Co.*,
　　78 F.2d 729 (D.C. Cir. 1935) ....................................................................24

*Thompson v. Jiffy Lube Intern., Inc.*,
　　505 F. Supp. 2d 907 (D. Kan. 2007) ....................................................................15

*United States ex rel. Purcell v. MWI Corp.*,
　　520 F. Supp. 2d 158 (D.D.C. 2007) ....................................................................24

*United States ex rel. Williams v. Martin-Baker Aircraft Co.*,
　　389 F.3d 1251 (D.C. Cir. 2004) ....................................................................14

*United States v. Philip Morris USA, Inc.*,
　　327 F. Supp. 2d 13 (D.D.C. 2004) ....................................................................20

*United States v. Viola*,
　　35 F.3d 37 (2d Cir. 1994) ....................................................................20

*University of Maryland v. Peat Marwick*,
　　996 F.2d 1534 (3d Cir. 1993) ....................................................................19

*Vanover v. Hantman*,
　　77 F. Supp. 2d 91 (D.D.C. 1999) ....................................................................3

*Vickers Stock Research Corp. v. Quotron Sys., Inc.*,
　　No. 96 Civ. 2269, 1997 WL 420265 (S.D.N.Y. July 25, 1997) ...............................17

*W. Assocs. Ltd. P'ship v. Mkt. Square Assocs.*,
　　235 F.3d 629 (D.C. Cir. 2001) ....................................................................16

*Walker v. S.W.F.T. SCRL*,
　　491 F. Supp. 2d 781 (N.D. Ill. 2007) ....................................................................15

*Westways World Travel v. AMR Corp.*,
　　182 F. Supp. 2d 952 (C.D. Cal. 2001) ....................................................................20

*Wisconsin Gas Co. v. F.E.R.C.*,
　　758 F.2d 669 (D.C. Cir. 1985) ....................................................................24

*Witherspoon v. Philip Morris Inc.*,
    964 F. Supp. 455 (D.D.C. 1997) ...............................................................................12

## STATE CASES

*Adam A. Weschler & Son, Inc. v. Klank*,
    561 A.2d 1003 (D.C. 1989) ...................................................................................11

*Baird & Warner, Inc. v. Addison Indus. Park, Inc.*,
    387 N.E.2d 831 (Ill. App. Ct. 1979) ....................................................................21

*Blake Constr. Co. v. C.J. Coakley Co.*,
    431 A.2d 569 (D.C. 1981) ....................................................................................21

*Brown v. Colonial Chevrolet Co.*,
    249 A.2d 439 (Del. Super. Ct. 1968) ...................................................................21

*Byrd v. Jackson*,
    902 A.2d 778 (D.C. 2006) ....................................................................................11

*Fort Lincoln Civic Ass'n, Inc. v. Fort Lincoln New Town Corp.*,
    944 A.2d 1055 (D.C. 2008) ..................................................................................23

*Hill v. Medlantic Health Care Group*,
    933 A.2d 314 (D.C. 2007) ..............................................................................25, 26

*Howard v. Riggs Nat'l Bank*,
    432 A.2d 701 (D.C. 1981) ....................................................................................10

*Jack Baker, Inc., v. Office Space Development Corporation*,
    664 A.2d 1236 (D.C. 1995) ..................................................................................20

*Jordan Keys & Jessamy, LLP v. St. Paul Fire and Marine Ins. Co.*,
    870 A.2d 58 (D.C. 2005) ......................................................................................23

*Paul v. Howard Univ.*,
    754 A.2d 297 (D.C. 2000) ....................................................................................25

*Reynolds v. Bement*,
    116 P.3d 1162 (Cal. 2005) ...................................................................................21

*Schiff  v. American Ass'n of Retired Persons*,
    697 A.2d 1193 (D.C. 1997) ..................................................................................23

*Snowder v. District of Columbia*,
    949 A.2d 590 (D.C. 2008) ........................................................................10

*Washkoviak v. Student Loan Marketing Association*,
    849 A.2d 37 (D.C. 2004) ..........................................................................12

## FEDERAL STATUTES

9 U.S.C. § 3..................................................................................................6


## STATE STATUTES

D.C. Code § 28-3901 *et seq* ..................................................................9, 10

## MISCELLANEOUS AUTHORITY

Charles A. Wright & Arthur R. Miller, 5A FEDERAL PRACTICE AND PROCEDURE
    §§ 1297 (3d. ed. 2008) ............................................................................13

Joseph M. McLaughlin, 1 McLaughlin On Class Actions § 5.46 (3d ed. 2006) ...............17

**INTRODUCTION AND SUMMARY OF ARGUMENT**

Plaintiffs' previous Consolidated Class Action Complaint named as defendants a corporation, InPhonic, Inc. ("InPhonic") and two vendors InPhonic hired to process rebates that Plaintiffs claimed InPhonic offered to customers as part of its wireless phone services business. *See* Docket # 19. That complaint alleged that InPhonic breached contracts with its customers by not honoring the rebates and set forth eight causes of action -- characterizing these alleged breaches of contract as federal RICO claims, tort claims, and state consumer protection act violations. *See id.* at ¶¶ 55-102. In November 2007, InPhonic filed for bankruptcy, *see* Docket # 38, which prompted Plaintiffs to withdraw their claims against InPhonic.

Now, in their Consolidated Second Amended Class Action Complaint ("Second Complaint" or "SAC") (Docket # 54), Plaintiffs have substituted InPhonic as a named defendant and replaced the corporation with several new defendants referred to as the "Individual Defendants" -- a term encompassing former InPhonic executives including David Steinberg, Andrew B. Zeinfeld, George Z. Moratis, and Brian T. Westrick (referred to herein as "New Defendants"), as well as up to 100 "John Doe" defendants described as other "officers, directors, employees, agents, distributors and co-conspirators." SAC ¶¶ 20 & 23. The Second Complaint alleges the same eight counts as the prior version. Indeed, apart from a single subparagraph alleging what position each New Defendant held at the company, SAC ¶¶ 20(b)-(f), and some conclusory phrases such as "at the direction of the Individual Defendants" or "with the express approval of the Individual Defendants," the Second Complaint contains no particularized factual allegations about the New Defendants.

For the reasons set forth below, the Court should dismiss each count of the Complaint asserted against Messrs. Steinberg, Zeinfeld, Moratis, and Westrick.  As a preliminary matter, the claims advanced in the Second Complaint are subject to binding and mandatory arbitration before the American Arbitration Association (or similar arbitral bodies) pursuant to the terms of the written contracts entered into by each of the Plaintiffs.  The New Defendants, therefore, seek dismissal of this action in its entirety in favor of arbitration.

Alternatively, the New Defendants seek dismissal of these claims pursuant to Federal Rules of Civil Procedure 12(b)(6) and 9(b).  While the Second Complaint demonstrates Plaintiffs' skill with the "find and replace" feature in their word processing software, this simple substitution does not fix fundamental flaws with Plaintiffs' legal theories.  Moreover, the total lack of specific allegations concerning the conduct of Messrs. Steinberg, Zeinfeld, Moratis, and Westrick and the use of group pleading violates Federal Rule of Civil Procedure 9(b), which applies to Plaintiffs' fraud-based claims.  Furthermore, even accepting as true the facts set forth in the complaint, Plaintiffs allege only a series of contract claims masquerading instead as common law torts, state statutory violations and federal RICO claims.  Because Plaintiffs fail to allege any contractual relationship with Messrs. Steinberg, Zeinfeld, Moratis, and Westrick, these individuals cannot be held liable for any of the contract breaches alleged -- let alone the various tort and fraud claims catalogued in the Complaint.

## ARGUMENT

### I.        Plaintiffs' Claims Should be Dismissed in Favor of Arbitration.

Plaintiffs allege they entered into binding contracts in their online transactions with InPhonic.  Compl. at ¶ 32.  These contracts were in written form and provided in the course of the transactions.  *Id.* at ¶ 33.  Indeed, it is these contracts on which Plaintiffs base their breach of contract claim.  *Id.* at ¶¶ 79-82.  As Plaintiffs acknowledge, the terms of these contracts varied

over time and depending on which carrier the customer chose for the phone service component of their online transaction with InPhonic. *Id.* at ¶¶ 24-34.

Each contract entered into by a Plaintiff, however, would have contained a mandatory arbitration clause associated with the phone service component of their online transaction. For example, around 2005, an InPhonic customer selecting Verizon would have had to agree to the following arbitration clause in order to complete the transaction:

> ANY CONTROVERSY OR CLAIM ARISING OUT OF OR
> RELATING TO THIS AGREEMENT, OR ANY PRIOR
> AGREEMENT FOR WIRELESS SERVICE WITH US OR ANY
> OF OUR AFFILIATES OR PREDECESSORS IN INTEREST,
> OR ANY PRODUCT OR SERVICE PROVIDED UNDER OR IN
> CONNECTION WITH THIS AGREEMENT OR SUCH A PRIOR
> AGREEMENT, OR ANY ADVERTISING FOR SUCH
> PRODUCTS OR SERVICES, WILL BE SETTLED BY ONE OR
> MORE NEUTRAL ARBITRATORS ON AN INDIVIDUAL
> BASIS BEFORE THE AMERICAN ARBITRATION
> ASSOCIATION ("AAA") OR BETTER BUSINESS BUREAU
> ("BBB") AS DESCRIBED BELOW. (IF YOUR LOCAL SMALL
> CLAIMS COURT OFFERS ARBITRATION, YOU MAY ALSO
> USE THAT PROCESS FOR ANY DISPUTE THAT
> QUALIFIES.)

*See* Sample Online Contract Terms at 7 (attached as Exhibit 1).[1] Thus, in any dispute with InPhonic, such a customer would be required to arbitrate claims "arising out of" or "related to" the purchase of "any product or service" provided "in connection with this agreement" before the American Arbitration Association or a similar forum. Each of Plaintiffs' claims in the Second

---

[1] In deciding a motion to dismiss, the court may consider certain extra-record materials, such as matters of public record and previous filings with the court. *Jacobsen v. Oliver*, 201 F.Supp. 2d 93, 110 (D.D.C. 2002) (citing *Marshall County Health Care Auth. v. Shalala*, 988 F.2d 1221, 1222 (D.C. Cir. 1993). Where as here, "a document is referred to in the complaint and is central to plaintiff's claim, such a document attached to the motion papers may be considered without converting the motion to one for summary judgment." *Vanover v. Hantman*, 77 F. Supp. 2d 91, 98 (D.D.C. 1999). Accordingly, in resolving the New Defendants' motion to dismiss it is appropriate for the Court to consider the arbitration provisions of the various sales contracts referred to and relied upon in the Second Amended Complaint.

Complaint is clearly covered under this broad arbitration provision and others like it.[2]  As the

Supreme Court has held, "'questions of arbitrability must be addressed with a healthy regard for

the federal policy favoring arbitration .... whether the problem at hand is the construction of the

contract language itself or an allegation of waiver, delay, or a like defense to arbitrability.'"

*Khan v. Parsons Global Servs., Ltd.*, 521 F.3d 421, 425 (D.C. Cir. 2008) (quoting *Moses H.*

*Cone Mem'l Hosp. v. Mercury Constr. Corp.*, 460 U.S. 1, 24-25 (1983)).

Plaintiffs cannot now avoid these arbitration provisions by suing New Defendants.

Courts have long recognized that one cannot avoid an agreement to arbitrate with a party by

suing that party's employees.  *See, e.g.*, *Roby v. Corp. of Lloyd's,* 996 F.2d 1353, 1360 (2d Cir.

1993) ("If it were otherwise, it would be too easy to circumvent the agreements by naming

individuals as defendants instead of the [entities] themselves"); *Davison v. Becker*, 256 F. Supp.

2d 377, 384 (D. Md. 2003) ("If plaintiffs could sue individual defendants, they could all too

easily avoid the arbitration agreements that they signed with corporate entities.").  Here, where

the Individual Defendants were "cut and pasted" into a complaint formerly directed to their

employer, InPhonic, this rule applies with particular force.

Broader principles governing the right of non-signatories to arbitrate disputes with

signatories lead to the same result.  For example, under the doctrine of equitable estoppel,

> signatories to an arbitration agreement can be compelled to
> arbitrate their claims with a non-signatory where a careful review
> of the relationship among the parties, the contracts they signed and
> the issues that had arisen among them discloses that the issues the

---

[2] Customers who selected a different carrier for the service component of the phone and service package sold by InPhonic agreed to similar, but non-identical arbitration clauses.  By way of example, contract terms for Cingular and Nextel from approximately 2005 are attached as Exhibits 2 and 3 respectively.  Because many of the Plaintiffs do not specify which carrier they selected, the Individual Defendants are not able to determine which arbitration clause applies to which Plaintiff.

> nonsignatory is seeking to resolve in arbitration are intertwined
> with the agreement that the estopped party has signed.

*Denney v. BDO Seidman, L.L.P.*, 412 F.3d 58, 70 (2d Cir. 2005) (internal quotation marks

omitted). *See also CD Partners, LLC v. Grizzle*, 424 F.3d 795, 799 (8th Cir. 2005) ("courts

clearly recognize a non-signatory's ability to force a signatory into arbitration under the

'alternative' estoppel theory when the relationship of the persons, wrongs and issues involved is

a close one"). Here, the claims against the corporation, InPhonic, and the New Defendants are

not merely related or intertwined; they are ***identical***. Thus, the New Defendants may invoke the

arbitration agreements between Plaintiffs and InPhonic.

The invocation of arbitration clauses by non-signatories against signatories on an

equitable estoppel theory has not been addressed by the D.C. Circuit. In *DSMC Inc v. Convera*

*Corp.*, which considered appellate jurisdiction over a stay incident to arbitration, the appellate

court explicitly left open the possibility that equitable estoppel might be permitted, but also made

statements that left the basis for such application unclear. 349 F.3d 679, 683 (D.C. Cir. 2003)

("We need not and do not decide whether such an effort can ever succeed. What we do decide is

that an effort to compel arbitration in such circumstances does not fall within Section 4 of the

FAA"). Consistent with *Convera*'s declaration that equitable estoppel remains possible, some

district court cases since *Convera* have applied the doctrine. For example, in *Khan v. Parsons*

*Global Servs., Ltd.,* 480 F. Supp. 2d 327, 341-342 (D.D.C. 2007), *rev'd on other grounds*, 521

F.3d 421 (D.C. Cir. 2008), Chief Judge Lamberth employed equitable estoppel to send non-

signatories to arbitration.

In other cases, the district court has invoked alternative theories to permit a non-signatory

to enforce arbitration. For example, in *Invista N. Am. S.A.R.L. v. Rhodia Polyamide*

*Intermediates S.A.S.*, 503 F. Supp. 2d 195, 202 (D.D.C. 2007), Chief Judge Lamberth held that a

non-signatory's confirmation that it sought arbitration pursuant to the agreement permitted the court to enforce arbitration because by so doing the non-party had assumed the obligation to arbitrate. *See also Gvozdenovic v. United Air Lines, Inc.*, 933 F.2d 1100, 1105 (2d Cir. 1991) (participation in arbitration demonstrates clear intent to arbitrate the dispute even if the party is not a party to the arbitration agreement).

In the present case, where the claims against the non-signatory New Defendants are identical to the claims brought against the corporate signatory, enforcement of the arbitration clause must be permitted, whether under an estoppel, assumption or other theory. The alternative would permit a plaintiff to avoid arbitration with a corporate defendant with whom it had previously agreed to arbitrate by the simple expedient of suing that corporation's officers, directors, or employees. Dismissal of this action in favor of arbitration is therefore warranted.[3]

## II. Alternatively, the Complaint Should Be Dismissed for Failure to State a Claim and for Failure to Plead Certain Claims With Particularity.

Plaintiffs' Second Complaint does not set forth factual allegations sufficient to state a claim against Messrs. Steinberg, Zeinfeld, Moratis, or Westrick under any of the legal theories it advances. Because Plaintiffs use group pleading rather than identifying specific conduct of any of the New Defendants, each of Plaintiffs' fraud-related claims (Counts I, II, III & V) fails the requirements of Rule 9(b). Furthermore, because Plaintiffs' claims all arise from alleged contracts and Plaintiffs only seek recovery for economic losses, Plaintiffs tort and quasi-contract claims, (Counts V, VI) and claims for equitable relief (Count VII) fail. Because they do not allege any contractual relationship or privity with movants, Plaintiffs' breach of contract claim (Count IV) also fails. Moreover, Plaintiffs fail to allege certain required elements of their

---

[3] Dismissal with prejudice is appropriate under 9 U.S.C. § 3 where, as here, all issues before the Court are subject to arbitration. *See, e.g.*, *Emeronye v. CACI Int'l, Inc.*, 141 F. Supp. 2d 82, 88 (D.D.C. 2001).

consumer protection act, civil conspiracy, federal RICO, and common law claims (Counts I, II, III, IV, V, VI & VIII). Because the operative complaint is Plaintiffs' third attempt to plead the case, all of Plaintiffs' claims should now be dismissed with prejudice.

### A.  Summary of Plaintiffs' Sparse Factual Allegations Concerning New Defendants

Despite its length and hyperbole, the Second Complaint contains few allegations of substance concerning the New Defendants. Because Rule 9(b) requires consideration of the sufficiency of the allegations with respect to each defendant separately,[4] Plaintiffs' allegations as they relate to the New Defendants are set forth in two categories: (1) specific factual allegations regarding each of the New Defendants; and (2) the allegations which Plaintiffs make through group pleading by alleging they were committed by the "Individual Defendants."

### 1.  Plaintiffs' Specific Factual Allegations Concerning the New Defendants.

Each of the New Defendants is identified by name in the Second Complaint exactly *twice* -- in the preamble and in a subparagraph describing the position each defendant purportedly held and the timeframe in which they purportedly served. The only specific factual allegations regarding the movants are that, "during the class period":

- Mr. Steinberg was "InPhonic's founder, served as Chairman of the Board of Directors and Chief Executive Officer. In addition he served as InPhonic's president from August 2002 until March 2004." SAC ¶ 20(b).

- Mr. Zeinfeld "served as President of E-Commerce (since April 2006) and served as InPhonic's President from June 2006 to November 2007." SAC ¶ 20(c).

---

[4] Rule 9(b) requires that plaintiffs "plead fraud with the requisite specificity as to *each* of the Defendants" individually, and bars efforts to "lump" all defendants together. *See Brooks v. Blue Cross & Blue Shield of Fla., Inc.*, 116 F.3d 1364, 1381 (11th Cir. 1997) (*per curiam*) (emphasis added); *Mills v. Polar Molecular Corp.*, 12 F.3d 1170, 1175 (2d Cir. 1993) ("Rule 9(b) is not satisfied where the complaint vaguely attributes the alleged fraudulent statements to 'defendants.'").

- Mr. Moratis "served as Senior Vice President of Financial Reporting and Analysis (since October 2005) and Chief Accounting Officer (since May 2007)." SAC ¶ 20(e).

- Mr. Westrick "served as President of InPhonic's Wireless Activation and Services Division (since July 2002) and held other executive level positions since joining InPhonic in June 2000." *Id.* ¶ 20(f).

There are no factual allegations in the Second Complaint concerning any conduct that any of the movants are supposed to have engaged in personally. Nor do Plaintiffs allege that any of the New Defendants were parties to the contractual relationships which are the source of the claims, nor have they alleged that they purchased any wireless devices or services from the New Defendants personally.

### 2.    Additional Factual Allegations Made Through Group Pleading

Plaintiffs, for themselves and on behalf of a putative class, each allege that they purchased from InPhonic a wireless cell phone device and/or wireless cell phone service. *See* SAC ¶¶ 1, 7-19. Almost all of the allegations in the Second Complaint concern Plaintiffs' alleged contractual relationship with InPhonic. As a term of these contracts, Plaintiffs allege that they were promised certain rebates. *Id.* Plaintiffs further allege that InPhonic failed to honor the rebates. *Id.* Plaintiffs also allege they suffered certain economic loss as a result. *See, e.g.,* SAC ¶¶ 7-19 (alleging that InPhonic has not paid promised rebates in certain amounts), ¶¶ 82 & 86 (describing damages as "economic loss"), ¶ 91 (seeking restitution of rebate amounts). Plaintiffs quantify the maximum amount of their economic loss, alleging that the cost of losing a rebate ranged "up to $500." SAC ¶ 31. Plaintiffs allege that they were induced to enter into these contracts with InPhonic by a series of purportedly "misleading" InPhonic advertisements. *See* SAC ¶¶ 25-45. In particular, Plaintiffs allege that "InPhonic advertised low after rebate sales prices," *id.* ¶ 25, but "InPhonic's rebate offers uniformly failed to disclose that its rebates were subject to numerous material limitations." *Id.* ¶ 33.

Plaintiffs make a series of non-factual, conclusory allegations that unspecified "Individual Defendants" "caused," "designed" or "approved" the "misleading and deceptive advertising" "to be disseminated" to Plaintiffs. SAC ¶¶ 1, 20(g), 25 & 33. Plaintiffs allege that "the Individual Defendants . . . had no intention of timely fulfilling the promised rebates to Plaintiffs," *id.* ¶ 1, and that the Individual Defendants ("and/or" InPhonic's rebate processing contractors Hegelson and CPG) "adopted" an "artificially complicated rebate redemption protocol." *Id.* ¶ 1, 20(g). The Second Complaint also includes a catch-all allegation concerning the "Individual Defendants'" supposed participation in the activities of InPhonic described in the Complaint:

> [T]he Individual Defendants, by virtue of their high-ranking corporate positions, actually operated InPhonic's day-to-day business and, consequently, purposefully devised, were involved in and/or knew about the scheme or artifice to defraud Plaintiffs and Class members described in Paragraphs 1 and 24-45 of this Amended Complaint.

*Id.* at ¶ 20(g). There are no specific factual allegations explaining which Defendant did what and when or why.

### B. Plaintiffs' Consumer Protection Act Claims (Counts I and II) Should Be Dismissed for Failure to State a Claim

#### 1. Plaintiffs Fail to State a Claim Under the DC Consumer Protection and Procedures Act

In Count I, Plaintiffs assert a claim under the District of Columbia's Consumer Protection Procedures Act, D.C. Code § 28-3901 *et seq*. (2001) (the "CPPA"). Because Plaintiffs do not and cannot allege any "consumer-merchant relationship" with Messrs. Steinberg, Zeinfeld, Moratis, and Westrick, Plaintiffs do not state a valid CPPA claim. Further, Plaintiffs fail the requirements of Rule 9(b) to allege with particularity where, when or how each of the New Defendants participated in the actions Plaintiffs allege constitute consumer fraud.

### a. Messrs. Steinberg, Zeinfeld, Moratis, and Westrick did not have a "consumer-merchant relationship" with Plaintiffs

The CPPA was "designed to police trade practices arising *only* out of consumer-merchant relationships." *Howard v. Riggs Nat'l Bank*, 432 A.2d 701, 709 (D.C. 1981) (emphasis added). *Accord Adler v. Vision Lab. Telecomms., Inc.*, 393 F. Supp. 2d 35, 39 (D.D.C. 2005); *Calvetti v. Antcliff*, 346 F. Supp. 2d 92, 103-04 (D.D.C. 2004). The D.C. Court of Appeals has made clear that a statutory right of action under the CPPA applies only against "merchants" who "supply the goods and services which are or would be the subject matter of a trade practice." *Howard*, 432 A.2d at 709, n.9 (quoting D.C. Code § 28-3901(a)(3)); *accord Snowder v. Dist. of Columbia*, 949 A.2d 590, 599 (D.C. 2008). Though persons apart from the actual seller of the goods and services complained of may be considered "merchants" under the Act, a CPPA plaintiff may only make claims against "a person connected with the supply side of a consumer transaction." *Snowder*, 949 A.2d at 599 (quoting *Howard*, 432 A.2d at 709).

Here, Plaintiffs allege CPPA violations arising out of contractual transactions with *InPhonic* -- not any of the New Defendants. Indeed, while Plaintiffs expressly allege that "InPhonic constituted a 'merchant' as that term is defined in Section 28-3901(a)(3) of the CPPA," they do not allege that Messrs. Steinberg, Zeinfeld, Moratis, and Westrick are "merchants." Nor do Plaintiffs allege that the New Defendants were individually involved in the "supply side" of the alleged transactions between Plaintiffs and InPhonic. For this reason alone, Plaintiffs' CPPA claim should be dismissed. *See, e.g., Kopff v. Battaglia*, 425 F. Supp. 2d 76, 93 (D.D.C. 2006) (granting defendant's motion to dismiss claims under CPPA for failure to show a consumer-merchant relationship).

Although Plaintiffs do allege, in an entirely conclusory manner, that the "Individual Defendants" "caused InPhonic" to engage in practices that purportedly violate the CPPA, *see*

SAC ¶ 61, these allegations are not sufficient to state a claim because there is no "aider-and-abettor liability" under the CPPA. *See Armstrong v. Accrediting Council for Continuing Educ. & Training, Inc.*, 832 F. Supp. 419, 426 (D.D.C. 1993), *vacated on other grounds*, 84 F.3d 1452 (D.C. Cir. 1996). No District of Columbia court has allowed a CPPA claim against a corporate officer simply by virtue of his high position in a large corporation that is deemed to have violated the CPPA. Rather, District of Columbia courts have deemed an individual a CPPA "merchant" only where there is proof that that individual was closely and personally involved in a deceptive transaction. *See, e.g.*, *Adam A. Weschler & Son, Inc. v. Klank*, 561 A.2d 1003, 1004 (D.C. 1989) (auctioneer was a merchant because he was "an actor clearly connected with the supply side of the transaction"); *Byrd v. Jackson*, 902 A.2d 778, 781 (D.C. 2006) (individual was merchant due to actively presenting himself to consumer as a foreclosure specialist). There are no such allegations here.

Although this Court must construe factual allegations liberally in deciding a motion to dismiss, it must not accept "legal conclusions cast in the form of factual allegations." *Kowal v. MCI Commc's Corp.*, 16 F.3d 1271, 1276 (D.C. Cir. 1994). Because Plaintiffs have failed to allege facts demonstrating that the New Defendants were "merchants," because there is no aiding-and-abetting liability under the CPPA, and because the claim is based upon conclusory allegations this Court should dismiss it with prejudice.

### b.   Plaintiffs' CPPA claim does not meet Rule 9(b) pleading standards.

Even were Messrs. Steinberg, Zeinfeld, Moratis, or Westrick considered "merchants" or to have "caused" InPhonic to act as a "merchant," the Complaint fails to plead with particularity the unlawful trade practices relating to fraudulent misrepresentation as required under Fed. R. Civ. P. 9(b). *See Witherspoon v. Philip Morris Inc.*, 964 F. Supp. 455, 463-64 (D.D.C. 1997) ("[A]llegations supporting the [statutory] claim 'must be pleaded with particularity because they are akin to allegations of fraud.'") (citation omitted)); *Washkoviak v. Student Loan Mktg. Ass'n*, 849 A.2d 37, 39 (D.C. 2004). The D.C. Circuit has held that a party pleading fraud "must state the time, place and content of the false misrepresentations, the fact misrepresented and what was retained or given up as a consequence of the fraud." *Kowal*, 16 F.3d at 1278. Plaintiffs' CPPA claim against the movants here falls far short of meeting this standard.

Nowhere in the Second Complaint do plaintiffs specifically set forth any of Messrs. Steinberg, Zeinfeld, Moratis, or Westrick's individual roles, involvement, or connection with the company's allegedly fraudulent acts. Nor do plaintiffs plead the time, place, or content of any alleged misrepresentation made by Messrs. Steinberg, Zeinfeld, Moratis, or Westrick. Rather, plaintiffs make conclusory group pleading allegations. This is not permissible under Rule 9(b). *Silverman v. Weil*, 662 F. Supp. 1195, 1201 (D.D.C. 1987) (dismissing with prejudice pursuant to Rule 9(b) fraud claims where Plaintiffs failed to identify the individual defendants' specific roles in the fraudulent activities); *Dooley v. United Techs. Corp.*, No. 91-2499, 1992 U.S. Dist. LEXIS 8653 at *7 (D.D.C. June 17, 1992) (dismissing RICO fraud claim against defendant where, among other deficiencies, Plaintiffs mentioned the defendant individually only 12 times in a 503 paragraph complaint).

Furthermore, Plaintiffs' conclusory assertion that the "Individual Defendants" "caused InPhonic" to participate in the alleged rebate scheme is undermined by factual admissions and omissions elsewhere in the Complaint.  Factual allegations that are contradicted by facts admitted elsewhere in the pleadings cannot form the basis for a valid claim for relief.  *Kaempe v. Myers*, 367 F.3d 958, 965 (D.C. Cir. 2004).  For example, with respect to Mr. Moratis, Plaintiffs concede affirmatively that Mr. Moratis "served [InPhonic] as Senior Vice President of Financial Reporting and Analysis" and "Chief Accounting Officer."  SAC ¶ 20(e).  Further, Plaintiffs make no allegation that Mr. Moratis had any responsibilities or authority with respect to the advertising or marketing functions of InPhonic.  In addition, Plaintiffs concede that Mr. Moratis did not become a top level manager at InPhonic until May 2007 -- a point in time *after* this lawsuit was filed, after all of the consumer purchases described in the complaint occurred, and well after the period of deceptive activity described in the Second Complaint took place (*see* SAC ¶¶ 7-19, alleging rebate scheme activity taking place between 2004-2006).  Thus, even granting Plaintiffs the benefit of available inferences, the facts alleged do not support the assertion that Mr. Moratis had even the authority or ability to "cause" InPhonic to carry out the rebate scheme that Plaintiffs allege in the Complaint.

Likewise, Plaintiffs allege only Mr. Westrick's title, "President of InPhonic's Wireless Activation and Services Division."  SAC ¶ 20(f).  They make no particularized allegation that Mr. Westrick had responsibilities with respect to the rebate processing functions of InPhonic.  The same arguments pertain as to Defendant Zeinfeld, who did not become an officer of InPhonic until June 2007 (again, after the lawsuit was filed, and well after the Plaintiffs allege to

have made purchases from InPhonic) and who is not alleged to have had responsibility for the rebate program.[5]

Similarly, Plaintiffs allege only that Mr. Steinberg served as CEO and Chairman of the Board. They make no particularized allegation that he had any direct knowledge of, responsibility for, or involvement in the details of InPhonic's rebate program.

Courts do not hesitate to dismiss with prejudice claims of fraud -- including claims made under state consumer protection acts -- where Plaintiffs fail to allege the fraud with requisite particularity. *See, e.g., United States ex rel. Williams v. Martin-Baker Aircraft Co.,* 389 F.3d 1251, 1259 (D.C. Cir. 2004); *Drobnak v. Andersen Corp.*, No. 07-2249, 2008 WL 80632, at *4 (D. Minn. Jan. 08, 2008) (dismissing with prejudice a Minnesota state consumer protection act claim for failure to comply with Rule 9(b)).

## 2. Plaintiffs' 50-State Consumer Protection Act Claims Also Fail.

In addition to its claim under the District of Columbia CPPA, Plaintiffs in Count II attempt to assert claims under the state consumer protection statutes of *all* 50 states. This is an impermissible pleading maneuver repeatedly rejected by the federal courts. *See, e.g.*, *Chin v. Chrysler Corp.*, 182 F.R.D. 448, 461 (D.N.J. 1998) (explaining that "no federal court had tried a class action which would require the application of the laws of the fifty one jurisdictions.").[6]

---

[5] Plaintiffs' are mistaken in their allegation that Defendant Zeinfeld first became President of InPhonic's E-Commerce Division in April 2006 and an officer of InPhonic in June 2006. *Compare* SAC ¶ 20(c) *with* www.sec.gov/Archives/edgar/data/1133324/ 0011931207224813/d8k.htm. Mr. Zeinfeld only became an officer of InPhonic in June 2007 and a director in October 2007, *i.e.*, well after Plaintiff's initial Complaint and well after the alleged misconduct underlying the Complaint. *Id.*; *see* SAC ¶¶ 7-19. The Court may take judicial notice of public records such as SEC filings in connection with a Rule 12 filing. *See, e.g., Antoine v. U.S. Bank Nat'l Ass'n*, 547 F. Supp. 2d 30, 37 n.3 (D.D.C. 2008).

[6] If, as alleged, the purported nationwide class includes plaintiffs who sustained injuries in every state, such a class cannot be certified. "Class certification is impossible where the fifty states truly establish a large number of different legal standards governing a particular claim." *Castano v. Am. Tobacco Co.*, 84 F.3d 734 (5th Cir. 1996).

Moreover, Plaintiffs' conclusory allegations fail to state a claim under any of the 50 state consumer protection statutes identified.  As with the District of Columbia CPPA, each of the state consumer protection statutes is subject to the heightened pleading standards required by Rule 9(b).  *See* Charles A. Wright & Arthur R. Miller, 5A FEDERAL PRACTICE AND PROCEDURE § 1297 (3d. ed. 2008) ("[T]he particularity requirement in Rule 9(b) applies … to averments of fraud … in whatever substantive or factual context fraud might arise."); *Walker v. S.W.F.T. SCRL*, 491 F. Supp. 2d 781, 794 (N.D. Ill. 2007) (Rule 9(b) applies to Illinois statute); *Thompson v. Jiffy Lube Int'l, Inc.,* 505 F. Supp. 2d 907, 930 (D. Kan. 2007) (Rule 9(b) applies to Kansas Consumer Protection Act claims); *Coleman DuPont Homsey v. Vigilant Ins. Co.*, 496 F. Supp. 2d 433, 439 (D. Del. 2007) (Rule 9(b) applies to Delaware Consumer Fraud Act).  Although the consumer protection laws of the fifty state jurisdictions differ from one another considerably, including with respect to whether they ban "deceptive" or simply "unfair" behavior, and whether scienter is a required element, each demands that a plaintiff allege some particular misrepresentation or omission by the particular defendant that the plaintiff either relied upon or that caused a plaintiff damages.  *See, e.g.*, Joseph M. McLaughlin, 1 MCLAUGHLIN ON CLASS ACTIONS § 5.46 (3d ed. 2006) (collecting and comparing various state consumer protection statutes).  Plaintiffs fail to allege these required elements with the requisite factual particularity.

Plaintiffs here merely allege that the "Individual Defendants" made "false promises" or "omission of material facts " with the intent that Plaintiffs would rely upon them "in connection with the sale of wireless devices and/or wireless services."  SAC ¶ 66.  Plaintiffs make no effort to identify any specific misrepresentation or omission made by Messrs. Steinberg, Zeinfeld, Moratis, or Westrick which was relied upon to the detriment of plaintiffs.  This is not sufficient under Rule 9(b), *see, e.g., Kowal* 16 F.3d at 1276, and this claim must be dismissed.

**C.    Plaintiffs' Claims Arising Under RICO (Count III) Should Be Dismissed.**

Plaintiffs' RICO claims suffer from many of the same deficiencies as their consumer

protection act claims.  In violation of Rule 9(b), and basic RICO pleading requirements,

Plaintiffs do not allege any particular acts of "mail fraud" or "wire fraud" undertaken by any of

Messrs. Steinberg, Zeinfeld, Moratis, or Westrick as individuals that would support their

inclusion in the RICO scheme Plaintiffs allege.  More fundamentally, Plaintiffs' RICO claims

are frivolous.  RICO was enacted "for the purpose of 'seek[ing] the eradication of organized

crime in the United States.'"  *Beck v. Prupis*, 529 U.S. 494, 496 (2000).  Where a RICO claim is

nothing more than a garden variety contract or fraud claim arising from a commercial dispute,

federal courts routinely dismiss the RICO claim on the pleadings.  *See, e.g., W. Assocs. Ltd.*

*P'ship v. Mkt. Square Assocs.,* 235 F.3d 629, 637 (D.C. Cir. 2001) ("RICO claims premised on

mail or wire fraud must be particularly scrutinized because of the relative ease with which a

plaintiff may mold a RICO pattern from allegations that, upon closer scrutiny, do not support

it."); *Ellipso Inc. v. Mann*, 541 F. Supp. 2d 365, 376-77 (D.D.C. 2008) (same); *Schmidt v. Fleet*

*Bank*, 16 F. Supp. 2d 340, 346 (S.D.N.Y. 1998) (courts "must always be on the lookout for the

putative RICO case that is really nothing more than an ordinary fraud case in the Emporer's

trendy garb"); *Katzman v. Victoria's Secret Catalogue*, 167 F.R.D. 649, 655 (S.D.N.Y. 1996)

("Because the 'mere assertion of a RICO claim … has an almost inevitable stigmatizing effect on

those named defendants, … courts should strive to flush out frivolous RICO allegations at an

early stage of the litigation.").

Here, Plaintiffs attempt to characterize facts that, at most, constitute a series of contract

breaches *by InPhonic* into claims that InPhonic's executives ran the company as a RICO

enterprise and participated in a racketeering scheme.  As set forth below, Plaintiffs fall well short

of satisfying the requirements for alleging cognizable RICO claims against Messrs. Steinberg,

Zeinfeld, Moratis, and Westrick.

### 1.    The Allegations of § 1962(c) Violations Do Not Meet Rule 9(b)'s Particularity Requirements.

Because the Complaint alleges a violation of § 1962(c) predicated on mail and wire

fraud, Plaintiffs must plead their allegations of fraud with particularity.  *See Johnson v.*

*Computer Tech. Serv., Inc.*, 670 F. Supp. 1036, 1039 (D.D.C. 1987) (holding that Rule 9(b)

requires a plaintiff alleging a RICO violation to plead the circumstances surrounding the

predicate acts of mail and wire fraud with particularity); *see also Bates v. NW Human Servs.,*

*Inc.*, 466 F. Supp. 2d 69, 92 (D.D.C. 2006) (applying Rule 9(b) to civil RICO claim); *Saporito v.*

*Combustion Eng'g*, 843 F.2d 666, 673 (3d Cir. 1988) (RICO sounds in fraud and must be

pleaded with particularity under Rule 9(b)).  The §1962(c) claim fails for two separate reasons.

First, group pleading, such as the Plaintiffs have engaged in here, does not satisfy Rule

9(b).  As Judge Walton recently explained in dismissing a RICO claim based on group pleading:

> Requiring the three defendants to guess among themselves which
> one is responsible for the instances of mail and wire fraud alleged
> by the plaintiffs is surely not in keeping with the purposes of Rule
> 9(b).

*Bates*, 466 F. Supp. 2d at 92.  Likewise here, Plaintiffs' mail and wire fraud allegations leave

Messrs. Steinberg, Zeinfeld, Moratis, and Westrick guessing which of them, if any, is alleged to

have engaged in the alleged fraudulent acts that Plaintiffs describe.  There are no distinct

allegations as to any particular defendant; rather, Plaintiffs simply group these four defendants

together.

The Complaint thus treats the individual defendants as a "monolithic enterprise" -- a

RICO pleading tactic that federal courts have consistently rejected.  *See Mostowfi v. I2 Telecom*

*Int'l, Inc.*, No. 06-15597, 2008 WL 624012, at *2 (9th Cir. Mar. 4, 2008) (finding that the RICO

cause of action fails to meet Rule 9(b)'s heightened pleading standard because "the plaintiffs lump together the defendants without identifying the particular acts or omissions that each defendant committed"); *Goren v. New Vision Int'l, Inc.*, 156 F.3d 721 (7th Cir. 1998) (affirming the dismissal of a RICO claim against, among other defendants, five members of a family that each owned part of a corporation, where the allegations did not address the family members' individual roles in the alleged fraud); *Bradley v. Phillips Petroleum Co.*, 527 F. Supp. 2d 625, 649 n.46 (S.D. Tex. 2007) ("RICO plaintiff must plead specified facts as to each defendant . . . [and cannot] lump[] together the defendants."); *Lubin v. Sybedon Corp.*, 688 F. Supp. 1425, 1443-44 (S.D. Cal. 1988) (noting that a complaint's grouping together of all defendants for each allegation is a "classic instance of pleading a 'monolithic enterprise'" and thus "cannot survive this Rule 9(b) challenge"). Accordingly, Plaintiffs' § 1962(c) claim must be dismissed.

Second, plaintiffs fail to adequately allege "conduct" or "participation" in the alleged scheme to defraud, as required under § 1962(c). The Supreme Court has clarified that "the word 'conduct' [must] require some degree of direction and the word 'participate' [must] require some part in that direction." *Reves v. Ernst & Young*, 507 U.S. 170, 179 (1993). Thus, to be liable under § 1962(c), the defendant must be involved in the "operation or management" of the enterprise. *See id.* But a defendant does not participate in the operation or management of the enterprise simply because he has "substantial persuasive power to induce the alleged enterprise to take certain actions." *Vickers Stock Research Corp. v. Quotron Sys., Inc.*, No. 96 Civ. 2269, 1997 WL 420265, at *4 (S.D.N.Y. July 25, 1997).

Here, the Complaint only describes Messrs. Steinberg, Zeinfeld, Moratis, and Westrick's roles and tenures at InPhonic, and states that "the Individual Defendants, by virtue of their high-ranking corporate positions, actually operated InPhonic's day-to-day business and, consequently, purposefully devised, were involved in and/or knew about the scheme or artifice to defraud

Plaintiffs." *See supra* § II(C).  That the movants operated *InPhonic* and had "high ranking positions in the company" fails to satisfy the requirement that each of Messrs. Steinberg, Zeinfeld, Moratis, and Westrick actually participated in or conducted the racketeering scheme that Plaintiffs allege, particularly where Plaintiffs have not identified any specific actions that any of the movants have taken individually to "conduct" or "participate" in the alleged scheme.

Furthermore, as respects Mr. Moratis, Plaintiffs' acknowledgements concerning his role as a financial analyst and accounting officer at the company, SAC ¶ 20(e), undermine the broad allegation that he "conducted" or "participated" in a company scheme involving false marketing, advertising, and rebate processing.  *See Univ. of Maryland v. Peat Marwick*, 996 F.2d 1534, 1539-40 (3d Cir. 1993) (holding that an auditor and accountants' provision of deficient financial services to an enterprise engaged in a pattern of racketeering does not give rise to liability under RICO).  Under *Reves*, even providing financial services that affect the enterprise's decisionmaking does not rise to the level of direction necessary for RICO liability.  *See* 507 U.S. at 186 (finding that accountant's incorrect financial estimates did not constitute participation in the management of the enterprise and thus did not give rise to RICO liability).  Similarly, as to Defendant Zeinfeld, Plaintiffs do not allege that, as President of E-Commerce beginning in April 2006, or (later) as President of InPhonic beginning in June 2007, he had responsibility for any aspect of the subject rebate program.  *See* SAC ¶¶ 20-49.  Nor do Plaintiffs allege any facts that Mr. Steinberg had any direct knowledge of, responsibility for, or involvement in the details of InPhonic's rebate program.  Instead, Plaintiffs mistakenly believe it is enough simply to allege his previous titles.

Plaintiffs' allegations that the New Defendants can be held liable under § 1962(c) for aiding and abetting the underlying mail and wire fraud allegations, *see* SAC  ¶¶33, 76, similarly fail.  Aiding and abetting an underlying act of racketeering does not give rise to civil RICO

liability. *See, e.g., Rolo v. City Investing Co. Liquidating Trust*, 155 F.3d 644, 656 (3d Cir. 1998) (citation omitted); *United States v. Viola*, 35 F.3d 37, 40 (2d Cir. 1994); *Lippe v. Bairnco Corp.*, 218 B.R. 294, 304 (S.D.N.Y. 1998) (holding that "[a] defendant is not liable under § 1962(c) for aiding and abetting RICO violations unless it had some part in directing the affairs of the RICO enterprise."); *Westways World Travel v. AMR Corp.*, 182 F. Supp. 2d 952, 961 (C.D. Cal. 2001) ("there is no aiding and abetting liability under Section 1962(c)").

> **2.  The Complaint's Conclusory Allegations of "Conspiracy" Do Not Sufficiently State a Claim Under § 1962(d).**

To state a claim under § 1962(d), Plaintiffs must demonstrate that "(1) two or more people agreed to commit a substantive RICO offense, and (2) the defendant knew of and agreed to the overall objective of the violation." *United States v. Philip Morris USA, Inc.*, 327 F. Supp. 2d 13, 19 (D.D.C. 2004). Plaintiffs must "allege facts from which one can infer each defendant's agreement to violate § 1962(c)," *Schiffels v. Kemper Fin. Servs., Inc.*, 978 F.2d 344, 352 (7th Cir. 1992), and must provide "supportive factual allegations" sufficient to describe the defendant's role in the alleged conspiracy. *Rose v. Bartle*, 871 F.2d 331, 366 (3d Cir. 1989). Plaintiffs here meet none of these requirements, stating only that the "Individual Defendants," "conspired to conduct or participate" in the allegedly wrongful conduct. SAC ¶ 77. Plaintiffs fail to specify what role -- if any -- each of Messrs. Steinberg, Zeinfeld, Moratis, and Westrick might have played in the alleged conspiracy. This is insufficient, and the Plaintiffs' § 1962(d) claim must be dismissed.

> **D.  The Breach of Contract Claim (Count IV) Must Be Dismissed.**

Count IV attempts to state a D.C. common law claim for breach of contract. SAC ¶ 79. In the District of Columbia, for a contract to exist, "there must be both (1) agreement as to all material terms; and (2) intention of the parties to be bound." *Jack Baker, Inc., v. Office Space*

*Dev. Corp.*, 664 A.2d 1236, 1238 (D.C. 1995) (quoting *Georgetown Entm't Corp. v. Dist. of Columbia,* 496 A.2d 587, 590 (D.C. 1985). Here, Plaintiffs do not allege that contracts exist between Messrs. Steinberg, Zeinfeld, Moratis, Westrick, and Plaintiffs; rather the Complaint expressly alleges that Plaintiffs entered into contracts with *InPhonic.* SAC ¶ 80. Because Plaintiffs fail to advance any allegations supporting the existence of a contractual relationship between the New Defendants as individuals and any of the Plaintiffs, this claim for breach of contract fails.

Furthermore, there is no legal basis to hold individual employees of a company liable for the company's contracts. Courts have repeatedly held that "as a general rule, so far as personal liability on corporate contracts is concerned, officers of corporations are in the same position as agents of private individuals and are not liable on corporate contracts as long as they do not act and purport to bind themselves individually." *Brown v. Colonial Chevrolet Co.*, 249 A.2d 439, 441 (Del. Super. Ct. 1968); *see also Reynolds v. Bement*, 116 P.3d 1162, 1169 (Cal. 2005) (corporate agents acting with scope of authority are not liable for corporate breach of contract); *Baird & Warner, Inc. v. Addison Indus. Park, Inc.*, 387 N.E.2d 831, 839 (Ill. App. Ct. 1979) (corporate officer not generally liable for corporate breach, even if sole shareholder). Accordingly, Count IV must be dismissed.

### E. The Common Law Negligent Misrepresentation Claim (Count V) Must Be Dismissed.

Count V is based on the D.C. common law claim of negligent misrepresentation. SAC ¶ 83. To state a valid claim of this type, Plaintiffs must show that (1) a defendant made a false statement or omission of a fact, (2) the statement was in violation of a duty to exert reasonable care, (3) the false statement or omission involved a material issue, (4) the plaintiff reasonably relied to its detriment on the false information, and (5) the defendant's challenged conduct

proximately caused injury to the plaintiff. *Burlington Ins. Co. v. Okie Dokie, Inc.*, 329 F. Supp. 2d 45, 48 (D.D.C. 2004) (citation omitted).

Plaintiffs fail to make any of these required allegations: the Second Complaint (1) never alleges that Messrs. Steinberg, Zeinfeld, Moratis, or Westrick as individuals made any specific false statements or omissions of fact -- material or otherwise; (2) never alleges that the New Defendants violated a duty of reasonable care; (3) never alleges that Plaintiffs relied on the New Defendants' statements in any manner; and (4) never alleges that the New Defendants' conduct proximately caused injury to Plaintiffs. As in the rest of the Complaint, Plaintiffs' allegations address only *InPhonic's* actions.

Furthermore, Plaintiffs' negligent misrepresentation allegations constitute an impermissible effort to allege tort damages for a breach of contract claim. The District of Columbia follows the economic loss rule, barring recovery in tort (such as for a negligent misrepresentation claim) for purely economic losses arising from a contract. *See RLI Ins. Co. v. Pohl, Inc. of Am.*, 468 F. Supp. 2d 91, 95 (D.D.C. 2006); *Potomac Plaza Terraces, Inc. v. QSC Prods., Inc.*, 868 F. Supp. 346, 354 (D.D.C. 1994); *Furash & Co. v. McClave*, 130 F. Supp. 2d 48, 56 (D.D.C. 2001). Here, Plaintiffs allege that InPhonic negligently misrepresented certain rebate terms and that, as a result, Plaintiffs paid more for wireless devices and services than they should have. SAC ¶ 84-85. But where as here, two parties are in dispute over performance under a contract, their recourse lies in a claim for breach of contract -- not in an action in tort. *See Blake Constr. Co. v. C.J. Coakley Co.*, 431 A.2d 569, 577 n.5 (D.C. 1981). Accordingly, Count V must be dismissed.

**F.    The Common Law Unjust Enrichment and Disgorgement of Profits Claim (Count VI) Must Be Dismissed.**

Count VI asserts a common law claim for unjust enrichment under the laws of the District of Columbia.  SAC ¶ 88.  Plaintiffs assert that Messrs. Steinberg, Zeinfeld, Moratis, and Westrick have been "unjustly enriched by unlawfully retaining rebate claim payments owed to Plaintiffs." SAC ¶ 89.

Under District of Columbia law, "where parties have an express contract, the law does not recognize a right to claim unjust enrichment."  *Paul v. Judicial Watch, Inc.*, 543 F. Supp. 2d 1, 7 (D.D.C. 2008) (citing *Schiff v. Am. Ass'n of Retired Pers.*, 697 A.2d 1193, 1194 (D.C. 1997)).  "Therefore District of Columbia courts will not 'resort to quasi contract when the evidence sustains the existence of a true contract, either express or implied.'"  *Id.* (quoting *Jordan Keys & Jessamy, LLP v. St. Paul Fire & Marine Ins. Co.*, 870 A.2d 58, 64 (D.C. 2005).  Here, all of Plaintiffs' claims -- including the claim for unjust enrichment -- arise from a series of contracts with InPhonic.  Accordingly, Plaintiffs' unjust enrichment claim is barred.

Moreover, Plaintiffs fail to make out the elements of an unjust enrichment claim against Messrs. Steinberg, Zeinfeld, Moratis, and Westrick.  "Unjust enrichment occurs when a person retains a benefit . . . which in justice and equity belongs to another."  *Jordan Keys*, 870 A.2d at 63; *accord Fort Lincoln Civic Ass'n, Inc. v. Fort Lincoln New Town Corp.*, 944 A.2d 1055, 1076 (D.C. 2008).  Fundamentally, a plaintiff must (1) confer a benefit on the defendant and (2) the defendant must retain that benefit.  *See Rapaport v. United States Dep't. of Treasury, Office of Thrift Supervision*, 59 F.3d 212, 217 (D.C. Cir. 1995).  "[U]njust enrichment simply does not lie when the plaintiff has not bestowed some sort of benefit upon the defendant." *Id*.  Here, Plaintiffs fail to allege *either* that Plaintiffs conferred a benefit on the New Defendants individually or that the New Defendants retained any benefits from the plaintiffs.  The alleged

payments made to InPhonic -- wireless product and services contract revenues not paid directly to the New Defendants -- are too attenuated to support an unjust enrichment claim.  Judge Urbina has explained that a benefit conferred on a corporation in general will not support an unjust enrichment claim against a corporate employee.  *See United States ex rel. Purcell v. MWI Corp.*, 520 F. Supp. 2d 158, 173 (D.D.C. 2007).  *See also In re Rezulin Prods. Liab. Litig.*, 392 F. Supp. 2d 597, 620 (S.D.N.Y. 2005) (dismissing unjust enrichment claim).  For this reason as well, Count VI should be dismissed.

> **G.    The Declaratory and Injunctive Relief Claims (Count VII) Must Be Dismissed.**

Count VII is a request for declaratory and injunctive relief.  Neither "claim" is appropriate:  A request for declaratory relief merely specifies a desired remedy and does not state a cause of action.  *See Fitts v. Fed. Nat'l Mortg. Ass'n*, 44 F. Supp. 2d 317, 330 (D.D.C. 1999).  Further, declaratory relief is inappropriate here because the purpose of that equitable remedy is to provide a method for adjudicating the rights of parties prior to the time that they are in shape for adjudication by a suit for damages or for some other affirmative relief.  *See Am. Greiner Elecs., Inc. v. Establissements Henry-Le Paute, S.A.*, 174 F. Supp. 918, 918 (D.D.C. 1959).  Here, Plaintiffs allege only past injuries for which they seek compensatory damages:  Prospective equitable relief is not warranted.

Likewise, injunctive relief is inappropriate here and may not be employed when an ordinary suit in law affords a remedy.  *See Sykes v. Jenny Wren Co.*, 78 F.2d 729, 732 (D.C. Cir. 1935); *S.J. Groves & Sons Co. v. Warren*, 135 F.2d 264, 267 (D.C. Cir. 1943).  Of course, InPhonic is no longer in business; there is no risk of further, ongoing injury associated with the former rebate program.  Further, equitable relief requires a showing of some irreparable harm. *See Wis. Gas Co. v. F.E.R.C.*, 758 F.2d 669, 674 (D.C. Cir. 1985) (citing *Sampson v. Murray*, 94

S. Ct. 937, 952 (1974)).  Plaintiffs have alleged only economic loss, and point to no injuries that would not be compensable by an award of damages.  Count VII must be dismissed.

### H.     The Common Law Civil Conspiracy Claim (Count VIII) Must Be Dismissed.

Plaintiffs' common law civil conspiracy claim also fails.  In the District of Columbia, to establish a prima facie case of civil conspiracy, a plaintiff must prove: (1) an agreement between two or more persons; (2) to participate in an unlawful act; and (3) injury caused by an unlawful overt act performed by one or more parties to the agreement, and in furtherance of the common scheme.  *See Hill v. Medlantic Health Care Group*, 933 A.2d 314, 334 (D.C. 2007) (citing *Paul v. Howard Univ.*, 754 A.2d 297, 310 (D.C. 2000)).

Plaintiffs here fail to allege *any* of these required elements, offering only the conclusory allegation that the "Individual Defendants" "agreed to take part in an unlawful action" by delaying or denying rebate claims.  SAC ¶ 96.  Plaintiffs offer no factual allegations concerning the timing, terms or nature of this alleged agreement, or any facts concerning Messrs. Steinberg, Zeinfeld, Moratis, or Westrick's participation in the conspiracy.  Courts do "not accept conclusory allegations on the legal effect of the events Plaintiff has set out if these allegations do not reasonably follow from his description of what happened."  *Kadar Corp. v. Milbury,* 549 F.2d 230, 233 (1st Cir. 1977) (quoting Wright & Miller, *Federal Practice and Procedure*, Civil § 1357).  Because Plaintiffs do not identify a single action undertaken individually by Messrs. Steinberg, Zeinfeld, Moratis, or Westrick, it is impossible to reasonably infer that any of the movants took part in a conspiracy.  *See id.* at 233 (dismissing conspiracy allegations against 14 individual defendants as to whom the plaintiffs failed to allege "with at least some degree of particularity overt acts which defendants engaged in which were reasonably related to the promotion of the claimed conspiracy.").

Moreover, a claim for civil conspiracy requires some underlying tortious act: civil conspiracy is not independently actionable, but is a means for establishing vicarious liability for the underlying tort. *See Hall v. Clinton*, 285 F.3d 74, 82 (D.C. Cir. 2002); *Medlantic*, 933 A.2d at 334. As discussed above, Plaintiffs have not properly alleged any valid tort that the Defendants might have conspired to commit, and any tort claim is barred by the economic loss doctrine. Accordingly, Count VIII must be dismissed.

## I.    Dismissal Should Be With Prejudice.

Given that Plaintiffs' current complaint is their *third* complaint, there is no reason to afford Plaintiffs a fourth opportunity to amend even to attempt to buttress or particularize the cursory fraud allegations set forth against Messrs. Steinberg, Zeinfeld, Moratis, and Westrick here. Federal courts in this Circuit and elsewhere routinely dismiss with prejudice claims that fail to meet Rule 9(b) pleading standards, especially where a plaintiff has already been granted multiple opportunities to amend his complaint. *See, e.g., U.S. ex rel. Williams v. Martin Baker Aircraft Co., Ltd.*, 389 F.3d 1251, 1259 (affirming dismissal with prejudice of claims that failed to satisfy Rule 9(b) and refusing leave to file third amended complaint); *Silverman*, 662 F.Supp. at 1201 (dismissal with prejudice of RICO claim on 9(b) grounds); *Edwards v. Marin Park, Inc.* 356 F.3d 1058, 1066 (9th Cir. 2004) (affirming dismissal with prejudice of a RICO claim where plaintiffs "already had [a] chance [to amend the complaint] and declined to exercise it."); *Burnett v. Amrein*, 243 Fed. App'x. 393, 394-95 (10th Cir. 2007) (affirming the dismissal with prejudice of a RICO count within a second amended complaint for failure to comply with Rule 9(b) because, after two amendments, the complaint "contained nothing more than general allegations"). As discussed, Plaintiffs' allegations in the Second Amended Complaint not only fail the requirements of Rule 9(b), but also fail to state a single claim upon which relief can be granted. Dismissal with prejudice is now appropriate.

Respectfully submitted,

_____/s/ John A. Freedman_____

**ARNOLD & PORTER LLP**
Scott B. Schreiber (DC Bar # 197681)
John A. Freedman (DC Bar # 453075)
Joshua P. Wilson (DC Bar # 487829)
555 12th Street, N.W.
Washington, D.C.  20004
(202) 942-5000

*Attorneys for Defendant*
*George Z. Moratis*

_____/s/ Ty Cobb_____

**HOGAN & HARTSON LLP**
Ty Cobb (D.C. Bar # 270736)
555 Thirteenth Street, N.W.
Washington, D.C. 20004
(202) 637-5600

Mark D. Gately (DC Bar # 386446)
111 South Calvert Street, Suite 1600
Baltimore, MD 21202-6191
(410) 659-2742

*Attorneys for Defendant,*
*David A. Steinberg*

_____/s/ James P. Wehner_____

**CAPLIN & DRYSDALE, Chartered**
James P. Wehner (D.C. Bar # 454823)
Nathan D. Finch (D.C. Bar # 438819)
One Thomas Circle, N.W.
Suite 1100
Washington, DC  20005
(202) 862-5000

*Attorneys for Defendant*
*Brian T. Westrick*

_____/s/ David W. Goewey_____
**VENABLE LLP**
David W. Goewey (D.C. Bar # 414257)
575 7th Street,  N.W.
Washington, D.C. 20004-1601
(202) 344-4853

*Attorneys for Defendant*
*Andrew B. Zeinfeld*

Dated: August 15, 2008

# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

IN RE INPHONIC, INC., WIRELESS     )
PHONE REBATE LITIGATION     )
    )    **Misc. Action No. 06-0507 (ESH)**
**This Document Relates to:**     )    **MDL Docket No. 1792**
**ALL CASES**     )
    )

## [PROPOSED] ORDER GRANTING MOTION TO DISMISS

Upon consideration of the Motion of Defendants David Steinberg, Andrew B. Zeinfeld, George Z. Moratis, and Brian T. Westrick to Dismiss the Consolidated Second Amended Class Action Complaint, dated August 15, 2008 (Docket # __), it is hereby

ORDERED this _____ day of _____, 2008, that all claims asserted against Messrs. Steinberg, Zeinfeld, Moratis, and Westrick in the Consolidated Second Amended Class Action Complaint (Docket # 54) are dismissed with prejudice.

_____
United States District Judge

**CERTIFICATE OF SERVICE**

I hereby certify that on August 15, 2008, a copy of the **MOTION OF DEFENDANTS STEINBERG, ZEINFELD, MORATIS, AND WESTRICK TO DISMISS THE CONSOLIDATED SECOND AMENDED CLASS ACTION COMPLAINT**, a **MEMORANDUM OF POINTS AND AUTHORITIES** and a **PROPOSED ORDER** were filed electronically.  I understand that notice of this filing will be sent to all parties by operation of the Court's electronic filing system.


Dated:  August 15, 2008                                /s/ Joshua P. Wilson
                                                       Joshua P. Wilson

# EXHIBIT 1
# (VERIZON CONTRACT)

**Important Information Regarding Your Equipment Discount**

Your price paid includes an Equipment Discount of $250 that has been provided to you by this Verizon Wireless authorized agent for activating a new non-substitute line of service with Verizon Wireless, and maintaining this new line of service with the selected rate plan in good standing for a minimum of 181 consecutive days.

By accepting this Equipment Discount, you agree that for a period of 181 days after your new line of service is activated, you

- will pay your balance due to Verizon Wireless each month
- will not disconnect this Verizon Wireless line of service
- will not transfer this equipment to another Verizon Wireless line of service
- will not port an existing phone number from another Verizon Wireless account to this new line of service
- will not change your Verizon Wireless service rate plan to a lower monthly service rate

*If these conditions are not met, you herein provide authorization for a $250 reimbursement to be charged to your credit card by this Verizon Wireless authorized agent without need for further approval.* This reimbursement of the $250 Equipment Discount will only be charged if the above conditions are not met.

## YOUR VERIZON WIRELESS CUSTOMER AGREEMENT

**Customer Information Overview**
**Customer Agreement Terms and Conditions**
**Please read carefully and file in a safe place.**

**Welcome To Verizon Wireless!**
In order to help you understand your new wireless service, here are answers to some questions commonly asked by new customers. In addition to reviewing this document, it is very important that you read your Customer Agreement, Calling Plan brochure and any other literature provided. Once you have reviewed this material, we will be happy to explain any portion of your agreement and answer any questions. Please contact your Sales Representative for assistance.

**Your Customer Agreement**
Your Customer Agreement with us starts when you accept it. You accept when you give us a written or electronic signature, OR tell us orally or electronically that you accept, OR activate your service through your wireless phone, OR open a package that says you are accepting by opening it, OR change your agreement, extend your contract term, OR accept a new promotional offer. If you don't want to be bound by the Customer Agreement, do not do any of the things listed above.

**Your Calling Plan**
Your calling plan is part of your Customer Agreement. Be sure to read it carefully. It determines your rates and charges, such as your monthly access, the number of minutes included in your monthly allowance, and the rate per minute for additional minutes, roaming, and long distance service, if applicable. At any time, you have the option to change to any qualifying calling plan, at no additional fee, without extending the minimum term of your Customer Agreement. (You may have to purchase new equipment to be able to take advantage of a new calling plan.) To take advantage of promotional offers, including equipment upgrades, you will be required to extend the minimum term of your Customer Agreement.

**Agreement Terms And Early Termination**
Your minimum term under your Customer Agreement will be for the period of time required by your calling plan or promotion, usually one or two years. If you cancel during this term, a $175 early termination fee will apply. After your minimum term, your Customer Agreement will convert to a month-to-month term.

**Night And Weekend Hours**
Your calling plan may have different rates depending on whether you make or receive calls on weekdays, at nights, on weekends or holidays. Airtime minutes may be classified as peak or off-peak, according to the time and day. Please refer to your calling plan brochure for the night
and weekend hours in your area, if applicable.

**Roaming**
You are "roaming" whenever you make or receive calls using a transmission site outside your home airtime rate area, or using another carrier's transmission site. The ROAM INDICATOR on your handset will assist you in determining when you are roaming. Long distance, roaming and other additional charges may apply to calls you place or receive while roaming. The billing for roaming minutes on another wireless carrier may be delayed depending on when we are
billed. These minutes may be applied against your monthly allowance in the month they appear on your bill and not during the month of usage, and may result in charges in addition to your monthly access charge.

**Directory Assistance/411Connect(SM)**
Enhanced directory assistance is available through 411 Connect, an exclusive directory, information, and call completion service for Verizon Wireless customers. A live operator will assist you when you request numbers, addresses and information for anything from restaurants and movies to the nearest florist. A per-call fee plus airtime and other charges apply. Simply dial 411 and press SEND.

**Reading Your Bill**
**Bill Cycle**
This is the date your bill is created. Except as noted in the Customer Agreement, your calls made within the bill cycle start and end dates will be included in your bill. Billing for certain home and/or roaming calls and related charges may be delayed to a later bill. These calls may be applied against your airtime allowance in the month they are billed, rather than the month you made or received the call. This may result in charges beyond your expected charges in the later month.

**Your First Bill**
On your first bill you may be billed a prorated portion of your Monthly Access Charge (calculated from the date you begin service to your first bill cycle start date), plus the next months service charge. Because of this proration, your first bill may be larger than subsequent bills. In addition, your first bill will include any applicable activation fees, feature charges, and equipment and accessory purchases.

**Monthly Access**
This is your monthly access or service charge based on your particular calling plan. Paying this charge gives you access to the Verizon Wireless network. It is usually billed one month in advance.

**Monthly Home Airtime Allowance**
Your calling plan may specify a set amount of included minutes for use in your home airtime rate area. Unused airtime cannot be carried forward or credited against the next month's usage. Various fees, toll charges, and regional calling and wireless long distance charges are not included in the home airtime allowance and will be charged separately.

**Promotional Minutes**
The amount of promotional minutes available in your first month is determined by date of activation in relation to bill cycle start and end dates.

**Chargeable Time**
We measure your calls in full minutes. That means partial minutes are rounded up to the next full minute. For example, a 15-second call is billed as one full minute. A one-minute, 20-second call is billed as two full minutes. Time starts when you first press "SEND" or the call connects to the system. Time stops when your call disconnects from the system, which may be a few seconds after you press "END" or the call is otherwise terminated. On incoming calls, charges begin when the call connects to the system, which may be before the phone rings or before you answer it. You are not charged for unconnected calls, busy signals and unanswered calls that ring for less than 60 seconds. You may be billed at normal airtime rates for calls that ring for 60 seconds or more in certain areas, even if such calls are busy or unanswered. If a device such as an answering machine or fax machine "answers" the incoming call automatically, the
call may be considered completed and billable.

### Home Airtime Rate Area

Your home airtime rate area is a geographic area where your home airtime rates apply. It may be local, regional or national. The calls you make or receive inside this area are billed at your home airtime rates without incurring roaming charges. Depending on your calling plan, long distance or toll charges may still apply inside your home airtime rate area. If you make calls outside this area, you may be charged more per minute for airtime. In certain instances you may incur toll, regional calling, or wireless long distance charges on calls made within your home airtime rate area. Home airtime rate areas may also be referred to as home service areas or home calling areas.

### Toll, Regional Calling and Wireless Long Distance

Toll, regional calling, and wireless long distance charges are in addition to home airtime charges for your calls. You will incur toll, regional calling, or wireless long distance charges when you are in a wireless local calling area and place a call to a number outside this area. Your local calling area is not the same as your home airtime rate area and may, in fact, be smaller. As with your home phone, your local calling area is defined by a group of local phone exchanges (the area code plus the three digits of a phone number). As with all wireless calls, these charges are based on your location at the start of the call and do not change even though you may move during the call.

### Other Fees, Taxes and Surcharges

Your bill will include federal, state, and where applicable, local taxes. It may also include surcharges, governmental fees and similar assessments, including fees such as Universal Service and Regulatory Fees. These charges, including taxes and surcharges on roaming, may be based on the rates applicable to the residential street address or the primary business street address you provided to us. This address will be considered the "place of primary use," provided it is within our licensed service area.

### Caller ID

Please note that your telephone number and account name may appear when you call someone who uses caller identification. You can block this "Caller ID" for most calls by dialing *67 before each call or by ordering per-line blocking, where available. (Dial *82 to unblock.)

### Dispute Resolution And Independent Arbitration

**Most customer concerns can be resolved through our Customer Service Department. If, however, you have an issue that cannot be resolved without third-party intervention, Verizon Wireless will arbitrate with you before the American Arbitration Association or the Better Business Bureau. This means that all such customer disputes (except perhaps certain small claims) will be resolved through arbitration, not with a judge or jury.**

*Please note that we reserve the right to make changes to the Customer Agreement as well as to our business practices and procedures. This Overview is for information purposes and is not a contract. It does not replace or supplement the Customer Agreement.*

This agreement covers important topics such as when it begins, how long it lasts, fees for early termination and late payments, our rights to change this agreement and your wireless service, limitations of liability, use of information about you, and settlement of disputes by arbitration instead of in court. If you accept this agreement, it will apply to all your wireless service from us, including all lines in service from us and all your existing calling plans. Its provisions also apply to any other transactions or agreements between us. To the extent their terms and conditions conflict with this agreement, this agreement will govern.

### Your Calling Plans

YOUR CALLING PLANS BECOME PART OF THIS AGREEMENT. The prices you pay, including activation fees, monthly access fees, monthly minutes of airtime included with an access fee, prices for additional minutes, roaming charges, and any per-minute charges for long distance service from us, may depend in part on how long the minimum term you're agreeing in advance to do business with us. Calling plans describe these prices and your minimum term.

### Your Rights To Refuse Or Cancel This Agreement

THIS AGREEMENT STARTS WHEN YOU ACCEPT. Paragraphs marked "°" continue after it ends. You accept when you do any of the following things after an opportunity to review this agreement:

- Give us a written or electronic signature;
- Tell us orally or electronically that you accept;
- Activate your service through your wireless phone;

- Open a package that says you are accepting by opening it; or
- Use your service after making any change or addition when we've told you that the change or addition requires acceptance.

IF YOU DON'T WANT TO ACCEPT, DON'T DO ANY OF THESE THINGS. You can cancel (if you're a new customer) or go back to the provisions of your former customer agreement (if you're already a customer) without additional fees if you tell us (and return to us in good condition any
wireless phone you got from us with your new service) **WITHIN 15 DAYS** of accepting. You'll still be responsible through that date for the new service and any calls using it.

### Your Rights To Change Or End Your Service; Termination Fees; Phone Number Portability

° Except as explicitly permitted by this agreement, you're agreeing to maintain service with us for your minimum term plus any additional time required by any promotions you accept. (Periods of suspension of service don't count toward these requirements.) After that, you'll become a month-to-month customer under this agreement. **IF YOU CHOOSE TO END YOUR SERVICE BEFORE YOU BECOME A MONTH-TO-MONTH CUSTOMER (OR IF WE TERMINATE IT EARLY FOR GOOD CAUSE), YOU MUST PAY UP TO $175 PER WIRELESS PHONE NUMBER AS**
**AN EARLY TERMINATION FEE.** If at any time you change your service (by accepting a promotion, for example), you'll be subject to any requirements, such as a new minimum term we set for that change. If you terminate your service as of the end of your minimum term, you won't be responsible for any remaining part of your monthly billing cycle. **Otherwise, all terminations by you during a monthly billing cycle become effective on the last day of that billing cycle.** You'll remain responsible for all fees and charges incurred until then and won't be entitled to any
partial month credits or refunds. You may be able to take your current wireless phone number to another service provider. This is called "porting" and will also terminate our service to you for that number. If you request your new service provider to port a number from us, and we receive your request from that new service provider, we'll treat the request as notice from you to terminate our service for that number upon successful completion of porting. After the porting is completed, you won't be able to use our service for that number. You'll remain responsible for any early
termination fee, and for all fees and charges through the end of that billing cycle, just like any other termination. If you're porting a phone number to us from another company, we may not be able to provide you some services, such as 911 location services, immediately.

### Our Rights To Make Changes

Your service is subject to our business policies, practices and procedures, which we can change without notice. WE CAN ALSO CHANGE PRICES AND ANY OTHER TERMS IN THIS AGREEMENT AT ANY TIME BY GIVING YOU WRITTEN NOTICE PRIOR TO THE BILLING PERIOD IN WHICH THE CHANGES WOULD GO INTO EFFECT.

**IF YOU CHOOSE TO USE YOUR SERVICE AFTER THAT POINT, YOU'RE ACCEPTING THE CHANGES. IF THE CHANGES HAVE A MATERIAL ADVERSE EFFECT ON YOU, HOWEVER, YOU CAN END THE AFFECTED SERVICE, WITHOUT ANY EARLY TERMINATION FEE, JUST BY CALLING US WITHIN 30 DAYS AFTER THE FIRST BILL WHEN THE CHANGES GO INTO EFFECT.**

### Your Wireless Phone

Your wireless phone is any device equipped to receive our wireless voice or data service. It must comply with Federal Communications Commission regulations and be compatible with our network and your calling plan. Whether you buy your wireless phone through us or through someone else is entirely your choice. **We may change a wireless phone's software or programming over the air without notice.** This might affect data stored on your wireless phone, or the way you've programmed it. Your wireless phone may also contain software that prevents it from being used with any other company's wireless service, even if you leave us.

### Your Wireless Phone Number And Caller ID

You don't have any rights in any personal identification number, e-mail address, or identifier we assign you. (We'll tell you if we decide to change or reassign them.) The same is true of your wireless phone number, except for any rights federal law grants you. Your wireless phone number and name may show up when you call someone. You can block this "Caller ID" for most calls by dialing *67 before each call, or by ordering per-line call blocking (dialing*82 to unblock)
where it's available. You can't block Caller ID to some numbers, such as toll-free numbers. Although it's illegal for unauthorized people to intercept your calls, such interceptions can occur.
We may also monitor or record our calls with you for training or quality assurance.

**How Service Works**

Wireless phones use radio transmissions, so we can't provide service when your wireless phone isn't in range of one of our transmission sites, or a transmission site of another company that's agreed to carry our customers' calls, or if there isn't sufficient network capacity available at that moment. There are places, particularly in remote areas, with no service at all. Weather, topography, buildings, your wireless phone, and other conditions we don't control may also cause dropped calls or other problems.

**Different Kinds Of Charges And Surcharges We Set**

° You agree to pay all access, usage, and other charges and surcharges we bill you, even if you weren't the user of your wireless phone and didn't authorize its use. You may have to pay a fee to begin service or reconnect suspended service. Usage charges may vary depending on where, when, and how you call. We may charge higher airtime rates for calls made and received on our network outside your calling plan's home airtime rate area. You also have a local calling area (which may be different than your home airtime rate area). When you call from inside a local calling area to somewhere outside it, or call from anywhere outside a local calling area, there may be toll, regional calling, or long distance charges in addition to airtime. (We provide or select the long distance service for calls on our network.) When you make a call inside your local calling area that uses a local phone company's lines (for example, a call to a typical home phone number), there may be a handling fee called a landline or connection fee. We charge airtime for most calls, including toll free and operator assisted calls. Additional features or services such as time, weather, operator or directory assistance, call dialing, calling card use, call forwarding, data calls, automatic call delivery, voice mail, Roadside Assistance, text messaging, and Mobile Web may have additional charges. We also charge monthly fees (such as universal service and regulatory fees) related to our governmental costs. These recurring fees aren't required by
law and are subject to change.

**Taxes And Surcharges We Don't Set**

You agree to pay all taxes, surcharges, and fees set by the government. We may not always give advance notice of changes to these items. If you're exempt from some taxes, we need your exemption certificates. You agree to pay for any filings we make related to your exemptions.

**Roaming And Roaming Charges**

You're "roaming" whenever you make or receive a call using a transmission site outside your home airtime rate area, or using another company's transmission site. Your wireless phone may sometimes connect to and roam on another company's network even when you're near our transmission sites. There may be extra charges (including long distance or toll charges) and higher rates for calls made or received while roaming, depending on your calling plan.

**Cumulative Charges**

On any call you make or receive, a number of the different kinds of charges described above may apply. Charges may also apply to two or more calls simultaneously if you use call waiting, call forwarding, or three way calling.

**Your Bill**

° Your bill is our notice to you of your fees and charges and other important information. You should read everything you receive with your bill. We bill applicable usage charges after calls are made or received. We bill some access fees and other charges in advance under some calling plans. If you choose Internet billing (where available), you waive any right to paper bills or notices. If your calling plan doesn't include detailed billing, we may charge you for that service if you choose it. We may charge a fee for a bill copy or reprint.

**How We Calculate Your Bill**

° Your bill reflects the fees and charges in effect under your calling plan at the time they're incurred. You can dispute your bill, but only within 90 days of receiving it. You must still pay
any disputed charges until the dispute is resolved. Usage charges may vary by location based on where your wireless phone is when the call starts. If a charge depends on an amount of time used, we'll round up any fraction of a minute to the next full minute unless your calling plan says otherwise. Time starts when you first press "SEND" or the call connects to a network on outgoing calls, and when the call connects to a network (which may be before it rings) on incoming calls. Time may end several seconds after you press "END" or after the call otherwise disconnects. We bill for calls that connect, including calls answered by machines. In some areas we also bill for uncompleted calls that ring for a minute or more. Generally, your calls made within the bill cycle start and end dates will be included in your bill. Billing for certain home and/or roaming calls and related charges may be delayed to a later bill. Depending on your calling plan, these calls may be applied against your airtime allowance in the month they are billed rather than the month you made or received the call. This may result in charges beyond your expected charges in the later month.

**Your Rights For Dropped Calls Or Interrupted Service**

If you get disconnected by our network from a call in your home airtime rate area, redial. If the same number answers within 5 minutes, call us within 90 days and we'll give you a 1 minute airtime credit. If service is interrupted in your home airtime rate area for more than 24 hours in a row due to our fault, call us within 90 days and we'll give you a pro rata daily credit, up to your monthly access charge, for that period. These are your only rights for dropped calls or
interrupted service.

**Payments, Deposits, Credit Cards And Checks**

° Payment is due in full as stated on your bill. IF WE DON'T RECEIVE PAYMENT IN FULL WHEN DUE, WE MAY, TO THE EXTENT PERMITTED BY LAW, CHARGE A LATE FEE OF UP TO 11/2 PERCENT A MONTH (18 PERCENT ANNUALLY), OR A FLAT $5 A MONTH, WHICHEVER IS GREATER, ON UNPAID BALANCES. WE MAY ALSO CHARGE FOR ANY COLLECTION AGENCY FEES BILLED TO US FOR TRYING TO COLLECT FROM YOU.

We may require an advance deposit (or an increased deposit) from you. We'll pay simple interest on any deposit at the rate the law requires. Please retain your evidence of deposit. You agree that we can apply deposits, payments or prepayments in any order to any amounts you owe us on any account. You can't use a deposit to pay any bill unless we agree. We won't honor limiting notations you make on or with your checks. We may charge you up to $25 for any returned check, depending on applicable law. We refund final credit balances of less than one dollar only
upon request.

**If Someone Steals Your Wireless Phone**

If someone steals your wireless phone, notify us, provide us with any documentation (such as a police report) we request, and we'll suspend your service for up to 30 days, or until you replace or recover your wireless phone, whichever comes first. Until you notify us, you're still responsible for
all fees and charges.

**Our Rights To Limit Or End Service Or This Agreement**

You agree not to use (or to permit your wireless phone to be used) for any purpose that's illegal or not allowed by this agreement. WE CAN, WITHOUT NOTICE, LIMIT, SUSPEND OR END YOUR SERVICE OR ANY AGREEMENT WITH YOU FOR THIS OR ANY OTHER GOOD CAUSE, including, but not limited to: (a) paying late more than once in any 12 months; (b) incurring charges larger than a required deposit or billing limit (even if we haven't yet billed the charges); (c) verbally or physically abusing our employees or agents; (d) lying to us; (e) interfering with network, customer service, or business operations; (f) becoming insolvent or going bankrupt; (g) breaching this agreement; (h) "spamming", "mail bombing", or other abusive messaging; (i) modifying your wireless phone from its manufacturer's specifications; (j) providing credit information we can't verify; (k) using your service in a way that adversely affects service to other customers; or (l) allowing anyone to steal or tamper with your wireless phone number. We can also temporarily limit your service for any business or governmental reason.

**Directories And Your Privacy**

° Except as follows, we won't share personal information about you with others without your permission. We have a duty under federal law to protect the confidentiality of information about the quantity, technical configuration, type, destination, and amount of your use of our service, together with similar information on your bills. (This doesn't include your name, address, and wireless number. Unless you arrange otherwise with us and pay any required fee, we may
list them in a public directory. We aren't responsible for mistakes in the listings.) We can, however, share and use this information as required by law, by legal process, by exigent
circumstances, or to protect ourselves. We can also use this information to communicate with you about goods and services related to the products and services you already buy from us, and we can share it with our affiliates when related to goods and services you already buy from both us and our affiliates. You can call us anytime if you do not wish to use this information to communicate about such other goods and services with you or you do not wish us to share this
information with our affiliates. In addition, you've authorized us to investigate your credit history at any time and to share credit information about you with credit reporting agencies. If you ask, we'll tell you the name and address of any credit agency that gives us a credit report about you.

**Disclaimer Of Warranties**

° WE MAKE NO REPRESENTATIONS OR WARRANTIES, EXPRESS OR IMPLIED, INCLUDING, TO THE EXTENT PERMITTED BY FEDERAL, STATE, AND LOCAL LAW, ANY
IMPLIED WARRANTY OF MERCHANTABILITY OR FITNESS FOR A PARTICULAR PURPOSE CONCERNING YOUR SERVICE OR YOUR WIRELESS PHONE. WE CAN'T PROMISE UNINTERRUPTED OR ERROR-FREE SERVICE AND DON'T AUTHORIZE ANYONE TO MAKE ANY WARRANTIES ON OUR BEHALF. THIS DOESN'T DEPRIVE YOU OF ANY WARRANTY RIGHTS YOU MAY HAVE AGAINST ANYONE ELSE.

**Waivers And Limitations Of Liability**
° UNLESS THE LAW FORBIDS IT IN ANY PARTICULAR CASE, WE EACH AGREE TO LIMIT CLAIMS FOR DAMAGES OR OTHER MONETARY RELIEF AGAINST EACH OTHER TO DIRECT DAMAGES. THIS LIMITATION AND WAIVER WILL APPLY REGARDLESS OF THE THEORY OF LIABILITY, WHETHER FRAUD, MISREPRESENTATION, BREACH OF CONTRACT, PERSONAL INJURY, PRODUCTS LIABILITY OR ANY OTHER THEORY. THIS MEANS THAT NEITHER OF US WILL CLAIM OR SEEK ANY INDIRECT, SPECIAL, CONSEQUENTIAL, TREBLE, OR PUNITIVE DAMAGES FROM THE OTHER. You agree that we aren't liable for problems caused by you or a third party; by buildings, hills, network congestion, tunnels, weather, or other things we don't control; or by any act of God. If another wireless carrier is involved in any problem (for example, while you roam), you also agree to any limitations of liability in its favor that it imposes.

**Dispute Resolution And Mandatory Arbitration**
° INSTEAD OF SUING IN COURT, WE EACH AGREE TO SETTLE DISPUTES (EXCEPT CERTAIN SMALL CLAIMS) ONLY BY ARBITRATION. THE RULES IN ARBITRATION ARE DIFFERENT. THERE'S NO JUDGE OR JURY, AND REVIEW IS LIMITED, BUT AN ARBITRATOR CAN AWARD THE SAME DAMAGES AND RELIEF, AND MUST HONOR THE SAME LIMITATIONS IN THIS AGREEMENT, AS A COURT WOULD. TO THE FULLEST EXTENT PERMITTED BY LAW WE EACH AGREE THAT:

1. THE FEDERAL ARBITRATION ACT APPLIES TO THIS AGREEMENT. ANY CONTROVERSY OR CLAIM ARISING OUT OF OR RELATING TO THIS AGREEMENT, OR ANY PRIOR AGREEMENT FOR WIRELESS SERVICE WITH US OR ANY OF OUR AFFILIATES OR PREDECESSORS IN INTEREST, OR ANY PRODUCT OR SERVICE PROVIDED UNDER OR IN CONNECTION WITH THIS AGREEMENT OR SUCH A PRIOR AGREEMENT, OR ANY ADVERTISING FOR SUCH PRODUCTS OR SERVICES, WILL BE SETTLED BY ONE OR MORE NEUTRAL ARBITRATORS ON AN INDIVIDUAL BASIS BEFORE THE AMERICAN
ARBITRATION ASSOCIATION ("AAA") OR BETTER BUSINESS BUREAU ("BBB") AS DESCRIBED BELOW. (IF YOUR LOCAL SMALL CLAIMS COURT OFFERS ARBITRATION, YOU MAY ALSO USE THAT PROCESS FOR ANY DISPUTE THAT QUALIFIES.) THIS DOESN'T CHANGE YOUR SUBSTANTIVE RIGHTS, JUST THE POTENTIAL FORUMS FOR RESOLVING DISPUTES. IN ADDITION, YOU CAN STILL BRING ANY ISSUES YOU MAY HAVE TO THE ATTENTION OF APPROPRIATE FEDERAL, STATE, OR LOCAL GOVERNMENT AGENCIES AND THEY CAN STILL, IF THE LAW ALLOWS, SEEK RELIEF AGAINST US ON YOUR BEHALF.

2. FOR CLAIMS OVER $10,000, THE AAA'S WIRELESS INDUSTRY ARBITRATION ("WIA") RULES WILL APPLY. FOR CLAIMS BETWEEN $2,500 AND $10,000, THE AAA'S ARBITRATION RULES FOR THE RESOLUTION OF CONSUMER-RELATED DISPUTES (THE "CONSUMER RULES"), WHICH INCLUDE A SMALL CLAIMS COURT OPTION, WILL APPLY. FOR CLAIMS UNDER $2,500, THE COMPLAINING PARTY CAN CHOOSE EITHER THE CONSUMER RULES OR THE BBB'S RULES FOR BINDING ARBITRATION. AN ARBITRATOR MAY, UNDER ANY OF THESE RULES, REQUIRE EACH OF US TO EXCHANGE RELEVANT EVIDENCE IN ADVANCE. IN LARGE/COMPLEX CASES UNDER THE WIA RULES, THE ARBITRATORS MUST APPLY THE FEDERAL RULES OF EVIDENCE AND THE LOSER MAY HAVE THE AWARD REVIEWED BY A PANEL OF 3 NEW ARBITRATORS.

3. YOU CAN OBTAIN RULES AND FEE INFORMATION FROM THE AAA (www.adr.org), THE BBB (www.bbb.org) OR FROM US. IF YOU CAN'T PAY THE REQUIRED ARBITRATION FEES, IF ANY, THERE ARE FEE WAIVER PROGRAMS. EVEN IF YOU DON'T QUALIFY FOR A FEE
WAIVER, WE'LL PAY ALL BUT $100 OF ANY COMBINED FEES YOU'D BE REQUIRED TO PAY FOR FILING AND A FIRST DAY OF ARBITRATION IF YOU COMPLETE OUR MEDIATION PROGRAM. MEDIATION IS A PROCESS FOR MUTUALLY RESOLVING DISPUTES. A MEDIATOR CAN HELP PARTIES REACH AGREEMENT, BUT DOESN'T DECIDE THEIR ISSUES. IN OUR MEDIATION PROGRAM, WE'LL ASSIGN SOMEONE (WHO MAY BE FROM OUR COMPANY) NOT DIRECTLY INVOLVED IN THE DISPUTE TO MEDIATE. THAT PERSON WILL HAVE ALL THE RIGHTS AND PROTECTIONS OF A MEDIATOR. NOTHING SAID IN THE MEDIATION CAN BE USED IN A LATER ARBITRATION OR LAWSUIT. COMPLETING THE
MEDIATION PROGRAM MEANS PARTICIPATING IN GOOD FAITH IN AT LEAST ONE TELEPHONIC MEDIATION SESSION. YOU CAN CONTACT US AT www.verizonwireless.com OR THROUGH CUSTOMER SERVICE TO FIND OUT MORE.

4. ONLY AN ARBITRATOR CAN DECIDE WHETHER AN ISSUE IS ARBITRABLE. AN ARBITRATOR CAN ALLOCATE THE FEES AND COSTS OF ARBITRATION IN AN AWARD.
IF AN APPLICABLE STATUTE PROVIDES FOR AN AWARD OF ATTORNEY'S FEES, AN ARBITRATOR CAN AWARD THEM, TOO. ANY ARBITRATION AWARD MADE AFTER COMPLETION OF AN ARBITRATION IS FINAL AND BINDING AND MAY BE CONFIRMED IN ANY COURT OF COMPETENT JURISDICTION. AN AWARD AND

ANY JUDGMENT CONFIRMING IT ONLY APPLIES TO THE ARBITRATION IN WHICH IT WAS AWARDED AND CAN'T BE USED IN ANY OTHER CASE EXCEPT TO ENFORCE THE AWARD ITSELF.

**5. IF FOR SOME REASON THESE ARBITRATION REQUIREMENTS DON'T APPLY, WE EACH WAIVE ANY TRIAL BY JURY.**

**About You**

° You represent that you're at least 18 years old and have the legal capacity to accept this agreement. If you're ordering for a company, you're representing that you're authorized to bind it, and where the context requires, "you" means the company.

**About This Agreement**

° A waiver of any part of this agreement in one instance won't be a waiver of any other part or any other instance. You can't assign this agreement or any of your rights or duties under it. We may assign all or part of this agreement without notice, and you agree to make all subsequent payments as instructed. NOTICES ARE CONSIDERED DELIVERED 3 DAYS AFTER MAILING TO THE MOST CURRENT BILLING ADDRESS WE HAVE ON FILE FOR YOU, IF BY US, OR TO THE CUSTOMER SERVICE ADDRESS ON YOUR MOST RECENT BILL, IF BY YOU. If any part of this agreement, including any part of its arbitration provisions, is held invalid, that part may be severed from this agreement. This agreement and the documents to which it refers form the entire agreement between us on their subjects. You can't rely on any other documents or statements on those subjects, and you have no other rights with respect to service or this agreement, except as specifically provided by law. This agreement isn't for the benefit of any third party except our parents, affiliates, subsidiaries, agents, and predecessors and successors in

interest. It's governed by the laws of the state encompassing the area code assigned to your wireless phone number, without regard to the conflicts of laws rules of that state. It's

also subject to any applicable tariffs.

# EXHIBIT 2
## (CINGULAR CONTRACT)

**Important Information Regarding Your Equipment Discount**

Your price paid includes an Equipment Discount of $250 that has been provided to you by this Cingular authorized agent for activating a new non-substitute line of service with Cingular, and maintaining this new line of service with the selected rate plan in good standing for a minimum of 181 consecutive days.

By accepting this Equipment Discount, you agree that for a period of 181 days after your new line of service is activated, you

- will pay your balance due to Cingular each month
- will not disconnect this Cingular line of service
- will not transfer this equipment to another Cingular line of service
- will not port an existing phone number from another Cingular account to this new line of service
- will not change your Cingular service rate plan to a lower monthly service rate

*If these conditions are not met, you herein provide authorization for a $250 reimbursement to be charged to your credit card by this Cingular authorized agent without need for further approval.* This reimbursement of the $250 Equipment Discount will only be charged if the above conditions are not met.

<u>**Cingular Wireless Terms and Conditions**</u>

**BILLING TERM -** billing for service begins when the order is completed.

**CREDIT CHECK CONSENT AND REPORTING AUTHORIZATION** I authorize any person, or consumer or credit reporting agency, to provide Cingular with any information it has on me or the entity on whose behalf I make this application. I authorize Cingular to: (a) compile this information, (b) disclose my account information including my payment history and confidential information to credit reporting agencies or private credit reporting associations, and (c) periodically obtain and use my credit report and other credit information from any source in connection with Cingular's offering of wireless and other services. I understand that if I fail to fulfill the terms of my credit obligations under this Agreement, Cingular may report my failure to a credit reporting agency.

**DOOR - TO-DOOR SALE** IF THIS IS A DOOR-TO-DOOR SALE, I MAY HAVE A LEGAL RIGHT TO CANCEL THIS TRANSACTION BEFORE MIDNIGHT OF THE THIRD BUSINESS DAY AFTER THE DATE OF THE TRANSACTION. IF APPLICABLE, I WILL REVIEW THE ASSOCIATED NOTICE OF CANCELLATION FORM AND EXPLANATION OF THIS RIGHT.

**REGULATORY COST RECOVERY FEE Cingular also imposes the following charges: a Regulatory Cost Recovery Fee of up to $1.25 to help defray its costs incurred in complying with obligations and charges imposed by State and Federal telecom regulation, a gross receipts surcharge, and State and Federal Universal Service charges. The Regulatory Cost Recovery Fee is not a tax or a government required charge.**

**GUARANTY** If I am signing on behalf of an entity, I represent that I am authorized to sign on its behalf, and I agree to be jointly responsible with the entity for payment of any sums that become due under, and to be bound by, this Agreement. I agree you can collect directly from me without first proceeding against the entity.

**CONTRACT PROVISIONS –** This Agreement includes all the provisions of Cingular's current terms of service form incorporated herein by reference, including **a binding arbitration clause.** It also includes and incorporates additional provisions contained in a separate rate plan or other brochure(s) describing the services to which I subscribed ("Rate Plan Brochure"). I agree to all of these contract provisions.

**SERVICE/COVERAGE LIMITATIONS** Service is not available at all times in all places. Coverage maps are available at www.cingular.com and are subject to the additional limitations described there. There are gaps in coverage within the service areas shown on coverage maps, which, by their nature, are only approximations of actual coverage. I accept Cingular's service with these limitations.

**EARLY TERMINATION FEE** In FL, GA, SC, NC, KY, TN, MS, LA, AL, NY, and parts of IN and NJ an Early Termination Fee in the amount of $240 per device prorated over the term of your commitment may be assessed against you in the event that you terminate this contract before the expiration of its term. In all other areas, an Early Termination Fee of $150 per device may be assessed against you in the event that you terminate this contract before the expiration of its term.

**CANCELLATION POLICY** As further set forth in this Agreement, we will cancel your service, for any reason and without imposing the Early Termination Fee, within thirty (30) days of your signing this Agreement, PROVIDED, however, that if you cancel service you will remain responsible for service fees and charges incurred. If you cancel within three (3) days of your signing this Agreement, you will be entitled to a refund of your activation fee, if any. If you exercise this option, it may be necessary for you to return handsets and associated accessories purchased in connection with your entry into this Agreement. I HAVE READ, UNDERSTAND, AND AGREE TO BE BOUND BY THIS AGREEMENT WITH ITS TERMS OF SERVICE **(including Changes to Terms and Rates, Limitation of Liability and Arbitration).**

I HAVE READ, UNDERSTAND, AND AGREE TO BE BOUND BY THIS AGREEMENT WITH ITS TERMS OF SERVICE **(including Changes to Terms and Rates, Limitation of Liability and Arbitration).**

"Cingular " or "we" "us" or "our" refers to Cingular Wireless LLC, acting on behalf of its FCC-licensed affiliates doing business as Cingular Wireless. "You" or "your" refers to the person or entity that is the customer of record. PLEASE READ THIS AGREEMENT CAREFULLY TO ENSURE THAT YOU UNDERSTAND EACH PROVISION. **This Agreement requires the use of arbitration to resolve disputes and also limits the remedies available to you in the event of a dispute.**

**SERVICE COMMITMENT; EARLY TERMINATION FEE** Your Service Commitment begins on the day we activate your service. You have received certain benefits from us in exchange for any Service Commitment greater than one month. If we terminate your service for nonpayment or other default before the end of the Service Commitment, or if you terminate your service for any reason other than (a) in accordance with the cancellation policy; or (b) pursuant to a change of terms, conditions, or rates as set forth below, you agree to pay us with respect to each Equipment Identifier or telephone number assigned to you, in addition to all other amounts owed, an Early Termination Fee. In Florida, Georgia, South Carolina, North Carolina, Kentucky, Tennessee, Mississippi, Louisiana, Alabama, New York, applicable parts of Indiana, and applicable parts of New Jersey the Early Termination Fee is $240 divided by the total number of months in your Service Commitment, then multiplied by the remaining months or parts of months in such Service Commitment; in all other areas it is $150. ("Early Termination Fee"). The Early Termination Fee is not a penalty, but rather a charge to compensate us for your failure to satisfy the Service Commitment on which your rate plan is based. AFTER YOUR SERVICE COMMITMENT, THIS AGREEMENT SHALL AUTOMATICALLY RENEW ON A MONTH-TO-MONTH BASIS UNTIL EITHER PARTY GIVES NOTICE PURSUANT TO THE TERMINATION PROVISION BELOW.

**CHARGES AND Disputes** You are responsible for paying all charges for or resulting from services provided under this Agreement. You will receive monthly bills that are due in full as shown thereon. **YOU MUST, WITHIN 100 DAYS OF THE DATE OF THE BILL, NOTIFY US IN WRITING AT CINGULAR WIRELESS, BILL DISPUTE, SUITE 1400, 5565 Glenridge Connector, P.O. BOX 16, ATLANTA, GA 30342 ("CINGULAR'S ADDRESS") OF ANY DISPUTE YOU HAVE WITH RESPECT TO THE BILL, INCLUDING ANY CHARGES ON THE BILL AND ANY SERVICE WE PROVIDED FOR WHICH YOU WERE BILLED, OR YOU WILL HAVE WAIVED YOUR RIGHT TO DISPUTE THE BILL OR SUCH SERVICES AND TO BRING, OR PARTICIPATE IN, ANY LEGAL ACTION RAISING ANY SUCH DISPUTE.** Charges include, without limitation, airtime, roamer, recurring monthly service, activation,

administrative, and late payment charges; regulatory cost recovery and other surcharges; optional feature charges; toll, collect call and directory assistance charges; any other charges or calls billed to your phone number; and applicable taxes and governmental fees, whether assessed directly upon you or upon Cingular. To determine your primary place of use ("PPU") and which jurisdiction's taxes and assessments to collect, you are required to provide us with your residential or business street address. If you do not provide us with such address, or if it falls outside our licensed service area, we may reasonably designate a PPU within the licensed service area for you. Except as provided below, monthly service and certain other charges are billed one month in advance, and there is no proration of such charges if service is terminated on other than the last day of your billing cycle. Monthly service and certain other charges are billed in arrears if you are a former customer of AT&T Wireless and maintain uninterrupted service on select Cingular rate plans following Cingular's acquisition of AT&T Wireless Services, Inc., provided, however, that in either case, if you elect to receive your bills for your Cingular services combined with your landline phone bill (where available) you will be billed in advance as provided above. You agree to pay for incoming and outgoing calls, and data services sent to and from your Equipment. AIRTIME AND OTHER MEASURED USAGE ("CHARGEABLE TIME") IS BILLED IN FULL MINUTE INCREMENTS, AND ACTUAL AIRTIME AND USAGE IS ROUNDED UP TO THE NEXT FULL MINUTE INCREMENT AT THE END OF EACH CALL FOR BILLING PURPOSES. CINGULAR CHARGES A FULL MINUTE OF AIRTIME USAGE FOR EVERY FRACTION OF THE LAST MINUTE OF AIRTIME USED ON EACH WIRELESS CALL. DATA TRANSPORT IS BILLED IN FULL KILOBYTE INCREMENTS, AND ACTUAL TRANSPORT IS ROUNDED UP TO THE NEXT FULL KILOBYTE INCREMENT AT THE END OF EACH DATA SESSION FOR BILLING PURPOSES. CINGULAR CHARGES A FULL KILOBYTE OF DATA TRANSPORT FOR EVERY FRACTION OF THE LAST KILOBYTE OF DATA TRANSPORT USED ON EACH DATA SESSION. NETWORK OVERHEAD, SOFTWARE UPDATE REQUESTS, AND RESEND REQUESTS CAUSED BY NETWORK ERRORS CAN INCREASE MEASURED KILOBYTES. If you select a rate plan that includes a predetermined allotment of Services (for example, a predetermined amount of airtime, megabytes or text messages), unless otherwise specifically provided as a part of such rate plan, any unused allotment of services from one billing cycle will not carry over to any other billing cycle. We may bill you in a format as we determine from time to time. Additional charges may apply for additional copies of your bill, or for detailed information about your usage of Services. **Charges for usage of services on networks maintained by other carriers or on networks acquired by Cingular after August 31, 2004 may appear on your bill after the billing cycle in which the usage occurred.** Chargeable Time begins for outgoing calls when you press SEND (or similar key) and for incoming calls when a signal connection from the caller is established with our facilities. Chargeable Time ends after you press END (or similar key), but not until your wireless telephone's signal of call disconnect is received by our facilities and the call disconnect signal has been confirmed. All outgoing calls for which we receive answer supervision or which have at least 30 seconds of Chargeable Time, including ring time, shall incur a minimum of one-minute airtime charge. Answer supervision is generally received when a call is answered; however, answer supervision may also be generated by voice mail systems, private branch exchanges, and interexchange switching equipment. Chargeable Time may include time for us to recognize that only one party has disconnected from the call, time to clear the channels in use, and ring time. Chargeable Time may also occur from other uses of our facilities, including by way of example, voice mail deposits and retrievals, and call transfers. Calls that begin in one rate period and end in another rate period may be billed in their entirety at the rates for the period in which the call began. If your wireless phone or other device ("Equipment") is lost or stolen, **you will be responsible for all charges incurred on your phone number until you report the theft or loss and provide a police report number to us.** After you report the theft or loss to us, you remain responsible for complying with your other obligations under this Agreement, including, but not limited to, payment of your monthly service fee. You also remain responsible for paying your monthly service fee if your service is suspended for nonpayment. We may require payment by money order, cashier's check or a similarly secure form of payment at our discretion. We will charge you $30.00 or the highest amount allowed by law, whichever is less, for any check or other instrument (including credit card chargebacks) tendered by you and returned unpaid by a financial institution for any reason. You agree to reimburse us the fees of any collection agency, which may be based on a percentage at a maximum of 33% of the debt, and all costs and expenses, including reasonable attorneys' fees, we incur in such collection efforts.

**CHANGES TO TERMS AND RATES** We may change any terms, conditions, rates, fees, expenses, or charges regarding your service at any time. We will provide you with notice of such changes (other than changes to governmental fees, proportional charges for governmental mandates, roamer rates or administrative charges) either in your monthly bill or separately. You understand and agree that State and Federal Universal Service fees and other governmentally imposed fees, whether or not assessed directly upon you, may be increased based upon the government's or our calculations. IF WE INCREASE THE PRICE OF ANY OF THE SERVICES TO WHICH YOU SUBSCRIBE, AS SUCH PRICES ARE SET FORTH IN YOUR RATE PLAN BROCHURE, OR IF WE MATERIALLY DECREASE THE GEOGRAPHICAL AREA IN WHICH YOUR AIRTIME RATE APPLIES (OTHER THAN A TEMPORARY DECREASE FOR REPAIRS OR MAINTENANCE), WE WILL DISCLOSE THE CHANGE AT LEAST ONE BILLING CYCLE IN ADVANCE (EITHER THROUGH A NOTICE WITH YOUR BILL, A TEXT MESSAGE TO YOUR EQUIPMENT, OR OTHERWISE) AND YOU MAY TERMINATE THIS AGREEMENT WITHOUT PAYING AN EARLY TERMINATION FEE OR RETURNING OR PAYING FOR ANY PROMOTIONAL ITEMS, PROVIDED YOUR NOTICE OF TERMINATION IS DELIVERED TO US WITHIN THIRTY (30) DAYS AFTER THE FIRST BILL REFLECTING THE CHANGE. If you lose your eligibility for a particular rate plan, we may change your rate plan to one for which you qualify.

**CONTINGENT BENEFITS.** You may receive or be eligible for certain rate plans, discounts, features, promotions, and other benefits ("Benefits") through a business or government customer's agreement with us ("Business Agreement"). Any and all such Benefits are provided to you solely as a result of the corresponding Business Agreement and such Benefits may be modified or terminated without notice. If a business or government entity pays your charges or is otherwise liable for the charges, you authorize us to share your account information with that entity and /or its authorized agents. If you are on a rate plan and/or receive certain Benefits tied to a Business Agreement with us, but you are liable for your own charges, then you authorize us to share enough account information with that entity and/or its authorized agents to verify your continuing eligibility for those Benefits and/or rate plan. You may receive Benefits because of your agreement to have the charges for your Service billed ("Joint Billing") by a landline company affiliated with Cingular ("Affiliate") or because you subscribe to certain service provided by an Affiliate. If you cancel Joint Billing or the Affiliate service your rates will be adjusted without notice to a rate plan for which you qualify.

**EQUIPMENT** Your Equipment must be compatible with, and not interfere with, our service, and must comply with all applicable laws, rules and regulations. We may periodically program your Equipment remotely with system settings for roaming service and other features that cannot be changed manually. Equipment purchased for use on our network may not function on other networks.

**ADVANCE PAYMENTS AND/OR DEPOSITS** We may require you to make deposits or advance payments for services, which we may offset against any unpaid balance on your account. Interest will not be paid on advance payments or deposits unless required by law. We may require additional advance payments or deposits if we determine that the initial payment was inadequate. Based on your creditworthiness as we determine it, we may establish a credit limit and restrict service or features. If your account balance goes beyond the limit we set for you, we may immediately interrupt or suspend service until your balance is brought below the limit. Any charges you incur in excess of your limit become immediately due. If you have more than one account with us, you must keep all accounts in good standing to maintain service. If one account is past due or over its limit, all accounts in your name are subject to interruption or termination and all other available collection remedies.

**LATE PAYMENT CHARGES** Late payment charges are based on the state to which the area code of the wireless telephone number assigned to you is assigned by the North American Numbering Plan Administration (for area code assignments see http://www.nationalnanpa.com/area_code_maps). You agree that for amounts not paid by the due date, CINGULAR may charge, as a part of its rates and charges, and you agree to pay, a late payment fee of $5.00 in CT, D.C., DE, IL, KS, MA, MD, MI, MO, NH, NJ, NY, PA, OK, OH, RI, VA, WI, WV; the late payment charge is 1.5% of the balance carried forward to the next bill in all other states.

**TERMINATION** Either party may terminate this Agreement at any time after your Service Commitment ends with thirty (30) days notice to the other party. We may terminate this Agreement at any time without notice if we cease to provide service in your area. We may interrupt or terminate your service without notice for any conduct that we believe violates this Agreement or any terms and conditions of your rate plan, or if you behave in an abusive, derogatory or similarly unreasonable manner with any of our representatives, or if we discover that you are under-age, or if you fail to make all required payments when due or if we have reasonable cause to believe that your Equipment is being used for an unlawful purpose or in a way that may adversely affect our service, or if you provided inaccurate credit information or we believe your credit has deteriorated and you refuse to pay any requested advance payment or deposit.

**SERVICE LIMITATIONS; LIMITATION OF LIABILITY** Service may be interrupted, delayed or otherwise limited for a variety of reasons, including environmental conditions, unavailability of radio frequency channels, system capacity, priority access by National Security and Emergency Preparedness personnel in the event of a disaster or emergency, coordination with other systems, equipment modifications and repairs, and problems with the facilities of interconnecting carriers. We may block access to certain categories of numbers (e.g. 976, 900 and international destinations) or certain websites in our sole discretion. We may, but do not have the obligation to, refuse to transmit any information through the Service and may screen and delete information prior to delivery of that information to you. **There are gaps in service within the service areas shown on coverage maps, which, by their nature, are only approximations of actual coverage. WE DO NOT GUARANTEE YOU UNINTERRUPTED SERVICE OR COVERAGE. WE CANNOT ASSURE YOU THAT IF YOU PLACE A 911 CALL YOU WILL BE FOUND.** Airtime and other service charges apply to all calls, including involuntarily terminated calls. CINGULAR MAKES NO WARRANTY, EXPRESS OR IMPLIED, OF MERCHANTABILITY OR FITNESS FOR A PARTICULAR PURPOSE, SUITABILITY, OR PERFORMANCE REGARDING ANY SERVICES OR GOODS, AND IN NO EVENT SHALL CINGULAR BE LIABLE, WHETHER OR NOT DUE TO ITS OWN NEGLIGENCE, for any: (a) act or omission of a third party; (b) mistakes, omissions, interruptions, errors, failures to transmit, delays or defects in the service provided by or through us; (c) damage or injury caused by the use of service or Equipment, including use in a vehicle; (d) claim against you by third parties; (e) damage or injury caused by a suspension or termination of service by Cingular; or (f) damage or injury caused by failure or delay in connecting a call to 911 or any other emergency service. Notwithstanding the foregoing, if your service is interrupted for 24 or more continuous hours by a cause within our control, we will issue you, upon request, a credit equal to a pro-rata adjustment of the monthly service fee for the time period your service was unavailable, not to exceed the monthly service fee. Our liability to you for service failures is limited solely to the credit set forth above. Unless applicable law precludes parties from contracting to so limit liability, and provided such law does not discriminate against arbitration clauses, Cingular shall not be liable for any indirect, special, punitive, incidental or consequential losses or damages you or any third party may suffer by use of, or inability to use, service or Equipment provided by or through Cingular, including loss of business or goodwill, revenue or profits, or claims of personal injuries. To the full extent allowed by law, you hereby release, indemnify, and hold Cingular and its officers, directors, employees and agents harmless from and against any and all claims of any person or entity for damages of any nature arising in any way from or relating to, directly or indirectly, service provided by Cingular or any person's use thereof (including, but not limited to, vehicular damage and personal injury), INCLUDING CLAIMS ARISING IN WHOLE OR IN PART FROM THE ALLEGED NEGLIGENCE OF CINGULAR, or any violation by you of this Agreement. This obligation shall survive termination of your service with Cingular. Cingular is not liable to you for changes in operation, equipment or technology that cause your Equipment or software to be rendered obsolete or require modification. SOME STATES, INCLUDING THE STATE OF KANSAS, DO NOT ALLOW DISCLAIMERS OF IMPLIED WARRANTIES OR LIMITS ON REMEDIES FOR BREACH. THEREFORE, THE ABOVE LIMITATIONS OR EXCLUSIONS MAY NOT APPLY TO YOU. THIS AGREEMENT GIVES YOU SPECIFIC LEGAL RIGHTS AND YOU MAY HAVE OTHER RIGHTS WHICH VARY FROM STATE TO STATE.

**ACCOUNT ACCESS.** You authorize us to provide information about and to make changes to your account, including adding new service, upon the direction of any person able to provide information we deem sufficient to identify you.

**VOICE MAIL SERVICE** We may deactivate your voice mail service if you do not initialize it within a reasonable period after activation. We will reactivate the service upon your request.

**ARBITRATION Please read this carefully. It affects your rights.** Cingular and you (such references include our respective subsidiaries, affiliates, predecessors in interest, successors and assigns) agree to arbitrate all disputes and claims (including ones that already are the subject of litigation) arising out of or relating to this Agreement, or to any prior oral or written agreement, for Equipment or services between Cingular and you. Notwithstanding the foregoing, either party may bring an individual action in small claims court. This Agreement evidences a transaction in interstate commerce, and thus the Federal Arbitration Act governs the interpretation and enforcement of this provision. A party who intends to seek arbitration must first send to the other, by certified mail, a written Notice of Intent to Arbitrate ("Notice"). The Notice to Cingular should be addressed to: General Counsel, Cingular Wireless, 5565 Glenridge Connector, 20th Floor, Atlanta, GA 30342 ("Arbitration Notice Address"). The Notice must (a) describe the nature and basis of the claim or dispute; and (b) set forth the specific relief sought ("Demand"). If we do not reach an agreement to resolve the claim within 30 days after the Notice is received, you or Cingular may commence an arbitration proceeding.  After Cingular receives notice at the Arbitration Notice Address that you have commenced arbitration, it will promptly reimburse you for your payment of the filing fee. All issues are for the arbitrator to decide, including the scope of this arbitration clause, but the arbitrator is bound by the terms of this Agreement. The arbitration shall be governed by the Commercial Dispute Resolution Procedures and the Supplementary Procedures for Consumer Related Disputes (collectively, "AAA Rules") of the American Arbitration Association ("AAA"), as modified by this Agreement, and shall be administered by the AAA. The AAA Rules are available at www.adr.org or by writing to the Arbitration Notice Address. Except as otherwise provided for herein, Cingular will pay all AAA filing, administration and arbitrator fees for any arbitration initiated in accordance with the notice requirements above. If, however, the arbitrator finds that either the substance of your claim or the relief sought in the Demand is improper or not warranted, as measured by the standards set forth in Federal Rule of Civil Procedure 11(b), then the payment of all such fees shall be governed by the AAA Rules. In such case, you agree to reimburse Cingular for all monies previously disbursed by it that are otherwise your obligation to pay under the AAA Rules. If the arbitrator grants relief to you that is equal to or greater than the value of your Demand, Cingular shall reimburse you for your reasonable attorneys' fees and expenses incurred for the arbitration. The arbitrator may make rulings and resolve disputes as to the payment and reimbursement of fees and expenses at any time during the proceeding and upon request from either party within 14 days of the arbitrator's ruling on the merits. **You agree that, by entering into this Agreement, you and Cingular are waiving the right to a trial by jury.** Unless Cingular and you agree otherwise, all hearings conducted as part of the arbitration shall take place in the county (or parish) of your billing address. The arbitrator may award injunctive relief only in favor of the individual party seeking relief and only to the extent necessary to provide relief warranted by that party's individual claim. You and Cingular agree that YOU AND CINGULAR MAY BRING CLAIMS AGAINST THE OTHER ONLY IN YOUR OR ITS INDIVIDUAL CAPACITY, and not as a plaintiff or class member in any purported class or representative proceeding. Further, you agree that the arbitrator may not consolidate proceedings or more than one person's claims, and may not otherwise preside over any form of a representative or class proceeding, and that if this specific proviso is found to be unenforceable, then the entirety of this arbitration clause shall be null and void.  Notwithstanding any provision in this Agreement to the contrary, we agree that if Cingular makes any change to this arbitration provision (other than a change to the Arbitration Notice Address) during your Service Commitment, you may reject any such change and require Cingular to adhere to the language in this provision.

**MISCELLANEOUS** This Agreement, the signature or rate summary sheet, the terms included in the rate brochure(s) describing your plan and services, and any documents expressly referred to herein or therein, make up the complete agreement between you and Cingular, and supersede any and all prior agreements and understandings relating to the subject matter of this Agreement. If any provision of this

Agreement is found to be unenforceable by a court or agency of competent jurisdiction, the remaining provisions will remain in full force and effect. The foregoing does not apply to the prohibition against class or representative actions that is part of the arbitration clause; if that prohibition is found to be unenforceable, the arbitration clause (but only the arbitration clause) shall be null and void. Cingular may assign this Agreement, but you may not assign this Agreement without our prior written consent. The law of the state of your billing address shall govern this Agreement except to the extent that such law is preempted by or inconsistent with applicable federal law. Your caller identification information (such as your name and phone number) may be displayed on the equipment or bill of the person receiving your call; technical limitations may, in some circumstances, prevent you from blocking the transmission of caller identification information. You consent to the use by us or our authorized agents of regular mail, predictive or autodialing equipment, email, text messaging, facsimile or other reasonable means to contact you to advise you about our services or other matters we believe may be of interest to you. In any event, we reserve the right to contact you by any means regarding customer service related notifications, or other such information. The original version of this Agreement is the English language. Any discrepancy or conflicts between the English version and any other language version will be resolved with reference to and by interpreting the English version.

# EXHIBIT 3
## (NEXTEL CONTRACT)

**PLEASE NOTE:** WHEN YOU BREAK THE SEAL ON THE MANUFACTURER'S BOX AND USE THE WIRELESS PHONE(S) WITH NEXTEL'S SERVICE, YOU HAVE AGREED TO THE FOLLOWING TERMS AND CONDITIONS OF THE CUSTOMER SERVICE AGREEMENT. THIS AGREEMENT REQUIRES THAT YOU MAINTAIN SERVICE WITH NEXTEL ON THE PREPROGRAMMED PHONE NUMBER(S) FOR THE MINIMUM CONTRACT PERIOD REQUIRED FROM THE ACTIVATION DATE. FAILURE TO MAINTAIN SERVICE FOR THE MINIMUM CONTRACT PERIOD REQUIRED MAY RESULT IN AN EARLY TERMINATION FEE IMPOSED BY YOUR SERVICE PROVIDER (READ THE SERVICE PROVIDER TERMS AND CONDITIONS BELOW FOR DETAILS).

**IT IS IMPORTANT THAT YOU READ THIS ENTIRE AGREEMENT CAREFULLY.**

This wireless service agreement (the "Agreement"), consisting of these Nextel National Network General Terms and Conditions and the Plan Information, is an agreement between you individually or, if a business, your business entity or corporation ("Customer"), and the Sprint Nextel Corporation local operating affiliate authorized to provide service in the geographic region in which Customer's billing address is located ("Sprint"). Customer represents that (1) he or she is at least 18 years of age and is legally competent to enter into this Agreement; (2) if acting on behalf of an entity, he or she is fully authorized to bind the entity; (3) if acting on behalf of a corporation, the execution of this Agreement has been authorized by all necessary corporate actions. These services may include, but are not limited to, wireless calling, Direct Connect® walkie-talkie services, Nationwide Direct Connect® walkie-talkie services, Group Connect® walkie-talkie services, "Wireless Data Services" (including, but not limited to, wireless web services, email services, text messaging, multimedia messaging and other mobile messaging services) and other related services and features. Together, the services selected by Customer make up Customer's "Service Plan" and are collectively referred to in this Agreement as the "Service" provided to Customer. Service is accessible to Customer through the telephone, data, email or messaging code or number(s) or email address(es) (collectively, the "Number(s)") assigned to Customer's account. This Agreement also governs the purchase and or use of Customer's cellular phone ("Phone"), BlackBerry®, radio equipment and all other related equipment or devices and the software applications loaded on any of the same used in connection with the Service ("Equipment"). This Agreement governs the entire relationship between Customer and Sprint regarding Equipment or Services using the Nextel National Network, and supersedes all earlier versions of any agreement between Customer and Nextel Communications, Inc. or any of its subsidiaries or affiliates ("Nextel"), regarding Equipment or Services using the Nextel National Network. Separate terms apply for any Equipment or Services using the Sprint PCS National Network. Customer acknowledges receipt of detailed information ("Plan Information") for each Service selected by Customer. ALL PLAN INFORMATION IS MADE PART OF THIS AGREEMENT AND SHOULD BE CAREFULLY REVIEWED BY CUSTOMER. If Plan Information conflicts with this Agreement, this Agreement shall govern. IN CONSIDERATION OF THE PAYMENTS AND THE MUTUAL COVENANTS AND CONDITIONS SET FORTH IN THIS AGREEMENT, SPRINT AND CUSTOMER AGREE AS FOLLOWS:

**1. ACCEPTANCE OF THIS AGREEMENT -** Customer will have accepted and be bound by this Agreement if Customer (1) provides Sprint with a written or electronic signature; (2) otherwise indicates electronically that Customer accepts; or (3) activates Service through the Equipment. Creditworthiness of Customer - Customer must complete a credit application ("Credit Application") before Service may be provided to Customer. THIS AGREEMENT SHALL NOT BE EFFECTIVE UNTIL SPRINT APPROVES CUSTOMER'S CREDIT APPLICATION AND OTHERWISE ACCEPTS THE AGREEMENT. Customer acknowledges that Sprint will rely on the credit information furnished by Customer ("Credit Information") and Customer's credit history to determine whether to provide Service to Customer. Customer consents to Sprint's requests for and verification of Customer's bank references and authorizes Sprint to assess Customer's creditworthiness from time to time by contacting

standard commercial credit reference services. Customer represents and warrants that all Credit Information is current, complete and accurate. Sprint may require Customer to update its Credit Information from time to time, and Customer agrees to notify Sprint immediately of any change to its Credit Information. SPRINT MAY, AT ANY TIME, TERMINATE THE SERVICE OF ANY CUSTOMER THAT DOES NOT PROVIDE CURRENT, COMPLETE AND ACCURATE CREDIT INFORMATION. Sprint may, at any time in its sole discretion, place restrictions on Customer's use of Service, including but not limited to, a limitation on the amount of charges Customer may incur with respect to any Number. In this event, Sprint shall provide reasonable notice to Customer. Customer acknowledges that Sprint may provide Customer's payment history and other billing/charge information regarding the Service or Equipment to any credit reporting agency or industry clearinghouse. Deposits - Sprint may, at any time in its sole discretion, require a deposit ("Deposit") from Customer to be held as a guarantee of payment. Customer grants to Sprint a security interest in any Deposit to secure all current or future amounts owed to Sprint. The Deposit may be mixed with other funds and will not earn interest, except as required by applicable law. Customer may not use the Deposit to pay Customer's bills or to extend payment. Sprint may, at any time, determine that Customer's Deposit is insufficient and, upon notice to Customer, require an increase in the Deposit to the extent permitted by law. In this event, Customer must either furnish the increased Deposit to Sprint within a reasonable time of its receipt of notice or terminate the Agreement during this period without incurring any liability for early termination. If Customer does not furnish Sprint with the increased Deposit amount or terminate the Agreement and pay to Sprint all amounts Customer owes to Sprint in a timely manner, Sprint may terminate the Agreement and Customer shall be liable to Sprint for early termination in accordance with Section 7 below. Sprint will apply the Deposit against any amount owed to Sprint at the end of the first billing cycle following the date that is one year from when Sprint received the deposit ("Application Date"), or, if earlier, upon termination of the Agreement or such other time as required by law. Sprint will return the Deposit (or any remaining balance) to Customer within ninety (90) days (or such shorter period as may be required by law) after termination of the Agreement. After the Application Date and upon Customer's request, Sprint will return to Customer within thirty (30) days of such request any balance remaining on the Deposit. Deposits will be returned to Customer, in whole or in part, at Customer's last known address. If required by law, Sprint will forward to appropriate state authorities any remaining balance that the postal service is unable to deliver to Customer.

**2. AGREEMENT TERM** - Information about the term of this Agreement for each Number has been made available to the Customer and shall begin on the date Customer accepts the Agreement in accordance with Section 1 above, and, except as provided elsewhere in this Agreement, shall end thirty (30) days after either Sprint or Customer gives notice of its intent to terminate. Customer may be required to commit to a fixed one or two-year minimum term ("Minimum Term"), depending on: (1) the Service Plan or Service features selected; (2) the Equipment purchase price paid by Customer; or (3) Customer's participation in a promotion. CUSTOMER MAY ALSO BE REQUIRED TO COMMIT TO A NEW MINIMUM TERM IF CUSTOMER CHANGES SERVICE PLANS OR UPGRADES EQUIPMENT DURING ANY EXISTING TERM OR MINIMUM TERM. IF CUSTOMER IS SUBJECT TO A MINIMUM TERM, CUSTOMER SHALL PURCHASE SERVICE FOR THE FULL TERM AND, UNLESS OTHERWISE PROVIDED IN THIS AGREEMENT, PAY DAMAGES TO SPRINT (AS DISCUSSED IN SECTION 7 BELOW) IF THE AGREEMENT IS TERMINATED BEFORE COMPLETION OF THE MINIMUM TERM. Customer will not be liable to Sprint for early termination if service is terminated under the applicable return policy. Information about Sprint's return policy, if applicable, will be made available to Customer at the place of sale and will become a part of this Agreement. Sprint may extend the Minimum Term by any period of time during which Service was suspended to Customer or during time on a seasonal Service Plan. Upon completion of the term, this Agreement shall automatically renew on a month-to-month basis. Sprint may, in its sole discretion, decide not to renew this Agreement at any time before completion of the term or any renewal period.

**3. CHANGES TO AGREEMENT** - SUBJECT TO APPLICABLE LAW, SPRINT MAY, AT ANY TIME IN ITS SOLE DISCRETION, MODIFY ANY OF THE TERMS AND CONDITIONS OF THIS AGREEMENT, INCLUDING BUT NOT LIMITED TO THE RATES IT CHARGES TO CUSTOMER. SPRINT WILL PROVIDE ADVANCE WRITTEN NOTICE TO CUSTOMER OF ANY MATERIAL MODIFICATION. Such notice may be provided in the form of a letter, postcard, separate invoice insert, message printed on the monthly invoice, text message or other printed or electronic form. If the modification is material and adverse to Customer (e.g., the modification increases the monthly Service Plan rates charged to Customer or decreases the number of minutes included in the Customer's monthly Service Plan) and Customer does not agree to accept the modification, Customer may terminate this Agreement and not owe Sprint invoice charges resulting from the Sprint material modification or an early termination fee by notifying Sprint within sixty (60) calendar days after the effective date of the modification. The effective date of the modification will be set forth in the written notice provided to Customer. Final invoicing and charges following termination shall be calculated and finalized in accordance with Sections 7 and 8 of this Agreement. If Customer does not terminate the Agreement during the sixty (60) day period, Customer will have agreed to accept the modification and the modification shall have retroactive effect to its effective date.

**4. USE OF SERVICE OR EQUIPMENT** - Customer shall not use the Service or the Equipment in any unlawful manner (including, but not limited to, use in any aircraft or motor vehicle where prohibited by law, ordinance, or regulation), or in a manner that may be abusive, harassing, threatening or fraudulent. Customer is solely responsible for all content transmitted using the Service or the Equipment and shall not use the Service or Equipment to communicate any (1) harassing, threatening, defamatory, pornographic or obscene messages; (2) unsolicited commercial messages; or (3) unsolicited commercial and/or bulk text or SMS messages. Customer shall not use the Service or Equipment in a manner that could result in damage or risk to the business, reputation, properties, or services of Sprint or to Sprint's or Nextel's subscribers, third parties or to the public generally. Accordingly, by way of example, Customer shall not attempt to gain unauthorized access to the Service or any account on the Service, use the Service to infringe the copyright of another, or upload or transmit any "virus", "worm" or other malicious code. Customer shall not modify, disassemble, deinstall or alter the Equipment in any manner, except in accordance with the use instructions accompanying the Equipment. Customer may not resell or lease the Service or the Equipment to any other person or party. Change in Service/Number - Any change in the Service or the Equipment may require additional programming or Equipment or changes to Numbers assigned to Customer. Customer may be assessed a programming fee in connection with any change requested by Customer. Sprint may, at any time, change or remove any Number assigned to Customer when such change is reasonably necessary in the conduct of Sprint's business. Customer acknowledges that Customer has no proprietary or ownership rights or interest in Customer's Number(s) and cannot acquire such rights or interest through usage, publication or otherwise. Customer may not assign its Number to any other Equipment and shall not program any other Number into its Equipment. If wireless number portability becomes available in Customer's Service Area, Customer may request that its Phone number(s) be ported to another service provider. Upon such request, all amounts then owed to Sprint (including damages for early termination and any amounts that appear on the final invoice) shall become immediately due and payable, and Customer's failure to provide timely payment to Sprint could delay Sprint's facilitation of Customer's request.

**5. WIRELESS DATA SERVICES** - Wireless Data Services consist of applications such as email, data, information and other wireless Internet services ("Online Applications"). Customer acknowledges that no guarantee or assurance exists that the Online Applications will be compatible, or, if currently compatible, will continue to be compatible, with Sprint's network or with Customer's Equipment or Service. Sprint does not endorse any Online Application, even if currently compatible with Sprint's network or with Customer's Equipment or Service. Sprint may, at any time in its sole discretion, disable or discontinue any Online

Application for any reason. Use of Wireless Data Services requires Internet compatible Equipment, and is subject to applicable storage, memory or other Equipment limitations. Only certain Internet sites may be accessed by Customer, and certain Wireless Data Services may not be available in all areas where Service is provided. Content - Customer may, from time to time, access through Wireless Data Services statements, opinions, graphics, photos, music, services and other information ("Content"), including Content provided by third parties. Customer acknowledges that Sprint offers no guarantee or assurance regarding the accuracy, completeness, appropriateness or utility of the Content. Customer also acknowledges that Sprint does not publish and is in no way responsible for any Content that is provided by third parties. Customer also may establish contact with third parties through Wireless Data Services. Sprint is not responsible for the actions of third parties contacted by Customer, whether such contact was initiated by Customer or was brought about through an embedded link on the Equipment. Content providers and others have copyright and other proprietary interests in certain Content. Customer shall not, and will not permit others, to reverse engineer, reproduce, broadcast, distribute, sell, publish, commercially exploit or otherwise disseminate any Content in any manner without the prior written consent of Sprint, the Content providers, or others with proprietary interests in such Content, as applicable. Customer's use of the Content is strictly limited to the Customer's own use solely in connection with the Equipment. Customer will be required to cease using the Content if Customer fails to comply with this Section 5 or any part of this Agreement. Network Security - Sprint may take any action that it deems necessary to (1) protect its network, its rights or the rights of its customers and third parties; or (2) optimize or improve its network, its Services and the Equipment. Customer acknowledges that such action may include, without limitation, employing methods, technologies, or procedures to filter or block messages sent through Wireless Data Services. Sprint may, in its sole and absolute discretion, at any time, filter "spam" or prevent "hacking," "viruses" or other potential harms without regard to any Customer preference. Application Support - Sprint is often not the developer of Online Applications that are accessible through Wireless Data Services. Therefore, if Customer contacts Sprint's Customer Service department regarding use of an Online Application, Customer may be referred to the customer service department of the developer of the Online Application, and Sprint shall not be obligated to support any such Online Application.

**6. SERVICE AVAILABILITY -** Service is generally available to Customer when Customer is within the operating range of the Nextel National Network or within the range of a provider with which Sprint has a reciprocal service arrangement ("Service Area"). Customer acknowledges that any map, diagram or other illustration of Customer's Service Area is only an estimate and actual service coverage may vary. CUSTOMER'S SERVICE AREA IS SUBJECT TO CHANGE AT ANY TIME IN SPRINT'S SOLE DISCRETION. Service quality and availability within Customer's Service Area is also affected by conditions Sprint does not control, including the Equipment, problems associated with interconnecting carriers, power failures, "viruses", obstructions such as buildings or trees, tunnels, atmospheric, geographic or topographical conditions and other conditions. Service also may be limited or temporarily unavailable due to system capacity limitations or system repairs or modifications. Sprint also may be required during public safety emergencies or when system capacity is otherwise limited to limit access to the Nextel National Network for those customers that are not then using the Service and connected to the network in order to facilitate communications by public safety organizations such as police and fire departments. In this event, customers that have priority access Service as part of their Service Plan will be given access to the Nextel National Network before Sprint's non-priority access customers. Sprint will not complete calls to 900, 976 or similar numbers for pay-per-call services. Caller identification information may not be available for all incoming calls. International calling may be blocked.

**7. RATES AND CHARGES -** Customer shall pay in full all charges for Services provided under this Agreement and any Service Plan that becomes part of this Agreement, including monthly service charges, usage charges, taxes, assessments and any additional fees or charges imposed on Customer or on Sprint and associated with the Service or the

Equipment. Customer is responsible for all charges or purchases associated with Customer's Number and Equipment whether or not Customer was the user of the Service or authorized its use. If Customer fails to pay any amounts when due under this Agreement, Customer shall be in default and Sprint shall be entitled to exercise any remedies available to it under this Agreement or at law or in equity. Service Charges - Customer shall pay all charges for Services selected by Customer as part of Customer's Service Plan, and any additional Services selected by Customer. Customer's Service Plan will be offered at the rates and subject to the conditions set forth in the Service Plan Information provided to Customer at the time of sale. CUSTOMER'S SERVICE PLAN INFORMATION SHALL BE CONSIDERED PART OF THIS AGREEMENT. Rates charged to Customer include monthly access charges and may include activation and other fees associated with features such as voicemail and caller identification. Monthly access charges shall begin once Customer's Service is activated, which may occur before Customer receives the Equipment. Usage Charges - Depending on the Service Plan selected, Customer may incur usage charges for Services such as: wireless calling, Direct Connect®, Nationwide Direct Connect®, Group Connect®, Wireless Data Services and other Services that may be offered from time to time. Usage charges may vary depending on how, where and when Customer uses the Service. Customer may be assessed long distance charges (including international calling) or other charges for "toll-free" calls to 800, 866, 877, 888 and other toll-free numbers. Customer also may be charged for the use of special Services such as 411 services, operator-assisted calls or call-forwarding. Airtime charges will be assessed for the entire period during which a call or Direct Connect® transmission is connected to the Nextel National Network. A wireless call connection begins approximately when Customer presses the button to initiate an outgoing call or the phone starts ringing for an incoming call and ends approximately when the first party terminates the call. Customer shall be responsible for all charges for incoming and outgoing wireless calls that are answered. A Direct Connect® or Group Connect® transmission occurs approximately when Customer presses the button to initiate a transmission and ends approximately six (6) seconds after completion of a communication (i.e., when Customer or another participant releases the button) to which no participant responds. Customer initiates a new Direct Connect® or Group Connect® transmission if Customer responds more than six (6) seconds after the other participant completes a communication. Nationwide Direct Connect® calls use the Direct Connect® minutes in Customer's plan and incur an additional access charge. Airtime charges for Direct Connect® or Group Connect® transmissions or Nationwide Direct Connect® access are charged to the customer that initiates the transmission and, unless a rate plan includes unlimited transmissions or access, are calculated by multiplying the duration of the transmission (including the six (6) second period referred to above) by the applicable rate and the number of participants. Customer will not be charged for sending or receiving call alert transmissions ("Call Alerts"), but will be deemed to have initiated a new Direct Connect® transmission if Customer responds to a Call Alert, even if Customer responds within six (6) seconds of receiving the Call Alert. Text and numeric messaging will be charged on a per message basis; however, Customer may elect to purchase a certain number of messages for a fixed monthly price. Any messages in excess of Customer's allotted messages will be charged at the per message rate. Depending on the plan, Customer may be charged on a per kilobyte basis (one megabyte equals 1024 kilobytes and one kilobyte equals 1024 bytes), for Customer's use of Wireless Data Services. Kilobytes may be used for, without limitation, browsing the Internet, accessing Wireless Data Services and for reading, sending and responding to email. Airtime minutes allotted to Customer under Customer's wireless calling plan may be used in connection with certain Wireless Data Services. CUSTOMERS ARE CHARGED AT LEAST ONE (1) MINUTE OF AIRTIME FOR ALL WIRELESS CALLS AND AT LEAST SIX (6) SECONDS OF AIRTIME FOR ALL DIRECT CONNECT® TRANSMISSIONS, REGARDLESS OF LENGTH. AFTER THE INITIAL MINUTE, AIRTIME CHARGES FOR WIRELESS CALLING ARE ROUNDED-UP AND BILLED TO THE NEXT SECOND OR TO THE NEXT MINUTE, DEPENDING ON CUSTOMER'S SERVICE PLAN. AFTER SIX (6) SECONDS, DIRECT CONNECT® TRANSMISSIONS ARE ROUNDED-UP AND BILLED TO THE NEXT SECOND. DATA USAGE FOR WIRELESS DATA SERVICES

IS ROUNDED TO THE NEAREST ONE-TENTH (1/10) OF A KILOBYTE. Taxes, Fees and Assessments - Customer shall pay all federal, state, and local taxes and fees that are imposed on transactions subject to this Agreement. Customer shall not be responsible for taxes and fees imposed on Sprint's net income or property. Customer shall be responsible for all taxes and fees (whether imposed upon Customer or Sprint) that are measured by gross receipts from sales made to Customer or imposed as a per-line or per-unit charge. Applicable taxes and fees include, but are not limited to, the following: federal, state, and local excise taxes, sales and transaction taxes, gross receipts taxes, utility taxes, and statutory 911 fees. If Customer is eligible for an exemption from any tax or fee, Customer must provide Sprint with a valid and properly executed exemption certificate for the exemption to be effective. Customer shall provide Sprint with the Primary Place of Use (i.e., Customer's residential street address or primary business address) for each unit activated on Customer's account, and notify Sprint of any changes in such address. Additional fees and assessments apply to Customer's monthly Service Plan. The charges may change and may vary depending on where Customer is located. The charges include, but are not limited to, a Universal Service Fund assessment and a Telephone Relay Service Fee. Sprint also imposes a Federal Programs Cost Recovery ("FPCR") fee that is not a tax or government mandated, but is kept by Sprint to recover Sprint's costs for complying with Federal Communications Commission ("FCC") programs and mandates. The FPCR fee is subject to adjustment, and Sprint will provide advance notice to Customer through the "Sprint News" section of Customer's bill or a bill insert of any significant increase in the FPCR fee. Please consult the current Sprint pricing materials, a sales consultant or visit http://www.Sprint.com for information regarding the FPCR fee and the current amount of the fee. Additional fees may be added to Customer's bill to recover Sprint's costs for funding government programs or initiatives. Early Termination Component of Rate Structure - Sprint incurs a significant cost in activating Service to Customer, including a large up-front cost in offering Equipment to Customer. These costs are partially recouped over the length of Customer's Agreement with Sprint through monthly service rate charges to Customer, which have been established in part for this purpose. If Customer breaches this Agreement or terminates Service for any reason (including by porting its Phone number to another service provider), Customer understands and acknowledges that Sprint will not receive the full benefit of its Agreement with Customer, in part, because Sprint will not continue to receive monthly service charges from Customer. As a result, Sprint shall incur damages that are difficult, if not impossible, to determine. THEREFORE, IN THE CASE OF BREACH OR EARLY TERMINATION OF THE AGREEMENT BY CUSTOMER, CUSTOMER SHALL PAY TO SPRINT, AS LIQUIDATED DAMAGES AND NOT AS A PENALTY (IN ADDITION TO ALL AMOUNTS THEN OWED TO SPRINT), $200 FOR EACH NUMBER ASSIGNED TO CUSTOMER'S ACCOUNT AS A REASONABLE ESTIMATE OF THE DAMAGES INCURRED BY SPRINT. This is intended to maintain Sprint's overall rate at an acceptable level despite Customer's early termination and will be assessed without exception unless otherwise provided in this Agreement or by applicable law. Failure to Pay - Customer acknowledges that time is of the essence with respect to all amounts owed to Sprint. IF CUSTOMER HAS NOT PAID ITS MONTHLY INVOICE IN FULL BY THE DUE DATE, A LATE PAYMENT CHARGE OF UP TO 1.5% PER MONTH (18% ANNUALLY), OR SUCH LESSER AMOUNT PERMITTED BY LAW, MAY BE APPLIED TO THE TOTAL UNPAID BALANCE DUE AND OUTSTANDING. THIS LATE PAYMENT CHARGE IS ASSESSED TO RECOVER COSTS FOR CUSTOMER'S FAILURE TO PAY AND SHALL NOT CONSTITUTE INTEREST. Sprint's acceptance of late or partial payments (even if marked "paid in full" or similar notations) shall not waive Sprint's right to collect the full amount due under this Agreement, plus any additional amounts charged under this paragraph. If Sprint obtains the services of a collection or repossession agency or an attorney to assist in remedying any breach of this Agreement by Customer, including but not limited to, Customer's nonpayment of charges, Customer shall be liable for this expense. Disputed Charges - Customer may dispute only those charges that Customer believes are the result of (1) a billing error; (2) a problem related to Customer's Service; or (3) dropped calls. To dispute any charge, Customer must pay all undisputed amounts when due and submit a written notice to Sprint within ninety (90) days of the date of the invoice.

CUSTOMER WAIVES THE RIGHT TO DISPUTE ANY CHARGES FOR WHICH TIMELY NOTICE IS NOT PROVIDED TO SPRINT. Sprint shall resolve all disputed charges in its sole discretion. If Sprint determines that an error was made on Customer's invoice, Sprint will credit Customer's account in the amount of the error. If Sprint determines that a disputed charge was validly assessed upon Customer, Sprint will notify Customer and Customer must furnish the amount to Sprint within a reasonable period of time; or, if authorized by Customer, Sprint may instead charge Customer's credit card or debit card by any amount that was validly assessed. If Customer fails to pay any undisputed amount or, after a reasonable period of time, fails to pay any amount determined by Sprint to have been validly assessed upon Customer, Sprint may exercise any remedies available to Sprint under this Agreement for non-payment, including termination of the Agreement. Customer hereby acknowledges that he or she has read the explanation of rates and charges set forth in this Section 7 and understands that these rates and charges may be assessed upon Customer, to the extent applicable.

**8. BILLING** - Sprint shall issue invoices for Service and for purchases of Equipment. Sprint's invoicing cycle is approximately thirty (30) days, but may change from time to time. The day of the month on which Customer receives an invoice may vary and is subject to change. Some billing details may be provided at http://www.Sprint.com and will not appear on invoices (except for a fee). Service charges will be invoiced to Customer in advance or in arrears, depending on the Service Plan, and usage charges will be invoiced in arrears. Customer may be assessed a shipping charge for Equipment delivered to Customer. Unless otherwise specified in Customer's Service Plan, any unused minutes or other allotted Services under Customer's Service Plan will not be carried over to any other billing cycle. If Customer's Service is terminated for any reason (including if Customer's Number is ported) before the end of any billing cycle, no credit or refund will be provided for unused minutes or other allotted Services and any monthly service charge will not be prorated to the date of termination. On occasion, Customer may be billed for Services in a month other than the month in which Customer used the Services, which may result in higher-than-expected Services charges for the month in which such Services are billed. The creation of new cell sites, Sprint's implementation of new billing technology, delays in the reporting of international or other roaming charges between carriers, and other similar events may result in such delayed billing. Sprint may bill Customer on behalf of third party providers of Online Applications that are accessed by Customer through the Equipment. Sprint may retain a percentage of these charges before providing the balance to the third party provider of such Online Application.

**9. PAYMENTS** - Recurring Credit/Debit Card Payments Customer may pay any amount owed to Sprint by using a credit or debit card acceptable to Sprint. If Customer wishes to pay all amounts in this manner on a recurring basis, Customer must complete a separate payment enrollment form ("Payment Form"). Customer acknowledges that upon signing the appropriate Payment Form, the Payment Form, including its applicable terms and conditions, will become a part of this Agreement. Customer shall promptly notify Sprint of any changes to the credit or debit card (e.g., if the card is terminated, lost, stolen or the expiration date changes) or bank account used for payment. Enrollment is for the duration of this Agreement unless cancelled earlier by either Customer or Sprint upon thirty (30) days' advance written notice to the other party. Specific Form of Payment - Sprint may, at any time and from time to time, as it deems appropriate (e.g., following receipt of a dishonored check or other instrument), demand that Customer make payment by money order, cashier's check, or a similarly secure form of payment. Sprint also may require at any time in its sole discretion that the Equipment be purchased for cash only. In this case, title to the Equipment shall be transferred to Customer only after receipt by Sprint of a cashier's or certified check or other equally secure form of payment in the amount required by Sprint. Dishonored Checks - Sprint may charge Customer up to the highest amount permitted by law for any check or other instrument tendered by Customer and returned unpaid by a financial institution for any reason.

**10. SUSPENSION, LIMITATION OR TERMINATION OF SERVICE OR THIS AGREEMENT** - General - Sprint may limit, suspend or terminate Customer's Service or this Agreement at any time and without providing notice to Customer if: (1) Customer fails to pay any charges (including, without limitation, any charges assessed on behalf of third parties) when due under this Agreement; (2) Customer behaves in an abusive, derogatory, or otherwise unreasonable manner to any Sprint employee, representative or agent; (3) Sprint has reason to believe that Customer's Service is being used in a fraudulent manner or for an illegal purpose (such as unusual activity levels or calling patterns); (4) Customer's Service is being used in a way that adversely affects other Customers' Service or Sprint's business operations; (5) Customer provides Credit Information that is false, inaccurate, dated or cannot be verified or Customer becomes insolvent or subject to any proceeding under the Bankruptcy Code or similar laws; (6) Sprint discovers that Customer is underage or does not otherwise possess the capacity or the authorization to enter into this Agreement; (7) Customer's use of the Service or Equipment exceeds limitations or violates any restrictions placed on Customer's account or otherwise breaches this Agreement; or (8) Sprint, in its sole discretion, believes action is required to protect its interests or the interests of Customer or its other customers. SPRINT SHALL NOT BE LIABLE TO CUSTOMER OR TO ANY OTHER PARTY FOR EXERCISING OR FAILING TO EXERCISE ITS RIGHTS UNDER THIS SECTION TO LIMIT, SUSPEND OR TERMINATE SERVICE OR THE AGREEMENT. If Customer's Service is subject to fraudulent use, Customer shall immediately notify Sprint's Customer Service department, provide Sprint with any documentation and information that it requests and otherwise cooperate with Sprint in the investigation of such incident. If Sprint terminates Service to Customer, and Service is not reconnected within thirty (30) calendar days, all amounts owed to Sprint (including any damages for early termination) shall become immediately due and payable. Reactivation - Sprint may, but is not required to, reactivate Service to Customer after Service has been suspended or terminated in accordance with the previous subsection. Before Service may be reactivated, Customer must pay to Sprint all past due amounts plus a reconnection charge of up to $30.00 per Number, plus applicable taxes. Sprint may modify the terms of Service before reactivating Service to Customer and may require Customer to provide Sprint with an initial Deposit or an additional Deposit.

**11. RELEASE OF CUSTOMER INFORMATION** - Privacy - Wireless systems use radio channels to transmit communications that may be accidentally or intentionally intercepted. Although federal and state laws may make it illegal for third parties to listen in on Customer's Service, privacy cannot be guaranteed. SPRINT SHALL NOT BE LIABLE TO CUSTOMER OR TO ANY THIRD PARTY FOR EAVESDROPPING ON OR INTERCEPTION OF COMMUNICATIONS MADE WHILE USING THE SERVICE OR THE EQUIPMENT. 911 or Other Emergency Calls - The Service does not interact with 911 and other emergency services in the same manner as non-wireless or landline telephone services. Depending on Customer's location, the type of Equipment being used, the type of equipment being utilized by any applicable emergency services provider, and the circumstances and conditions of a particular call, Customer's phone number and/or location may not be identifiable to emergency services providers and Customer may not be connected to the appropriate emergency services provider. In certain circumstances, a 911 call may be routed to a state patrol dispatcher. Sprint is deploying wireless E911 compatible Equipment that meets applicable FCC requirements and that is designed to help public safety authorities locate users of the Service who make 911 calls. However, E911 service that is compatible with the FCC technical requirements is not available in all areas, and even in those areas where it is available, it is not entirely reliable. Moreover, if Customer's Equipment is not GPS-enabled, emergency services personnel may have much less precise location information about the Customer, compared to the information available to them if Customer's Equipment was GPS-enabled. The information available to emergency service providers may also be limited if Customer's number or numbers are in the process of being ported. Customer acknowledges that E911 service is not available in all areas, is not completely reliable and is further limited when using non-GPS enabled Equipment or during the number porting process. Customer

consents to Sprint's disclosure of Customer information to governmental and public safety authorities in response to emergencies. This information may include, but is not limited to, Customer's name, address, Number, and the location of the user of the Service at the time of call. Access, Use and Disclosure of Customer Information and Communications - Customer acknowledges and agrees that Sprint may access, use, and disclose to third parties, any information whether personally identifying information, or "customer proprietary network information" ("CPNI") within the meaning of 47 U.S.C. § 222 and its implementing regulations ("CPNI Regulations") that Sprint collects, possesses or develops about Customer to: (1) provide Customer with Equipment, Service, or customer support; (2) conduct marketing activities in accordance with applicable law (Customer may opt out of any such marketing by contacting Sprint; (3) enable Customer to switch to a new service provider (either Sprint or another service provider) while retaining the same phone number; (4) provide handset-based or network-based geographic information services via Sprint-provided or third party software applications; (5) comply with applicable law; or (6) respond to emergencies. Customer acknowledges that any information that identifies Customer (e.g., Customer's name and Number) and calls made by Customer may appear on the equipment or bill of a person or party that receives Customer's call. Sprint may access, use, disclose, record or monitor any communications to or from Customer or any other person to protect Sprint's rights or property or those of other customers, as permitted by law. Geographic Information Services - Consistent with the foregoing, Customer acknowledges and agrees that Sprint or a third party application service provider may access, use, and disclose to third parties the geographic location of Customer's Equipment to provide Customer with any geographic information service which Customer accesses through the Service or Equipment. If Customer utilizes any such service and there are additional users on Customer's account, Customer shall clearly, conspicuously, and regularly notify all individual users of the Service that location information (i.e., the geographic coordinates of the Equipment) may be accessed, used, or disclosed in connection with the Service. For any geographic information service that is governed by the CPNI regulations or a similar law, Sprint will provide Customer with a separate notice and opportunity to consent to the access, use, and disclosure of geographic information. CUSTOMER SHALL HOLD HARMLESS AND INDEMNIFY SPRINT AGAINST ANY AND ALL CLAIMS, LOSSES, EXPENSES, DEMANDS, ACTIONS, OR CAUSES OF ACTION (INCLUDING ALL ACTIONS BY THIRD PARTIES) ARISING OUT OF A BREACH OF CUSTOMER'S OBLIGATION TO NOTIFY USERS AS SET FORTH IN THIS SECTION OR CUSTOMER'S USE OF ANY GEOGRAPHIC INFORMATION SERVICE OR LOCATION INFORMATION.

**12. EQUIPMENT -** Customer shall provide Sprint with an initial payment in the amount required by Sprint to be applied towards any amount owed to Sprint one (1) year from the effective date of the Agreement. Customer acknowledges that Sprint is not responsible for the Equipment or its installation. Sprint is not responsible for the operation, quality of transmission, or, unless separate maintenance arrangements have been made between Sprint and Customer, for maintenance of the Equipment. Customer further acknowledges that Equipment purchased from Sprint is not compatible with and will not support services provided by other wireless carriers, except for those services provided by an entity operating compatible iDEN equipment or in connection with roaming to certain countries outside of the United States. SPRINT SHALL NOT BE LIABLE FOR ANY DAMAGES (INCLUDING DAMAGE TO THE EQUIPMENT) RESULTING FROM INSTALLATION OF THE EQUIPMENT BY CUSTOMER OR ANY THIRD PARTY. UPON CUSTOMER'S ACCEPTANCE OF DELIVERY OF THE EQUIPMENT, ALL RISK OF LOSS, DAMAGE, THEFT, OR DESTRUCTION TO THE EQUIPMENT SHALL BE BORNE BY THE CUSTOMER. NO LOSS, DAMAGE, THEFT, OR DESTRUCTION OF THE EQUIPMENT, IN WHOLE OR IN PART, SHALL IMPAIR CUSTOMER'S OBLIGATIONS UNDER THIS AGREEMENT, INCLUDING, WITHOUT LIMITATION, CUSTOMER'S RESPONSIBILITY FOR THE PAYMENT OF SERVICE CHARGES DUE UNDER THE AGREEMENT. Insurance - Customer may purchase Direct Protect insurance ("Direct Protect") to protect Customer against loss, theft, incidental damage or accidents involving Customer's Equipment.

However, Direct Protect is not available for certain Equipment. Customer acknowledges that Direct Protect insurance is provided by The Signal Telecommunications Insurance Services ("Signal") and not by Sprint. If Customer selects Direct Protect coverage, Customer will be assessed a monthly charge, which Sprint will remit to Signal on Customer's behalf. Any requests for information or claims regarding Direct Protect shall be directed to Signal. Customer acknowledges that a summary of coverage is available at www.Sprint.com, which information is also available by calling Signal at 1-888-352-9182. Lost or Stolen Equipment - If Customer's Equipment is lost or stolen, Customer agrees to: (1) notify Sprint within two calendar days by calling Sprint's Customer Service department; (2) provide Sprint with any documentation and information that it requests; and (3) otherwise cooperate with Sprint in the investigation of such incident.

**13. DISCLAIMER OF WARRANTIES -** SPRINT MAKES NO REPRESENTATIONS OR WARRANTIES, STATUTORY, EXPRESS OR IMPLIED, INCLUDING, WITHOUT LIMITATION, ANY WARRANTY OF MERCHANTABILITY, FITNESS FOR A PARTICULAR PURPOSE, TITLE OR NON-INFRINGEMENT CONCERNING CUSTOMER'S SERVICE OR THE EQUIPMENT. SPRINT DOES NOT AUTHORIZE ANYONE TO MAKE ANY REPRESENTATION OR WARRANTY ON ITS BEHALF, AND CUSTOMER SHOULD NOT RELY ON ANY SUCH STATEMENT(S). ANY STATEMENTS MADE IN PACKAGING, MANUALS OR OTHER DOCUMENTS, OR BY ANY SPRINT EMPLOYEES, AGENTS OR REPRESENTATIVES, ARE PROVIDED FOR INFORMATIONAL PURPOSES ONLY AND NOT AS WARRANTIES BY SPRINT OF ANY KIND. CUSTOMER ASSUMES ALL RESPONSIBILITY FOR USE OF THE SERVICE AND THE QUALITY AND PERFORMANCE OF THE EQUIPMENT. CUSTOMER ACKNOWLEDGES THAT SERVICE MAY NOT BE ERROR-FREE AND THAT INTERRUPTIONS WILL LIKELY OCCUR FROM TIME TO TIME. SPRINT DOES NOT MANUFACTURE THE EQUIPMENT AND ANY STATEMENT REGARDING THE EQUIPMENT SHOULD NOT BE INTERPRETED AS A WARRANTY. THIS SECTION SHALL SURVIVE TERMINATION OF THIS AGREEMENT.

**14. LIMITATION OF LIABILITY AND REMEDIES FOR BREACH -** Sprint shall not be liable for: (1) any deficiency in the Service, including, but not limited to, mistakes, omissions, interruptions (including, among others, interruptions caused by Equipment or facilities failure or shortages), errors, failures to transmit, delays or defects, network problems, lack of coverage or network capacity, dropped calls, inability to access the Service or inability to place or receive calls or problems of unauthorized access; (2) the unavailability or any failure or delay in delivery of the Equipment or the cancellation of any orders of Equipment by the manufacturer; (3) any suspension or termination of Service by Sprint or any other action taken by Sprint in its sole discretion intended to protect the Sprint wireless network, systems, and the rights or property of Sprint, its Customers, or others from "hacking," "spamming," "viruses" or other potential harms that Sprint believes may adversely impact its network or systems; (4) the availability or use of Wireless Data Services, including but not limited to, the compatibility or use of Online Applications or Content, whether or not supported by Sprint, or any contact with third parties through the use of Wireless Data Services; (5) any damage or personal injury allegedly caused by use of the Equipment or Service; (6) any other damage due directly or indirectly to causes beyond Sprint's control, including, but not limited to, any act or omission of any carrier or service provider other than Sprint; or (7) acts of God, acts of public enemies, acts of the government, acts or failure to act of Customer, its agents, employees or subcontractors, fires, floods, epidemics, quarantine restrictions, corrosive substances in the air or other hazardous environmental conditions, strikes, freight embargoes, inability to obtain materials or services, commotion, war, terrorism, unusually severe weather conditions or default of Sprint's subcontractors. WITHOUT LIMITING THE FOREGOING, SPRINT'S SOLE LIABILITY FOR SERVICE DISRUPTION, WHETHER CAUSED BY THE NEGLIGENCE OF SPRINT OR OTHERWISE, IS LIMITED TO A CREDIT ALLOWANCE OF NOT MORE THAN THE PROPORTIONATE CHARGE TO CUSTOMER FOR THE PERIOD OF SERVICE DISRUPTION. EXCEPT AS OTHERWISE SET FORTH IN THE PRECEDING SENTENCE, IN NO EVENT SHALL SPRINT BE LIABLE FOR ACTUAL

DAMAGES OR FOR CONSEQUENTIAL, INCIDENTAL, SPECIAL OR OTHER INDIRECT DAMAGES CAUSED BY ITS NEGLIGENCE OR OTHERWISE, NOR FOR ECONOMIC LOSS, PERSONAL INJURIES OR PROPERTY DAMAGE SUSTAINED BY CUSTOMER OR ANY THIRD PARTIES. IF CUSTOMER IS PROVIDED WITH A CREDIT ALLOWANCE UNDER THIS SECTION, SPRINT SHALL BE SUBROGATED TO ANY AND ALL RIGHTS THAT CUSTOMER MAY HAVE AGAINST ANY THIRD PARTY AS A RESULT OF CUSTOMER'S LOSS OR EXPENSE, INCLUDING BUT NOT LIMITED TO, ANY RIGHT CUSTOMER MAY HAVE UNDER THE TELEPHONE CONSUMER PROTECTION ACT. THIS SECTION 14 SHALL SURVIVE TERMINATION OF THIS AGREEMENT. UNDER CERTAIN CIRCUMSTANCES, SOME JURISDICTIONS MAY NOT RECOGNIZE OR GIVE EFFECT, IN WHOLE OR IN PART, TO WARRANTY DISCLAIMERS AND/OR LIMITATIONS OF REMEDIES FOR BREACH; AND THEREFORE, TO THE EXTENT THAT THE DISCLAIMER SET FORTH IN SECTION 13 AND THE LIMITATION OF REMEDIES IN SECTION 14 ARE NOT PERMITTED BY APPLICABLE LAW, THEY WILL NOT APPLY TO CUSTOMER OR SHALL ONLY APPLY TO THE EXTENT PERMITTED BY SUCH APPLICABLE LAW.

**15. INDEMNIFICATION -** Customer shall indemnify, defend, and hold Sprint harmless from any violation by Customer of any applicable law or regulation. Customer will further indemnify Sprint for any claim or demand, including reasonable attorneys' fees, made by any third party due to or arising out of: (1) information or Content that Customer submits, posts, transmits or makes available through the Service; (2) Customer's use of the Service or Equipment; (3) Customer's connection to the Service or Equipment; (4) Customer's violation of this Agreement; or (5) Customer's violation of any rights of a third party.

**16. DISPUTE RESOLUTION -** THIS SECTION PROVIDES FOR THE RESOLUTION OF MOST DISPUTES OR CLAIMS THROUGH ARBITRATION INSTEAD OF COURT TRIALS AND CLASS ACTIONS. CUSTOMER SHOULD READ THIS SECTION CAREFULLY; ARBITRATION IS FINAL, BINDING AND SUBJECT TO ONLY VERY LIMITED REVIEW BY A COURT. THIS SECTION GOVERNING DISPUTES SHALL SURVIVE TERMINATION OF THIS AGREEMENT. Mandatory Arbitration - CUSTOMER AND SPRINT AGREE TO ARBITRATE ANY CLAIM, CONTROVERSY OR DISPUTE ARISING UNDER OR RELATED TO THIS AGREEMENT OR ANY EQUIPMENT USED IN CONNECTION WITH THE SERVICE (OR ANY PRIOR ORAL OR WRITTEN AGREEMENT FOR WIRELESS SERVICE WITH SPRINT OR NEXTEL) EXCEPT THAT CUSTOMER OR SPRINT MAY BRING AN INDIVIDUAL ACTION IN SMALL CLAIMS COURT. CUSTOMER AND SPRINT ACKNOWLEDGE THAT THIS AGREEMENT EVIDENCES A TRANSACTION IN INTERSTATE COMMERCE AND THAT THE FEDERAL ARBITRATION ACT SHALL GOVERN THE INTERPRETATION AND ENFORCEMENT OF THIS ARBITRATION PROVISION. TO INITIATE ARBITRATION, CUSTOMER OR SPRINT MUST FIRST SEND A WRITTEN NOTICE, VIA CERTIFIED MAIL, TO THE OTHER PARTY INDICATING ITS INTENT TO ARBITRATE, WHICH NOTICE SHALL INCLUDE: (1) A DESCRIPTION OF THE FACTS; (2) A DESCRIPTION OF THE NATURE OF THE CLAIM; AND (3) THE RELIEF SOUGHT ("NOTICE TO ARBITRATE"). SEND NOTICE TO ARBITRATE TO: **SPRINT GENERAL COUNSEL, ARBITRATION OFFICE, 2001 EDMUND HALLEY DRIVE, RESTON, VIRGINIA 20191.** BOTH PARTIES AGREE TO MAKE REASONABLE ATTEMPTS TO RESOLVE ANY SUCH DISPUTE; HOWEVER, IF THE PARTIES CANNOT RESOLVE THE DISPUTE WITHIN FORTY-FIVE (45) DAYS OF RECEIPT OF NOTICE TO ARBITRATE, THEN AN ARBITRATION CLAIM MAY COMMENCE. ANY ARBITRATION INITIATED UNDER THIS AGREEMENT SHALL BE ADMINISTERED BY THE AMERICAN ARBITRATION ASSOCIATION ("AAA") IN ACCORDANCE WITH ITS WIRELESS INDUSTRY ARBITRATION RULES (AND THE AAA SUPPLEMENTAL PROCEDURES FOR CONSUMER RELATED DISPUTES AS THEY MAY BE APPLICABLE), AS MODIFIED BY THIS AGREEMENT. INFORMATION CONCERNING THE AAA, ITS WIRELESS INDUSTRY ARBITRATION RULES AND OTHER INFORMATION CONCERNING ARBITRATION PROCEDURES AND FEES CAN BE FOUND BY CALLING THE AAA AT 1-800-778-7879

OR VISITING ITS WEBSITE AT http://www.adr.org. ANY ARBITRATION SHALL BE CONDUCTED BY A SINGLE NEUTRAL ARBITRATOR. CUSTOMER AND SPRINT SHALL COOPERATE IN GOOD FAITH TO SELECT THE ARBITRATOR WITHIN THIRTY (30) CALENDAR DAYS OF THE COMMENCEMENT OF ANY ARBITRATION PROCEEDING. IF CUSTOMER AND SPRINT CANNOT AGREE UPON A NEUTRAL ARBITRATOR WITHIN THE THIRTY DAY PERIOD, THEN EITHER PARTY MAY REQUEST THAT THE AAA APPOINT, IN ITS SOLE DISCRETION, A NEUTRAL ARBITRATOR. CUSTOMER AND SPRINT FURTHER AGREE THAT NO ARBITRATOR SHALL HAVE THE AUTHORITY TO AWARD ANY RELIEF OR REMEDY IN EXCESS OF OR CONTRARY TO WHAT IS PROVIDED IN THIS AGREEMENT, EXCEPT WHERE SUCH PROVISION IS NOT PERMITTED UNDER APPLICABLE LAW. THE ARBITRATOR'S DECISION AND AWARD SHALL BE FINAL AND BINDING, AND JUDGMENT ON THE AWARD RENDERED BY THE ARBITRATOR MAY BE ENTERED IN ANY COURT HAVING JURISDICTION. THE LAW THAT IS APPLIED TO THIS AGREEMENT ALSO SHALL BE APPLIED IN ANY ARBITRATION PROCEEDING. UNLESS THE CUSTOMER AND SPRINT OTHERWISE AGREE, ANY ARBITRATION SHALL BE CONDUCTED IN THE COUNTY SEAT OF THE COUNTY IN WHICH CUSTOMER'S BILLING ADDRESS IS LOCATED. ALL ADMINISTRATIVE COSTS AND FEES OF ARBITRATION SHALL BE BORNE EQUALLY BY CUSTOMER AND SPRINT, EXCEPT IF THE CLAIM IS LESS THAN $1000, CUSTOMER WILL BE OBLIGATED TO PAY ONLY $25. FOR CLAIMS OVER $1,000 BUT UNDER $75,000, CUSTOMER WILL BE REQUIRED TO PAY ITS SHARE OF ARBITRATION FEES, BUT NO MORE THAN THE EQUIVALENT COURT FILING FEE FOR A COURT ACTION FILED IN THE JURISDICTION WHERE CUSTOMER'S BILLING ADDRESS IS LOCATED. CUSTOMER AND SPRINT SHALL EACH BEAR THE EXPENSES OF THEIR OWN COUNSEL, EXPERTS, WITNESSES AND THE PREPARATION AND PRESENTATION OF EVIDENCE IN CONNECTION WITH ANY ARBITRATION. Waiver of Jury Trial and Class Actions - BY ENTERING INTO THIS AGREEMENT, CUSTOMER AND SPRINT ACKNOWLEDGE AND AGREE TO WAIVE CERTAIN RIGHTS TO LITIGATE DISPUTES IN COURT, TO RECEIVE A JURY TRIAL OR TO PARTICIPATE AS A PLAINTIFF OR AS A CLASS MEMBER IN ANY CLAIM ON A CLASS OR CONSOLIDATED BASIS OR IN A REPRESENTATIVE CAPACITY. CUSTOMER AND SPRINT BOTH AGREE THAT ANY ARBITRATION WILL BE CONDUCTED ON AN INDIVIDUAL AND NOT ON A CONSOLIDATED, CLASS-WIDE OR REPRESENTATIVE BASIS AND THAT IF ARBITRATION IS NOT CONDUCTED ON AN INDIVIDUAL BASIS, THIS SECTION 16 SHALL BE DEEMED NULL AND VOID. THE ARBITRATOR MAY AWARD INJUNCTIVE RELIEF ONLY IN FAVOR OF THE INDIVIDUAL PARTY SEEKING RELIEF AND ONLY TO THE EXTENT NECESSARY TO PROVIDE RELIEF WARRANTED BY THAT PARTY'S INDIVIDUAL CLAIM. IF FOR ANY REASON THE ARBITRATION CLAUSE SET FORTH IN THIS AGREEMENT IS DEEMED INAPPLICABLE OR INVALID, OR TO THE EXTENT THE ARBITRATION CLAUSE ALLOWS FOR LITIGATION OF DISPUTES IN COURT, CUSTOMER AND SPRINT BOTH WAIVE, TO THE FULLEST EXTENT ALLOWED BY LAW, ANY RIGHT TO PURSUE OR PARTICIPATE AS A PLAINTIFF OR AS A CLASS MEMBER IN ANY CLAIM ON A CLASS OR CONSOLIDATED BASIS OR IN A REPRESENTATIVE CAPACITY.

**17. MISCELLANEOUS - Assignment -** Customer may not assign all or any part of this Agreement (including any of its rights and duties under the Agreement) or sell or lease the Service to others without Sprint's prior written consent. Sprint may assign all or any part of this Agreement to any successor or any other entity capable of performing Sprint's obligations under this Agreement without obtaining Customer's consent or providing notice to Customer. Sprint shall be released from all liability upon assignment of this Agreement. Customer shall continue to be bound by the terms of this Agreement following assignment. Sprint Associates - Sprint's subsidiaries, affiliates and certain third party service providers (the "Sprint Associates") may provide wireless communication services in support of Sprint from time to time. All rights and protections afforded to Sprint by this Agreement are also afforded to the Sprint Associates. Notice - Notice to Customer shall be considered delivered

if sent by U.S. Mail addressed to the most current address on file for Customer (effective three (3) days following deposit in U.S. Mail) or by electronic means such as email or text messaging (effective immediately upon transmission). Written notice to Sprint must be sufficient to identify Customer and the Service and shall be considered delivered when directed to Sprint's Customer Service department and received by Sprint. Oral and electronic notice to Sprint shall be considered delivered on the date reflected in Sprint's records. To ensure receipt of notice, Customer shall notify Sprint of any changes in Customer's email or mailing address. Limitation on Third Party Beneficiaries - This Agreement is not for the benefit of any third party other than the Sprint Associates. Governing Law - The laws of the state associated with the area code assigned to Customer's Number will govern this Agreement, without regard to the conflict of laws rules of that state. This Agreement is also subject to applicable federal laws and federal or state regulations or tariffs Entire Agreement - This Agreement and the documents to which it refers (e.g., return policy, Plan Information and Payment Forms, to the extent such documentation may be applicable), form the entire Agreement between Customer and Sprint. There are no oral or written agreements between Customer and Sprint for Equipment or Service relating to the Nextel National Network other than as set forth in this Agreement. If Customer is a business, Sprint shall not be bound by the terms and conditions included in Customer's purchase orders or elsewhere, unless expressly agreed to in writing by a duly authorized officer of Sprint. If any provision of this Agreement is found to be illegal or otherwise invalid, the remainder of this Agreement will remain enforceable. If, at any time, Sprint fails to enforce any right or remedy under this Agreement (including, but not limited to, a waiver of Sprint's right to written notice under the Agreement), Sprint shall retain the right to enforce such right or remedy at a later time.